**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FuturHealth, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-_____ (___) |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO 11 U.S.C. §§ 105, 364(c), AND 364(d); (III) AUTHORIZING USE OF CASH COLLATERAL AND THE PAYMENT OF CERTAIN RELATED FEES AND CHARGES; (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER; (V) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (VI) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

The above-captioned debtor and debtor in possession (the "Debtor"), by and through its undersigned counsel, hereby moves the Court (the "Motion") pursuant to sections 105(a), 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 4002, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 2002-1, 4001-2, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of interim and final orders authorizing the Debtor to enter into a senior secured credit facility (the "DIP Financing") in an aggregate amount not to exceed $5 million (the "DIP Commitment"). The DIP Commitment will be made available (i) in an aggregate cash principal amount of $1.5 million upon the entry of an interim order approving the DIP Financing (the "Interim DIP Order"), substantially in the form attached hereto as **Exhibit A**, and (ii) on a final basis up to the full amount of the DIP Commitment

[1] The Debtor's mailing address is 325 W Washington Street Suite 2944 San Diego, CA 92103-1946, and the last four digits of the Debtor's federal tax identification number are 1229.

upon the entry of a final order approving the DIP Financing (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"), contingent upon the Debtor's receipt and continued effectiveness of a Qualified Stalking Horse APA (as defined in the DIP Term Sheet) and satisfaction or written waiver of the other applicable funding conditions. The DIP Financing is being provided substantially on the terms set forth in the *Superpriority Senior Secured DIP Financing Term Sheet* dated October 14, 2026 between the Debtor and Twelve Bridge Capital, LLC (the "DIP Lender"), annexed to the proposed Interim DIP Order as Exhibit 1 (as amended, the "DIP Term Sheet,"[2] and together with the DIP Orders and any ancillary, collateral, or related documents and agreements, the "DIP Documents").[3] Through the Motion, the Debtor also seeks an order (i) authorizing use of cash collateral and payment of certain related fees and charges, (ii) providing adequate protection to the prepetition secured party, iHeartMedia + Entertainment, Inc. ("iHeartMedia"), (iii) modifying the automatic stay to the extent applicable, (iv) granting related relief, and (v) scheduling a final hearing. In support of the Motion, the Debtor submits the *Declaration of Richard Klein in Support of Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims Pursuant to 11 U.S.C. §§ 105, 364(c), and 364(d); (III) Authorizing Use of Cash Collateral and the Payment of Certain Related Fees and Charges; (IV) Granting Adequate Protection to the Prepetition Lender; (V) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (VI) Scheduling a Final Hearing Pursuant*

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Term Sheet.

[3] Following additional negotiations with the DIP Lender, the parties agreed to an amendment of the Term Sheet on October 30, 2026, which provided for a more favorable set of fees if the Debtor acquires an acceptable binding stalking horse bid within the first twenty-one (21) days following the Petition Date.

*to Bankruptcy Rule 4001* (the "DIP Declaration"), filed contemporaneously herewith, and respectfully states as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this case is proper in this district under 28 U.S.C. §§ 1408 and 1409.

2. Pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final judgment or order with respect to this Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3. The statutory predicates for the relief sought herein are sections 105(a), 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, and the procedural predicates are Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1, 4001-2, and 9013-1.

## BACKGROUND

### A. The Debtor's Chapter 11 Case

4. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is operating its business and managing its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made, and no official committees have been appointed, in this Chapter 11 Case

5. FuturHealth is a direct-to-consumer wellness platform focused primarily on weight-management and wellness solutions. Through its digital platform, the Debtor facilitates

access to prescription medications, including glucagon-like peptide-1 medications commonly referred to as "GLP-1 Medications," as part of broader wellness programs that incorporate medical support, nutrition planning, exercise resources, and other tools designed to support customers throughout their weight-loss journeys.

6. Additional information about the Debtor, including its business operations, corporate and capital structure, and the events leading to the filing of this case is detailed in the *Declaration of Jon Hambidge in Support of FuturHealth, Inc.'s Chapter 11 Petition and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

**B. Overview of the Debtor's Business**

7. The Debtor's business is designed to simplify what can otherwise be a fragmented patient experience. Through relationships with medical service organizations, pharmacies, and other third-party service providers, the Debtor provides customers with access to a coordinated digital experience that may include medical consultations, prescription fulfillment and delivery, nutrition guidance, fitness content, progress tracking, and ongoing customer support. Customer payments are processed principally through third-party merchant processors.

8. The Debtor's services are delivered principally through a proprietary technology and operating platform known as "Whole Health OS." Whole Health OS integrates with medical, pharmacy, and wellness-service providers and supports the Debtor's services through mobile and web-based applications, text messaging, email, and other digital channels. The platform uses dynamic content, data, and artificial-intelligence-enabled tools to guide users through individualized wellness journeys, including by directing patient information to an appropriate

medical-service organization or treatment pathway and delivering personalized nutrition, fitness, and educational content throughout a user's program.

9. Since its inception, the Debtor made substantial investment in Whole Health OS and the operating infrastructure that supports it. Among other things, this infrastructure connects the Debtor's customer-acquisition capabilities, digital-user experience, medical-service relationships, pharmacy supply chain, customer support, payment processing, data, and wellness content into an integrated platform. The Whole Health OS platform is one of the Debtor's most valuable assets. Among other assets, the Debtor owns a federally registered FUTURHEALTH trademark covering downloadable software and meal-planning services and has additional trademark applications relating to its stylized "F" logo and related health, diet, and weight-management services.

10. The Debtor's business model is substantially dependent upon recurring customer relationships. Marketing expenditures are used to acquire new customers, while customer renewals and additional product offerings are intended to generate revenue over the duration of the customer relationship. Accordingly, the Debtor's ability to invest in customer acquisition, retain existing customers, and maintain uninterrupted access to its technology and supply-chain partners has a direct effect on its revenue.

11. The Debtor markets its programs primarily through digital and social-media channels. Its programs vary based on the duration selected by a customer, the services included, and, where prescribed by an independent medical professional, the medication selected. The Debtor's revenues include both initial customer purchases and recurring subscription or renewal revenue.

12. The Debtor has achieved significant scale in a relatively short period. In 2024, its first full year of operations, FuturHealth grew rapidly and generated $86.6 million in GAAP revenue. Although the Company recorded an operating loss of $10.7 million for the year, it was cash-flow positive and generated $1.2 million in cash during 2024. Since its formation in 2023, the Debtor has facilitated more than one million prescriptions and served more than 500,000 subscribers.

13. The Debtor's remaining workforce is lean following prepetition cost-reduction measures. The Debtor's employees, independent contractors, and staffing-agency personnel perform essential functions across the business, including engineering, quality assurance, customer experience, medical operations, marketing, finance, and administration, with limited redundancy in several areas. The Debtor operates through a remote workforce located across multiple states and does not depend upon any centralized office location for its day-to-day operations. Although the Debtor maintains a lease for office space in San Diego, California, that location is not currently utilized for ongoing business operations, and the Debtor presently anticipates rejecting the lease during this Chapter 11 Case. The loss of additional employees or other key workforce personnel could therefore disrupt customer-facing operations, impair the Debtor's ability to maintain Whole Health OS and its integrations, and jeopardize the continuity of services provided to customers.

**C. <u>The Debtor's Prepetition Capital Structure</u>**

14. As of the Petition Date, the Debtor estimates approximately $28 million in liabilities which includes secured indebtedness arising from the iHeartMedia transaction, unsecured merchant cash advance financing obligations, unsecured prepetition notes, aged accounts payable, and other liabilities incurred in the ordinary course of business. As of the Petition Date, the Debtor's estimated liabilities include:

- Secured debt owed to iHeartMedia: approximately $7.5 million

- Unsecured merchant cash advance obligations: approximately $1 million.
- Unsecured prepetition notes and related financing obligations: approximately $1.7 million.
- Unsecured trade debt: approximately $10 million.

15. During the first quarter of 2025, the Debtor entered into an approximately $13.5 million advertising agreement with iHeartMedia. At the end of 2025, iHeartMedia agreed to convert the remaining payable balance under that arrangement into an approximately $9.1 million secured debt facility (the "Prepetition Facility"). The obligations under the Prepetition Facility are secured by the Debtor's now-owned and after-acquired accounts receivable and all proceeds thereof (collectively, the "iHeart Collateral"). iHeartMedia's security interest in the iHeart Collateral is perfected by UCC financing statements. As of the Petition Date, approximately $7.5 million in principal, interest, fees, and other obligations remained outstanding under the Prepetition Facility.

16. During 2026, after the Debtor was unable to obtain conventional equity or debt financing, the Debtor obtained approximately $1.8 million in aggregate net proceeds through a series of merchant cash agreements (the "Merchant Cash Agreements") with Cedar Advance LLC and Velocity Capital Group LLC (the "MCA Parties"). The Merchant Cash Agreements provided for the purchase of specified percentages of the Debtor's future receipts and required substantial weekly remittances based on the Debtor's revenue. Although the Merchant Cash Agreements provided needed liquidity, the resulting payment obligations further strained the Debtor's cash resources. The Merchant Cash Agreements purport to effect sales of future receipts rather than loans and provide the counterparties with security interests in the Debtor's receivables and certain other assets. Accordingly, as of October 31, 2026, approximately $1 million in aggregate obligations remained outstanding under the Merchant Cash Agreements.

17. In March and April 2026, the Debtor entered into two note and warrant purchase agreements (the "Prepetition Note Purchase Agreements") to obtain additional liquidity to fund operations while pursuing a resolution of the Goglia Litigation. Under the first Pre-Petition Note Purchase Agreement, the Debtor was authorized to issue up to $1.5 million in promissory notes bearing interest at 18% per annum and maturing 180 days after the first closing, together with warrants to purchase up to an aggregate of 427,866 shares of the Debtor's common stock at an exercise price of $6.35 per share. The Debtor ended up issuing only $1.3 million in promissory notes under the first Prepetition Note Purchase Agreement. Certain of the purchasers included then-current officers and directors of the Debtor, or their affiliates, and the financing was approved by the Debtor's disinterested director and disinterested stockholders after disclosure of those relationships. The second Prepetition Note Purchase Agreement was with InterAlpen Partners, LLC, an affiliate of a holder of the Debtor's preferred stock. Under this financing, the Debtor issued a $300,000 promissory note requiring fourteen weekly payments totaling approximately $360,000, together with a seven-year warrant to purchase 142,622 shares of common stock at an exercise price of $6.35 per share. As of the Petition Date, approximately $1.6 million in principal, accrued interest, and other obligations remains outstanding under the Prepetition Note Purchase Agreements (collectively, the "Prepetition Note Obligations"). The Debtor also incurred debt owed to Attivo Partners LLC in connection with consulting, finance, accounting, and administrative services provided to the Debtor (the "Attivo Note"). As of October 31, 2026, approximately $174,000, consisting of principal and accrued interest, remained outstanding under the Attivo Note.

18. The Debtor's unsecured liabilities consist primarily of aged accounts payable and other trade and operating obligations. Declining revenue and the Debtor's substantial scheduled

debt payments caused the Debtor to fall behind on amounts owed to vendors and other service providers. As of the Petition Date, the Debtor estimates that its general unsecured claims total approximately $10 million.

## D. The Debtor's Need for DIP Financing

19. Without the financing proposed in the DIP Term Sheet, the Debtor would have insufficient funds to preserve its business operations and assets and would be forced to liquidate. The Debtor's ability to seamlessly transition into chapter 11 and continue operating depends on immediate access to the DIP Financing. Access to sufficient working capital to fund operations during this Chapter 11 Case is vital for preserving the value of the Debtor's assets and business operations while the Debtor runs a robust marketing and sale process. Failure to obtain the relief requested in this Motion will immediately and irreparably harm the Debtor, its estate, and creditors.

20. The DIP Financing is being offered by the DIP Lender to fund the Debtor's Chapter 11 Case to implement a value-maximizing transaction through either (a) a sale of all or substantially all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code (the "363 Sale") or (b) the acquisition of new capital to permit a reorganization (the "Reorganization"). Given the unsuccessful prepetition search for alternatives, the Debtor does not believe it will be able to obtain financing on terms more favorable than those offered by the DIP Lender under the DIP Financing (either unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit under section 364(c) of the Bankruptcy Code). DIP Declaration ¶ 11. Indeed, even with respect to the DIP Lender, the DIP Financing is available only with the Debtor's agreement to grant the DIP Lender (a) the DIP Liens and DIP Claims, subject to the Carve-Out and other express limitations in the DIP Orders (each defined below), and (b) the other protections in the DIP Orders. *Id.* at ¶¶ 20-21.

21. As a condition to extending credit under the DIP Financing, the DIP Lender and the Debtor have agreed that proceeds of any advance under the DIP Financing and the Debtor's cash collateral will be used exclusively in a manner consistent with the agreed upon Approved Budget that may only be modified with the DIP Lender's written consent. No portion of the proceeds of any advance under the DIP Financing or any cash collateral will be used, directly or indirectly, to make any payment or prepayment that is prohibited under the DIP Term Sheet. A copy of the Approved Budget is attached to the proposed Interim Order as Exhibit 2.

22. Although iHeartMedia, as the Debtor's only consenting prepetition secured lender, has declined to extend additional financing to the Debtor, it has agreed to be primed by and subordinate its security interest to those of the DIP Lender under the DIP Financing subject to the receipt of adequate protection as set forth herein.

23. Without funding, the Debtor's business cannot function, and the Debtor faces the prospect of, among other things, failing to make upcoming payroll obligations. The Debtor needs to fund these obligations right away or face the prospect of immediate liquidation, and there is no option outside of the proposed DIP Financing that can provide this funding fast enough.

**E. The DIP Financing Will Support the Administration of the Chapter 11 Case.**

24. In addition to preventing the shuttering of the Debtor's business, the DIP Financing will support the administration of the Debtor's Chapter 11 Case by, among other things, facilitating the Debtor's efforts to retain its employees. It is imperative that the Debtor maintain its employee base to ensure the smooth operation of the business through the closing of any 363 Sale or any successful Reorganization. Moreover, the DIP Financing will provide liquidity to address operating needs during the reorganization and marketing process and the Chapter 11 Case, and by extension the estate and the Debtor's creditors.

## F. The Proposed DIP Financing

25. The Debtor proposes to enter into the DIP Financing to fund obligations that would normally be satisfied through Debtor's ordinary course operations and to fund this Chapter 11 Case. The DIP Financing will provide the Debtor with up to $5,000,000 in cash principal, with only $1,500,000 available on an interim basis and further availability subject to the Final DIP Order, an effective Qualified Stalking Horse APA and the other funding conditions, to fund the necessary obligations of the Debtor. Without such funding, the Debtor would be forced to shut down its operations, which would also harm the Debtor's estate and its creditors through the loss of a business partner and its related negative effects on revenue. Moreover, the DIP Financing supports the Debtor's robust sale process and the Chapter 11 Case in general.

26. Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the principal terms of the DIP Term Sheet are as follows:[4]

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| **Borrowers:**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(J)* | FuturHealth, Inc. as debtor and debtor in possession.<br><br>*See* DIP Term Sheet p. 1. |
| **DIP Lender:**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Twelve Bridge Capital, LLC, together with its successors and permitted assigns.<br><br>*See* DIP Term Sheet p. 1. |
| **DIP Facility:**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rules 4001-2(a)(ii) and 4001-2(a)(i)(B)* | The DIP Lender agrees to make a new-money, senior secured, superpriority priming, delayed-draw term loan facility (the "DIP Facility," the loans thereunder, the "DIP Term Loans," and all obligations thereunder, the "DIP Obligations") in an aggregate committed cash principal amount of up to $5,000,000 (the "DIP Commitment").<br><br>Each draw after the initial $1,500,000 draw shall be limited to the budgeted amount requested by the Debtor and reasonably required under the Approved Budget and shall remain subject to the applicable Conditions Precedent. Subject to satisfaction or written waiver of the applicable Conditions Precedent, the DIP Lender shall fund each properly submitted draw request within two (2) Business Days after receipt thereof. |

[4] To the extent this summary or the DIP Term Sheet conflicts with the proposed Interim DIP Order, the Interim DIP Order controls. The specific staged fee provisions govern over inconsistent general descriptions of interim or final approval in the DIP Term Sheet.

| Bankruptcy Code / Rule | Summary of Material Terms |
| --- | --- |
| | *See* DIP Term Sheet p. 1. |
| **Borrowing Limits:**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A)* | Subject to limitations on borrowing under the DIP Term Sheet, the Debtor may draw up to $1.5 million upon entry of the Interim DIP Order and up to $5 million in the aggregate upon entry of the Final DIP Order and the execution and continued effectiveness of a Qualified Stalking Horse APA, subject to the other applicable funding conditions. Capitalized fees, PIK interest and other DIP Obligations are additional to, and do not reduce, these cash borrowing limits; capitalization does not authorize additional cash advances.<br><br>Amounts repaid or prepaid may not be reborrowed, and each funding permanently reduces the remaining DIP Commitment by the amount funded.<br><br>*See* Interim DIP Order ¶¶ 7-8; DIP Term Sheet pp. 1-2. |
| **Budget:**<br>*Bankruptcy Rule 4001(c)(1)(B)* | DIP proceeds and authorized Cash Collateral may be used solely under the Approved Budget and DIP Orders for necessary working capital and ordinary-course operating expenses, DIP transaction expenses, allowed and budgeted estate professional expenses subject to the Carve-Out, authorized adequate-protection payments, and other uses expressly agreed in writing by the DIP Lender and approved by the Court.<br><br>The initial Approved Budget shall be acceptable to the DIP Lender and shall cover at least thirteen (13) weeks. The Debtor shall deliver an updated rolling thirteen-week budget and variance report weekly. The Debtor shall not permit aggregate cash disbursements for any testing period to exceed the aggregate disbursements set forth in the Approved Budget by more than 15% (the "<u>Permitted Variance</u>"), measured on a rolling four-week basis, unless otherwise agreed by the DIP Lender. Favorable variances may be carried forward within the testing period unless otherwise provided in the definitive DIP Documents. Any updated budget shall become an Approved Budget upon written approval of the DIP Lender. Testing begins after the first completed four-week period. The Permitted Variance does not increase any Carve-Out allocation, post-trigger cap or other express dollar limit. Reserve deposits count as disbursements when made and are not counted again when paid to professionals; a budget update does not retroactively cure a breach absent written waiver.<br><br>*See* Interim DIP Order ¶¶ 24-25; DIP Term Sheet pp. 2, 9. |
| **Interest Rate:**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B)* | <u>Interest Rate:</u> 14.0% per annum, calculated on the basis of a 360-day year and payable in kind ("<u>PIK</u>") monthly in arrears by capitalizing accrued interest and adding it to outstanding principal. Capitalized PIK interest shall thereafter constitute principal for all purposes and itself bear interest.<br><br><u>Default Rate:</u> During a continuing Event of Default, all DIP Obligations automatically bear an additional 3.0% per annum (the "<u>Default Rate</u>"), payable in kind or in cash at the DIP Lender's election and due on demand or the DIP Termination Date.<br><br>*See* Interim DIP Order ¶ 11; DIP Term Sheet pp. 2-3 |

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| **Expenses and Fees:**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rules 4001-2(a)(i)(B); 4001-2(a)(i)(K)* | Commitment Fee: A fee equal to $250,000 (the "Interim Commitment Fee"), fully earned, non-refundable and irrevocable upon entry of the Interim DIP Order, and an additional $250,000 fully earned, non-refundable and irrevocable upon entry of the Final DIP Order (the "Final Commitment Fee," and together with the Interim Commitment Fee, the "Commitment Fee"), whether or not the entire DIP Commitment is ultimately funded, provided however that if the Debtor obtains replacement financing from a different lender between the entry of the Interim DIP Order and the entry of the Final DIP Order, the full Commitment Fee shall be fully earned, non-refundable and irrevocable. The Interim Commitment Fee shall be capitalized and added to the DIP Obligations upon entry of the Interim DIP Order, and the Final Commitment Fee shall be capitalized and added to the DIP Obligations upon entry of the Final DIP Order. If the replacement-financing trigger occurs, the unpaid $250,000 balance is added to DIP Obligations and paid in the replacement-financing payoff; absent that trigger or entry of the Final DIP Order, the Final Commitment Fee is not accelerated. In the event the Debtor obtains a Qualified Stalking Horse APA prior to the commencement of the Chapter 11 Case, the Commitment Fee shall be reduced to $350,000, with $175,000 due upon entry of the Interim DIP Order and the remaining $175,000 due upon entry of the Final DIP Order. As provided in the proposed Interim DIP Order, no Qualified Stalking Horse APA was executed before the Petition Date, so the reduced pricing does not apply. Pursuant to the amendment to the DIP Term Sheet, if the Debtor obtains a Qualified Stalking Horse APA in the first twenty-one (21) days of the Chapter 11 Case, the Final Commitment Fee will be reduced to $150,000.<br><br>Funding Fee: A fee equal to 5.0% of the principal amount of each DIP Term Loan funded (each, a "Funding Fee"), fully earned and non-refundable when the applicable draw is funded. Each Funding Fee shall be capitalized and added to the DIP Obligations at the time of the applicable draw. The Funding Fee applicable to each draw, whenever funded, shall be approved on a final basis upon entry of the Interim DIP Order. In the event the Debtor obtains a Qualified Stalking Horse APA prior to the commencement of the Chapter 11 Case, the Funding Fee shall be reduced to 2.5%. The reduced pricing is inapplicable as stated above. The Funding Fee is calculated solely on cash principal actually advanced; the Interim Draw carries a $75,000 Funding Fee. Pursuant to the amendment to the DIP Term Sheet, if the Debtor obtains a Qualified Stalking Horse APA in the first twenty-one (21) days of the Chapter 11 Case, the Funding Fee for each draw after the Interim Draw will be reduced to 4% of the principal amount funded in each draw.<br><br>Exit Fee: A fee equal to 7.0% of the aggregate principal amount of DIP Term Loans outstanding plus capitalized PIK interest immediately before the applicable repayment, refinancing, satisfaction, sale closing, plan effective date, acceleration or other exit from the DIP Facility (the "Exit Fee"), fully earned and payable in cash at such time. The Exit Fee shall be determined by reference to principal amounts actually outstanding, including interest, not the DIP Commitment. Any partial voluntary or mandatory prepayment shall trigger payment of the Exit Fee on the amount of principal then repaid (including capitalized PIK interest), without duplication on subsequent payments. The Exit Fee shall be approved upon entry of the Interim DIP Order subject to final approval upon entry of a Final DIP Order, notwithstanding that it is payable only upon the applicable repayment or other exit from the DIP Facility. In the event the Debtor obtains a Qualified Stalking Horse APA prior to the commencement of the Chapter 11 Case, the Exit Fee shall be reduced to 2.5%. The reduced pricing is inapplicable as stated above. The Exit Fee base excludes Commitment Fees, Funding Fees, professional fees and expenses, and the Exit Fee |

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| | itself. Any request for final Exit Fee approval before the Final DIP Order, including in a replacement financing, requires notice and an opportunity to be heard.<br><br>Work Fee: $50,000 (the "Work Fee") payable upon execution of the DIP Term Sheet are deemed fully earned and nonrefundable upon receipt, subject only to a $25,000 credit against the Exit Fee. The Work Fee does not reduce the separate obligation to pay DIP Lender Professional Fees. *See* Interim DIP Order ¶ 14.<br><br>All Commitment Fees, Funding Fees, Exit Fees and any other fees approved by the Bankruptcy Court (collectively, the "Fees") shall constitute DIP Obligations, shall be secured by the DIP Liens, shall be entitled to the DIP Claims, and, except for the express Work Fee credit and matters reserved for final determination, approved and earned Fees shall not be subject to reduction, setoff, recoupment, recharacterization, avoidance or disgorgement.<br><br>Expenses: The Debtor shall pay reasonable, documented out-of-pocket DIP Lender Professional Fees, whether incurred before or after the Petition Date, including fees and expenses of Fishel Law Group, Morris James and a designated financial advisor. Invoices or summaries shall be emailed to the Debtor, its counsel, the U.S. Trustee, and Committee counsel, if any, and may redact privileged or protected information, provided sufficient summary detail is supplied for meaningful review without requiring detailed time entries or waiving privilege. Recipients have ten (10) Business Days to object in writing to specific items. Undisputed amounts shall then be paid promptly; timely disputed amounts await agreement or Court determination. Accrued unpaid fees through closing are payable from the Interim Draw only after this procedure is satisfied. DIP Lender Professional Fees are outside, and not limited by, the Carve-Out. The same review procedure applies to budgeted iHeartMedia professional fees, with invoices also provided to DIP Lender counsel.<br><br>*See* Interim DIP Order ¶¶ 12-14, 45; DIP Term Sheet pp. 3-4, 11. |
| **Maturity Date:**<br>*Bankruptcy Rules 4001(b)(l)(B)(iii) and 4001(c)(1)(B)* | All DIP Obligations shall be due and payable in full in cash on the earliest of (each, a "Termination Event," and the earliest thereof, the "Maturity Date"):<br><br>i. 120 days after the Petition Date;<br>ii. the closing of any sale or other disposition of all or substantially all of the Debtor's assets or business;<br>iii. the effective date of any chapter 11 plan;<br>iv. conversion of the Chapter 11 Case to chapter 7;<br>v. dismissal of the Chapter 11 Case;<br>vi. appointment of a chapter 11 trustee or examiner with enlarged powers;<br>vii. consummation of any financing, recapitalization or other transaction that refinances or replaces the DIP Facility; or<br>viii. acceleration following an Event of Default.<br><br>*See* Interim DIP Order, ¶ 41; DIP Term Sheet p. 2. |
| **Prepayment:**<br>*Local Rule 4001-2(a)(i)(I)* | Optional Prepayment: Voluntary prepayments shall be permitted only upon at least three (3) Business Days' prior written notice to the DIP Lender, in minimum principal |

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| | amounts of $50,000, together with all accrued PIK interest, the Exit Fee and all other amounts then due. Amounts prepaid may not be reborrowed.<br><br><u>Mandatory Prepayment:</u> Unless waived in writing by the DIP Lender, the Debtor shall immediately apply 100% of the following proceeds to the DIP Obligations until indefeasibly paid in full in cash:<br><br>i. net cash proceeds of any sale, lease, assignment, transfer or other disposition of assets outside the ordinary course, including all proceeds of the Sale Process;<br>ii. net proceeds of any insurance recovery, condemnation award, litigation recovery, tax refund or other extraordinary receipt, except to the extent specifically budgeted for reinvestment with the prior written consent of the DIP Lender;<br>iii. proceeds of any financing, refinancing, recapitalization, equity issuance or similar transaction; and<br>iv. such other proceeds as may be agreed in the definitive DIP Documents.<br><br>Subject to the Carve-Out, Permitted Prior Liens, excluded property and express iHeartMedia sharing provisions in the Interim DIP Order, the first dollars of Sale Proceeds shall be paid by the purchaser or closing agent to the Detor at closing and promptly remitted by the Debtor to the DIP Lender until the DIP Obligations are indefeasibly paid in full cash. The Debtor shall provide a proposed payoff and funds flow reasonably before closing. No reserve, escrow, netting, allocation or distribution may delay or reduce the payoff without written DIP Lender consent and required Court approval. No reference to "net" proceeds permits deduction of transaction costs ahead of the DIP Lender except as expressly authorized by the Interim DIP Order or further order on notice. Proceeds payable to the DIP Lender are applied first to professional fees and reimbursable expenses; second to Fees; third to accrued interest, including default interest; fourth to principal, including capitalized PIK interest and capitalized Fees; and fifth to other DIP Obligations, without double counting.<br><br>The first $50,000 of Sale Proceeds is shared equally between iHeartMedia and the DIP Lender as a single aggregate amount, with each payment reducing the recipient's debt. Solely to the extent a Sale Process transaction will pay all DIP obligations in full, the interest portion of the DIP Obligations ranks pari passu with obligations under the iHeart Loan; this does not subordinate DIP principal or Fees or excuse full cash repayment. Subject to section 363(k), the DIP Lender may credit bid authorized DIP Obligations and assign those rights as permitted in the Interim DIP Order. iHeartMedia may credit bid its allowed secured prepetition claim only in a transaction paying all DIP Obligations and DIP Lender Professional Fees in full in cash at closing. The Court's authority under section 363(k) and Court-approved bidding procedures are preserved.<br><br>*See* Interim DIP Order, ¶ 37-40; DIP Term Sheet p. 4 |
| **Collateral and Priority**<br>*Bankruptcy Rules 4001(c)(1)(B)(i) and 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(i)(G)* | <u>First Priority Security Interest:</u> Pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Lender shall receive continuing, valid, binding, enforceable, non-avoidable and automatically perfected liens and security interests with the priorities and limitations stated below (the "<u>DIP Liens</u>") on all prepetition and postpetition property of the Debtor, whether now owned or hereafter acquired, and all proceeds thereof (collectively, the "<u>DIP Collateral</u>"), including cash, deposit accounts, accounts receivable, inventory, equipment, intellectual property, equity interests, insurance proceeds, commercial tort claims, litigation claims and |

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| | proceeds, and, subject to express approval in the Final DIP Order, proceeds of avoidance actions.<br><br>Subject to the Carve-Out and express limitations in the Interim DIP Order, the DIP Liens are first-priority liens on unencumbered DIP Collateral and prime iHeartMedia's liens and all liens and security interests asserted by the MCA Parties. Except for the Carve-Out and express iHeartMedia sharing provisions, DIP Liens are senior to other liens and claims, including adequate-protection liens.<br><br>Merchant Cash Advance and Receivables Interests. The DIP Liens prime all liens and security interests asserted by Cedar Advance LLC and Velocity Capital Group LLC in DIP Collateral, without acknowledging validity, perfection or enforceability or waiving challenges. The Debtor's assertions concerning nonperfection or avoidability are not adjudicated by the Interim DIP Order. Asserted true-sale and ownership rights remain reserved for Court determination; an interest determined to be a lien is subordinate to the DIP Liens. No adequate protection or postpetition payment to an MCA Party is authorized.<br><br>The Debtor shall cause postpetition merchant-processor settlements and other receivables proceeds to be remitted to accounts subject to the DIP Liens and shall not permit any prepetition MCA Party to divert or receive postpetition receipts except as expressly authorized by the Bankruptcy Court. Unless agreed by the DIP Lender, the entry of an order authorizing any MCA Party to divert or receive postpetition receipts shall be an event of default.<br><br>The DIP Obligations shall constitute allowed superpriority administrative expense claims under section 364(c)(1) (the "<u>DIP Claims</u>") with priority over all other administrative expenses and unsecured claims, subject only to the Carve-Out. The express iHeartMedia sharing provisions remain preserved. Allowance of DIP Claims does not finally approve the Exit Fee or other deferred relief.<br><br>The DIP Liens shall be effective and automatically perfected upon entry of the Interim DIP Order without further action, filing or recording, and the Debtor shall execute any additional perfection documents reasonably requested by the DIP Lender.<br><br>*See* Interim DIP Order, ¶¶ 16, 18, 19, 20; DIP Term Sheet pp. 5-6. |
| **Carve Out**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F)* | The "<u>Carve-Out</u>" shall mean, collectively, and subject to the definitive DIP Orders: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus statutory interest, if any; (b) fees and expenses of a chapter 7 trustee payable under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; and (c) to the extent allowed by the Bankruptcy Court, accrued and unpaid fees and expenses of professionals retained by the Debtor and any statutory committee that are (i) incurred on or before delivery of a Carve-Out Trigger Notice, but only to the extent such fees and expenses are within the amounts allocated to the applicable professionals in the Approved Budget through the applicable period, and (ii) incurred after delivery of a Carve-Out Trigger Notice, subject to an aggregate post-trigger cap of $100,000.<br><br>Debtor shall be permitted to establish a professional fee reserve (the "<u>Professional Fee Reserve</u>") to ensure payment of professional fees. Amounts funded into the Professional Fee Reserve shall be considered used by the Debtor at such time as they are deposited into the Professional Fee Reserve for distribution to professionals in accordance with orders of the Bankruptcy Court. Any Professional Fee Reserve shall |

| Bankruptcy Code / Rule | Summary of Material Terms |
| --- | --- |
| | be limited to amounts provided for in the Approved Budget, shall not include unbudgeted or accelerated amounts, and any unused balance shall remain or become DIP Collateral.<br><br>"Carve-Out Trigger Notice" means written notice delivered by the DIP Lender following the occurrence and during the continuation of an Event of Default to the Debtor, the U.S. Trustee, and such other parties as may be required by the DIP Orders.<br><br>*See* Interim DIP Order ¶¶ 33-35; DIP Term Sheet pp. 10-11. |
| **Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The Debtor shall:<br><br>i. provide the DIP Lender and its professionals with drafts of material pleadings, motions, orders, sale documents, bid procedures, asset purchase agreements and other restructuring materials sufficiently in advance of filing to permit meaningful review and comment; Such drafts shall be provided at least two (2) Business Days before filing or execution unless the DIP Lender agrees in writing to a shorter period;<br>ii. promptly provide all bids, indications of interest, proposals and other material communications concerning any sale, restructuring or financing transaction unless and until DIP Lender elects to participate in the Sale Process as bidder or otherwise submits a Qualified Bid by any deadline set forth in the bid procedures order entered in the chapter 11 case;<br>iii. comply with the DIP Documents, DIP Orders, Milestones and Approved Budget; maintain cash-management and merchant-processing controls, insurance, permits, licenses and books and records; maintain the Whole Health OS platform and material medical, pharmacy, technology and service-provider relationships in the ordinary course; and pay postpetition taxes and other administrative obligations when due;<br>iv. following funding of the Interim Draw, maintain unrestricted cash on hand of not less than $100,000 at all times, unless otherwise agreed in writing by the DIP Lender;<br>v. not incur additional indebtedness or liens, or make material payments on prepetition debt, except as expressly permitted in the Approved Budget, authorized by the Bankruptcy Court and not opposed by the DIP Lender;<br>vi. not sell or dispose of material assets outside the ordinary course except pursuant to the Sale Process or with the prior written consent of the DIP Lender;<br>vii. not enter into or materially amend any sale, financing, settlement or other restructuring transaction in a manner materially adverse to the DIP Lender without its prior written consent; and<br>viii. take commercially reasonable actions to preserve collateral value and facilitate the Sale Process. The fiduciary-out and Alternate Proposal provisions of the DIP Term Sheet remain applicable: the Debtor must notify DIP Lender counsel within twenty-four hours of a fiduciary determination, and the DIP Lender retains its termination and challenge rights. Before the Final DIP Order, the Debtor and its representatives may consider, respond to and facilitate alternate financing proposals as permitted by those provisions. Exercise of expressly permitted rights is not itself an Event of Default.<br><br>*See* Interim DIP Order ¶¶ 27, 42; DIP Term Sheet pp. 9, 12-13. |

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| **Use of DIP Financing Facility and Cash Collateral**<br>*Bankruptcy Rule 4001(b)(l)(B)(ii)* | DIP proceeds and authorized Cash Collateral may be used solely under the Approved Budget and DIP Orders for necessary working capital and ordinary-course operating expenses, DIP transaction expenses, allowed and budgeted estate professional expenses subject to the Carve-Out, authorized adequate-protection payments, and other uses expressly agreed in writing by the DIP Lender and approved by the Court. Use of another nonconsenting holder's Cash Collateral requires consent or an express order after appropriate notice and consideration of adequate protection. No DIP proceeds, Cash Collateral or Carve-Out may fund challenges against the DIP Lender or DIP financing except an expressly agreed and Court-approved investigation budget. This restriction preserves review of final financing relief, authorized fee objections, enforcement of the Interim DIP Order, budgeted investigation of iHeartMedia and rights at a remedies hearing.<br><br>*See* Interim DIP Order, ¶¶ 22, 36; DIP Term Sheet p. 2. |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | Each of following shall constitute an "<u>Event of Default</u>":<br><br>i. failure to pay any DIP Obligation when due or comply with any mandatory-prepayment obligation;<br>ii. material failure to comply with any DIP Document, DIP Order, Milestone, Approved Budget or Permitted Variance, subject to any applicable cure period;<br>iii. occurrence of any Termination Event;<br>iv. reversal, vacatur, stay or material modification of a DIP Order or Sale Order in a manner adverse to the DIP Lender without its prior written consent;<br>v. entry or allowance of any lien or superpriority claim senior to or pari passu with the DIP Liens or DIP Claims other than the Carve-Out or other expressly agreed priority;<br>vi. incurrence or approval of additional financing that does not indefeasibly repay the DIP Obligations in full;<br>vii. cessation of the DIP Liens or DIP Claims to be valid, perfected, enforceable and senior as required;<br>viii. payment of any material prepetition claim except as expressly authorized by the Bankruptcy Court and included in the Approved Budget;<br>ix. after execution of a Qualified Stalking Horse APA and funding from the additional $3,500,000 final availability, termination or abandonment of such APA without a replacement transaction acceptable to the DIP Lender;<br>x. any material misrepresentation or breach of representation or warranty; or<br>xi. an entry of an MCA Party receipts order without the consent of the DIP Lender<br><br>*See* Interim DIP Order, ¶ 42; DIP Term Sheet pp. 5, 8-9. |
| **Rights and Remedies Upon Event of Default**<br><br>*Local Rule 4001-2(a)(i)(T)* | Upon the occurrence and during the continuance of an Event of Default, and subject only to the delivery of a notice of event of default to the Debtor by the DIP Lender (a "<u>Termination Notice</u>") and the passage of any notice period expressly required by the DIP Orders and the Carve-Out, the DIP Lender may, without further order of the Bankruptcy Court:<br><br>i. terminate all remaining DIP Commitments and any obligation to fund additional DIP Term Loans;<br>ii. declare all DIP Obligations immediately due and payable;<br>iii. terminate or restrict the Debtor's use of cash collateral; |

| Bankruptcy Code / Rule | Summary of Material Terms |
| --- | --- |
| | iv. sweep or apply cash and other proceeds of DIP Collateral to the DIP Obligations;<br>v. exercise rights and remedies against DIP Collateral, including foreclosure and other rights of a secured creditor; and<br>vi. seek such other relief as is authorized by the DIP Orders or applicable law.<br><br>Subject to the notice and hearing rights preserved in the Interim DIP Order, the Debtor shall waive any right to seek relief under section 105 or otherwise to restrict or impair the DIP Lender's exercise of the rights and remedies expressly provided in the DIP Documents and DIP Orders. The wavier does not deprive the Court of jurisdiction or restrict nondebtor parties' available arguments.<br><br>The DIP Lender shall email a Termination Notice identifying the default and intended remedies to the Debtor and its counsel, U.S. Trustee, Committee counsel and iHeartMedia's counsel and file it on the docket. Termination of Cash Collateral use, sweeps and collateral enforcement may not take effect until five (5) Business Days after delivery (the "Default Notice Period"). A timely emergency-hearing request by the Debtor or U.S. Trustee extends that period until the Court hears and rules; the Committee and other parties with standing may also seek relief, and the Court may extend the period. Necessary budgeted cash use to avoid immediate and irreparable harm, payroll and the Carve-Out continues during that period and extensions, subject to Court order. Commitment termination and acceleration are permitted upon notice; no further funding is required while conditions remain unsatisfied. Enforcement after the period remains subject to the Carve-Out, express priorities and the other limitations in the Interim DIP Order.<br><br>See Interim DIP Order ¶ 43-44; DIP Term Sheet pp. 6-7. |
| **Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(a)(i)(H)* | The DIP Facility is being underwritten on the basis of a prompt sale or other monetization process acceptable to the DIP Lender (the "Sale Process"). The Debtor shall comply with the milestones set forth in the Interim DIP Order (the "Milestones"), including:<br><br>i. entry of Interim DIP Order: within three (3) business days of the Petition Date;<br>ii. filing of motion seeking approval of bidding procedures and sale process, including the approval of stalking horse protections: within seven (7) days of the Petition Date;<br>iii. entry of Final DIP Order and bidding-procedures order: within thirty (30) days of the Petition Date;<br>iv. execution and continued effectiveness of a Qualified Stalking Horse APA before any funding from the additional $3,500,000 of final availability;<br>v. bid deadline, auction (if required), Sale Hearing and closing on dates to be agreed in the definitive DIP Documents, with the objective of consummating a Sale Transaction within approximately one hundred and twenty (120) days of the Petition Date, without extending the Maturity Date; and<br>vi. such other reasonable process milestones as the parties may agree following completion of diligence.<br><br>Each Milestone may be extended or waived by prior written consent of the DIP Lender. Failure to timely achieve a Milestone shall constitute an Event of Default only after expiration of any applicable cure period set forth in the definitive DIP Documents or as otherwise waived by the DIP Lender. No additional blanket cure |

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| | period is created, and no Milestone overrides required notice or directs the Court to enter an order.<br><br>*See* Interim DIP Order ¶ 29; DIP Term Sheet p. 8. |
| **Conditions to Closing**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | Each extension of credit is subject to satisfaction or written waiver by the DIP Lender of customary conditions, including:<br><br>i. entry and continued effectiveness of the applicable DIP Order authorizing the requested funding and the DIP Documents;<br>ii. valid, perfected and enforceable DIP Liens and DIP Claims with the priority contemplated herein;<br>iii. an Approved Budget and updated liquidity forecast acceptable to the DIP Lender;<br>iv. receipt of required corporate approvals, borrowing notices and customary closing deliverables;<br>v. accuracy in all material respects of representations and warranties;<br>vi. no Event of Default or Termination Event has occurred and is continuing or would result from the funding;<br>vii. payment or provision for all then-due DIP Lender Professional Fees and other amounts owing to the DIP Lender;<br>viii. continued compliance in all material respects with the Approved Budget, Permitted Variance, Milestones, DIP Documents and DIP Orders; and<br>ix. immediately after giving effect to each draw and the disbursements then due, unrestricted cash on hand shall be not less than $100,000;<br><br>with respect to any funding from the additional $3,500,000 available following entry of the Final DIP Order, execution and continued effectiveness of a Qualified Stalking Horse APA. A Qualified Stalking Horse APA must be acceptable to the DIP Lender, provide sufficient closing cash to pay all DIP Obligations and DIP Lender Professional Fees in full, have no financing or material remaining diligence contingency, be supported by reasonable evidence of purchaser financial capacity, and provide a credible closing path within the Milestones. Entry of the Final DIP Order alone does not satisfy this condition.<br><br>*See* Interim DIP Order ¶ 9; DIP Term Sheet p. 7 |
| **Conditions to Funding of Subsequent DIP Loans**<br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | Same as Conditions to Close set forth above. |
| **Stipulations to Prepetition Liens and Claims**<br>*Bankruptcy Rule 4001(c)(1)(B)(iii); Local Rule 4001-2(a)(i)(Q)* | In exchange for iHeartMedia's agreement to be primed by the DIP Lender, the Debtor stipulates to the validity, extent, perfection and priority of the IHeart Loan, and both the Debtor and the DIP Lender agree not to challenge the iHeart Loan, which remains subject to the customary challenge period.<br><br>*See* Interim DIP Order ¶ 32; DIP Term Sheet p. 6. |
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(U)* | The DIP Collateral does not include avoidance actions under chapter 5 of the Bankruptcy Code, provided that DIP Collateral shall include proceeds of avoidance actions upon entry of the Final DIP Order. Before express final approval, avoidance |

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| | recoveries are also unavailable to satisfy DIP Claims or iHeartMedia adequate-protection claims.<br><br>*See* Interim DIP Order ¶ 17; DIP Term Sheet p. 5. |
| **Challenge Period**<br>*Bankruptcy Rule 4001(c)(1)(B)(iii), (viii); Local Rule 4001-2(a)(i)(Q)* | The Debtor acknowledges the iHeart Loan and liens and, together with the DIP Lender, agrees not to challenge their extent, validity or priority. These stipulations bind the Debtor and the DIP Lender upon entry but do not bind the Committee or another party with requisite standing before expiration of seventy-five days after entry of this first Interim DIP Order (the "Challenge Deadline"). Until then, such parties may commence an appropriate proceeding challenging the amount, validity, enforceability, perfection or priority of the iHeart Loan or liens or asserting estate claims against iHeartMedia (a "Challenge"). No derivative standing is conferred automatically. A motion seeking standing filed before the Challenge Deadline preserves the proposed claims identified with specificity in that motion until the Court rules and, if standing is granted, for the filing period fixed by the Court. The deadline may be extended by written agreement with iHeartMedia or Court order on a motion filed before it expires. A timely Challenge remains preserved through its final disposition. If no timely Challenge or standing motion is filed, the stipulations become binding on the estate and its representatives to the extent not otherwise ordered; matters not covered by the stipulations are not released. The Court's authority to grant appropriate relief upon a successful Challenge, including recovery or reallocation of adequate-protection payments, is preserved. This challenge period concerns iHeartMedia's prepetition claims and liens, not the DIP Lender's new-money DIP Liens, DIP Claims or authorized advances. It does not limit objections to the Final DIP Order or fee review rights expressly preserved herein.<br><br>*See* Interim DIP Order ¶ 32. |
| **Waiver or Modification of the Automatic Stay**<br>*Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001-2(a)(i)(S)* | The automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to the extent necessary to permit the Debtor and the DIP Lender to accomplish the transactions contemplated by the Interim Order and to permit DIP Lender to exercise remedies subject to the notice, hearing and enforcement limitations in paragraphs 43-44 of the Interim DIP Order.<br><br>*See* Interim DIP Order ¶ 21. |
| **Indemnification and Limited Release**<br>*Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtor shall provide customary indemnification to the DIP Lender and its affiliates, members, managers, officers, employees, professionals and representatives for claims, liabilities, losses, damages, costs and expenses arising from or relating to the DIP Facility, the DIP Documents, the Chapter 11 Case or the transactions contemplated thereby, except to the extent finally determined by a non-appealable judgment to result from such indemnified party's gross negligence, fraud, or willful misconduct. These reimbursement and indemnification obligations shall survive repayment of the DIP Obligations and termination of the DIP Facility. The proposed Interim DIP Order also grants a limited release by the Debtor on behalf of itself and its estate in favor of the DIP Lender and related protected persons for pre-entry negotiation, documentation and consummation of the DIP Facility, extended upon actual funding to matters relating to that Interim Draw through funding. It excludes future conduct, obligations to perform the DIP Documents, fraud, gross negligence and willful misconduct established by final nonappealable judgment, and third parties' direct claims, and preserves enforcement and fee objections. The release is requested |

| Bankruptcy Code / Rule | Summary of Material Terms |
|---|---|
| | on an interim basis as part of the protections necessary to induce the new-money Interim Draw.<br><br>*See* Interim DIP Order ¶ 46-47; DIP Term Sheet p. 11. |
| **Section 506(c) Waiver**<br>*Bankruptcy Rule 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(V)* | The DIP Lender's requested protections concerning surcharge under section 506(c), the equities-of-the-case exception under section 552(b), and marshaling are reserved for express consideration in the Final DIP Order. No such waiver is granted on an interim basis, whether by incorporation, priority language, a release, or otherwise. The DIP Lender reserves its request for those protections and for liens on Avoidance Action proceeds at the Final Hearing. Consent to interim cash use or funding does not constitute consent to a surcharge or marshaling, and all parties' rights concerning the reserved relief remain available.<br><br>*See* Interim DIP Order ¶ 48. |
| **Section 552(b) Waiver**<br>*Local Rule 4001-2(a)(i)(W)* | The DIP Lender's requested protections concerning surcharge under section 506(c), the equities-of-the-case exception under section 552(b), and marshaling are reserved for express consideration in the Final DIP Order. No such waiver is granted on an interim basis, whether by incorporation, priority language, a release, or otherwise. The DIP Lender reserves its request for those protections and for liens on Avoidance Action proceeds at the Final Hearing. Consent to interim cash use or funding does not constitute consent to a surcharge or marshaling, and all parties' rights concerning the reserved relief remain available.<br><br>*See* Interim DIP Order ¶ 48. |
| **Marshaling**<br>*Local Rule 4001-2(a)(i)(X)* | The DIP Lender's requested protections concerning surcharge under section 506(c), the equities-of-the-case exception under section 552(b), and marshaling are reserved for express consideration in the Final DIP Order. No such waiver is granted on an interim basis, whether by incorporation, priority language, a release, or otherwise. The DIP Lender reserves its request for those protections and for liens on Avoidance Action proceeds at the Final Hearing. Consent to interim cash use or funding does not constitute consent to a surcharge or marshaling, and all parties' rights concerning the reserved relief remain available.<br><br>*See* Interim DIP Order ¶ 48. |

## **RELIEF REQUESTED AND BASIS THEREFOR**

27. By this Motion, the Debtor requests entry of the Interim DIP Order, in substantially the form attached hereto as **Exhibit A**: (i) authorizing the Debtor to obtain and enter into the DIP Financing and granting to the DIP Lender liens on the DIP Collateral securing the DIP Term Loans on a superpriority basis according to the priorities and limitations set forth in the Interim DIP Order; (ii) authorizing the Debtor to execute and deliver the DIP Term Sheet and to perform such

other and further acts as may be necessary under the DIP Documents; (iii) ordering that, subject to the Carve-Out and express limitations of the Interim DIP Order, all obligations of the Debtor to the DIP Lender under the DIP Documents shall be entitled to superpriority claim status under section 364(c)(1) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code; (iv) authorizing the Debtor's use of postpetition cash collateral pursuant to the terms and conditions set forth in the DIP Orders and the DIP Term Sheet; (v) granting adequate protection to iHeartMedia; (vi) modifying the automatic stay to the extent applicable and necessary to implement and effectuate the terms and provisions of the DIP Orders, as applicable; (vii) scheduling an interim hearing (the "Interim Hearing") to consider entry of this Interim DIP Order; (viii) scheduling a final hearing (the "Final Hearing") to consider entry (in form and substance acceptable to the DIP Lender) of the Final DIP Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion; (ix) approving the Final DIP Order; and (x) granting related relief.

28. The Debtor has insufficient cash with which to properly administer its estate, operate its business, and proceed with the restructuring process beyond the filing of this Motion. Thus, the Debtor needs the DIP Financing to maintain its business pending the closing of a 363 Sale or a Reorganization to maximize the value of its assets for the benefit of all its creditors. The Debtor has negotiated with the DIP Lender and iHeartMedia to obtain iHeartMedia's consent to priming and cash use on the terms presented in this Motion on a consensual basis to achieve the highest value possible for creditors.

29. The Debtor believes that, in its business judgment, entry into the DIP Term Sheet is in its best interests. Provided that a debtor's business judgment does not run afoul of the

provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds*, 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purposed is not so much to benefit the estate as it is to benefit parties in interest."). As such, the Court should authorize the Debtor to enter into the DIP Term Sheet.

**A. <u>The DIP Financing Should be Approved Under Section 364 of the Bankruptcy Code</u>**

30. Bankruptcy Code section 364(c) provides among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

31. Courts consider various factors in determining whether obtaining post-petition financing pursuant to section 364(c) is appropriate, including whether (1) the debtor is unable to obtain unsecured credit under section 364(b), *i.e.,* by allowing a lender only an administrative claim; (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate under the circumstances. *See In re Los Angeles*

*Dodgers LLC*, 457 B.R. at 312-13 (noting these three factors in considering proposed post-petition financing) (citations omitted); *see also In re Farmland Indus., Inc.,* 294 B.R. 855, 879 (Bankr. W.D. Mo. 2003) (noting that courts look to various factors including whether "the proposed financing is an exercise of sound and reasonable business judgment").

32. In addition, section 364(d)(1) of the Bankruptcy Code provides that a court may authorize a debtor to incur post-petition debt on a senior or "priming" basis if (a) the debtor is unable to obtain credit otherwise and (b) there is "adequate protection of the interest of the holder of the lien on the property of the estate on which senior or equal lien is proposed to be granted." *See* 11 U.S.C. § 364(d)(1); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441, (Bankr. S.D.N.Y. 2010).

**1. <u>The Debtor is Unable to Obtain Unsecured Credit.</u>**

33. The Debtor urgently requires short-term working capital financing to preserve and maintain its business during the chapter 11 case. Prior to the Petition Date, the Debtor engaged with thirty-three (33) parties that regularly provide postpetition financing in middle and lower middle market spaces, whereby eight (8) parties singed NDAs. DIP Declaration, ¶10. Ultimately, the Debtor received three (3) indicative non-binding term sheets: one from the DIP Lender, one from an unrelated third-party, and one from an entity affiliated with the Debtor's CEO. *Id.* at ¶11. None of the potential lenders were willing to provide adequate post-petition financing on an unsecured basis. The offer from the unrelated third-party contained significantly less favorable economic terms than the DIP Loan and was ultimately withdrawn during the negotiation process. *Id.* Accordingly, the Debtor was left with no other option other than the non-binding term sheet from the DIP Lender, and the Restructuring Committee moved forward with negotiating a binding letter of intent and term sheet with the DIP Lender.. *Id.* After executing the DIP Term Sheet, the

Debtor received the third proposal from the CEO-affiliated party, which contained similar, but not substantially better terms. *Id.* at ¶12. That proposal was also ultimately withdrawn, leaving the DIP Term Sheet as the only viable financing proposal. *Id.*

34. The DIP Lender also requires the liens and priorities specified in the Interim DIP Order and is unwilling to lend solely on an administrative-expense or superpriority basis, solely against unencumbered priority, or solely on junior liens.

35. The DIP Lender is unwilling to provide DIP Financing on an unsecured basis and the Debtor is unaware of any lender willing to provide financing on an unsecured basis. *Id.* at ¶¶ 11, 19. As such, the Debtor has determined that it is unable to obtain critical post-petition financing on an unsecured basis.

**2. The Transaction Under the DIP Documents is Necessary to Preserve the Estate and is in the Best Interests of Creditors.**

36. The Debtor has insufficient cash with which to operate its business short-term or properly protect its assets. Without access to post-petition financing, the Debtor will be unable to provide for the orderly sale and marshaling of its assets, which would significantly impair the value of the Debtor's assets and jeopardize the Debtor's ability to sell its assets or otherwise reorganize, to the detriment of all creditor constituencies.

37. By obtaining the DIP Financing, the Debtor will be in a position to preserve the value of its assets during the Chapter 11 Case—specifically, the DIP Commitment will allow the Debtor to continue its operations and will provide interim liquidity to preserve operations and pursue the Sale Process, with the additional $3,500,000 available only after entry of the Final DIP Order, executed and continued effectiveness of a Qualified Stalking Horse APA, and satisfaction or waiver of the other funding conditions.

38. Absent approval of the relief sought herein, the Debtor faces a substantial risk of irreparable damage to the value of its assets and the probability of conversion of the Chapter 11 Case to a case under chapter 7. *See In re Sun Healthcare Grp., Inc.*, 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates"). Accordingly, the Debtor needs sufficient liquidity to avoid a forced liquidation of its assets on a piece by piece "fire-sale" basis to the detriment of all creditors.

**3. <u>The Terms of the DIP Financing are Fair and Reasonable.</u>**

39. In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.),* 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

40. Under the circumstances of this case, including the Debtor's inability to fund this Chapter 11 Case from operating revenue, and the lack of readily available financing, the terms of the DIP Financing are fair and reasonable. First, the terms and conditions of the DIP Term Sheet were negotiated by the parties in good faith and at arms' length and were instituted for the purposes of enabling the Debtor to meet ongoing operational expenses while in chapter 11, supporting the Chapter 11 Case and its related sale process, and preserving the value of the Debtor's assets. Second, the terms themselves are reasonable and favorable to the Debtor. The interest and fees reflect the new-money funding, the Debtor's liquidity and collateral risks, the absence of an executed prepetition Qualified Stalking Horse APA, and the lack of a better financing alternative.

The specific staged fee approvals in the Interim DIP Order are requested to induce the immediate $1,500,000 advance; the remaining availability remains conditional, and final Exit Fee approval is reserved.

41. Furthermore, the DIP Financing subjects the security interests and administrative expense claims granted to the DIP Lender to the Carve Out for certain administrative and professionals fees, including (i) fees required to be paid to the Court and to the United States Trustee, and (ii) the reasonable fees and expenses incurred by the professionals of the Debtor and any statutory committee appointed in this Chapter 11 Case, subject to the Approved Budget. Carve outs for professional fees have been found to be reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are adequately assisted by counsel and other professionals. *See In re Ames*, 115 B.R. at 38. Accordingly, the terms of the DIP Financing are fair and reasonable and should be approved under section 364(c) of the Bankruptcy Code.

**B. Use of Cash Collateral and Proposed Adequate Protection is Appropriate.**

42. Sections 363(c)(2) and 363(e) of the Bankruptcy Code provide that a debtor is not authorized to use Cash Collateral without the consent of the prepetition secured lender unless such lender receives adequate protection of its interest in the Cash Collateral. Here, iHeartMedia is the prepetition secured party but not the DIP Lender. iHeartMedia has consented to the Debtor's use of Cash Collateral pursuant to the agreed upon Approved Budget attached to the proposed Interim Order and under the conditions set forth in the DIP Term Sheet. As adequate protection, the Debtor proposes to provide iHeartMedia (in its capacity as the prepetition secured party) with: (a) a second priority lien on the DIP Collateral, in all cases junior and subordinate to DIP Liens and the Carve-Out; (b) a superpriority claim under section 507(b) of the Bankruptcy Code solely to the extent the foregoing adequate protection proves insufficient, junior and subordinate to the DIP Claims and

the Carve-Out; (c) current cash payments, when due, of interest accruing under the iHeart Loan at the applicable non-default contract rate; (d) all reporting and information rights provided to the DIP Lender under the DIP Documents, including weekly cash, liquidity and variance reporting and Sale Process updates, subject to customary privilege and confidentiality limitations; (e) the first $50,000 in proceeds from the Sale Process shall be shared *pari passu* between iHeartMedia and the DIP Lender, (f) the Debtor's and DIP Lender's agreement not to challenge the extent, validity, or priority of the iHeart Loan, and (g) payment by the Debtor of the reasonable and documented fees and expenses of iHeartMedia's legal counsel and financial advisor, subject to customary notice and review procedures and inclusion in the Approved Budget. All such adequate-protection payments, liens, claims and rights shall be subject and subordinate to the DIP Liens and DIP Claims as set forth above, and, except solely for the sharing of the first $50,000 of Sale Proceeds expressly provided in clause (e) above, nothing in this adequate-protection package shall alter the first-dollar Sale Proceeds waterfall in favor of the DIP Lender.

43. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Grp (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987)); *Martin v. U.S. (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The goal is to protect a secured creditor from diminution in the value of its interest in the collateral during the period of use. *See Swedeland Dev. Grp., Inc.*, 16 F.3d at 564 ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy." (internal

citations omitted)). As noted above, the Debtor proposes to provide the DIP Lender with the DIP Liens. Without access to the proposed DIP Financing and use of cash collateral, the Debtor will have no liquidity and will be forced to cease operations immediately, destroying the value of its business to the detriment of all creditors and rendering impossible the continuation of the restructuring process. In contrast, the value of iHeartMedia's interest in the iHeart Collateral will be preserved, if not increased, by access to the DIP Facility to allow the Debtor to pursue a successful Reorganization or 363 Sale. *See generally In re Pine Lake Village Apartment*, 19 B.R. 819, 826 (Bankr. S.D.N.Y 1982) (creditor had adequate protection where the debtor used cash collateral to maintain and preserve the value of the collateral).

44. As part of the adequate protection package provided to iHeartMedia, certain of the obligations outstanding under the Prepetition Facility, specifically, any of the interest owed under the Prepetition Facility coming due after the Petition Date will be paid in the ordinary course of the Debtor's operation as set forth in the DIP Term Sheet and the Approved Budget. The payment of those limited obligations is justified because the Debtor would not have been able to secure the debtor in possession financing needed to stabilize its business without satisfying this condition. As noted above, the DIP Lender was unwilling to provide the DIP Facility on a junior basis, and these payments were a condition to iHeartMedia's agreement to be primed by the DIP Facility.

45. Likewise, the Debtor's agreement to provide iHeartMedia with a replacement lien in the DIP Collateral is warranted under the circumstances here. The iHeart Collateral is unquestionably diminished by being subordinated to the DIP Facility, and that loss of value can only be replaced by granting iHeart a lien in the remainder of the DIP Collateral. All of the Debtor's cash collateral is iHeart Collateral, which the Debtor cannot use without iHeart's consent, and without the use of that operating cash, the Debtor's need for financing would be even greater.

No other lending source, including the DIP Lender, has expressed a willingness to loan additional amounts to the Debtor. Thus, iHeartMedia's demand for a second priority lien in the DIP Collateral in exchange for its agreement to be primed by the DIP Lender was a necessary concession by the Debtor to get the financing needed to fund this Chapter 11 Case.

46. Importantly, these accommodations ultimately inure to the benefit of all stakeholders because it gives the Debtor the liquidity it needs to proceed under chapter 11 with a clear trajectory rather than a liquidation. The Debtor will use the proceeds of the DIP Facility to finance this Chapter 11 Case and move expeditiously towards the closing of a 363 Sale or, alternatively, a plan of reorganization. As the only existing secured creditor of the Debtor, iHeartMedia is entitled to interest under the Prepetition Facility and would be entitled to such interest ahead of any other creditors of the Debtor, so securing iHeartMedia's agreement to subordinate its debt to the DIP Facility is an easy business decision for the Debtor under the circumstances of this Chapter 11 Case and avoids expensive and contested litigation at the outset of this Chapter 11 Case.

47. The adequate protection offered to iHeartMedia will, taken together, sufficiently protect its interest in the iHeart Collateral. Consequently, the proposed adequate protection is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code.

**C. The DIP Financing Was Negotiated in Good Faith and Should Be Afforded the Protection of Section 364(e) of the Bankruptcy Code.**

48. Pursuant to section 364(e) of the Bankruptcy Code, any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority of lien

granted as long as the entity that extended credit "extended such credit in good faith." *See* 11 U.S.C. § 364(e).

49. Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co.* (*In re Ellingsen MacLean Oil Co.*), 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, "[g]ood faith is measured with respect to the good faith of the lender as contrasted to that of the borrower." *In re Lynondell Chem. Co.,* No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009). Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees and to protect pre-petition positions are understandable and acceptable motivations for a post-petition lender in negotiating a deal. *Id.*

50. The terms of the DIP Financing were negotiated at arm's length and reflect the most advantageous terms available to the Debtor in light of the exigent circumstances it faces. The DIP Financing is being extended by the DIP Lender in good faith (as such term is used in section 364(e) of the Bankruptcy Code). No consideration is being provided to any party to the DIP Term Loans, other than as set forth herein and in the Interim DIP Order. As such, the DIP Lender should be entitled to the full protection of section 364(e) of the Bankruptcy Code if the Interim DIP Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

**D. <u>The Automatic Stay Should be Modified on a Limited Basis.</u>**

51. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens. Stay modification provisions of this sort are ordinary

and usual features of debtor in possession financing facilities and are reasonable under certain circumstances.

52. The Debtor further requests that, upon the occurrence of an Event of Default under the DIP Term Sheet, the automatic stay shall terminate to permit the DIP Lender to exercise all rights and remedies under the DIP Documents, as applicable, without further action or order of the Bankruptcy Court. Following an Event of Default, the DIP Lender may, among other things, deliver a Termination Notice to counsel for the Debtor and the U.S. Trustee declaring the occurrence of a Termination Event (such date, the "DIP Termination Date"). During the five (5) business days following the DIP Termination Date (the "Remedies Notice Period"), the Debtor or the U.S. Trustee may seek an emergency hearing to contest the DIP Lender's attempted termination. Such relief is an appropriate balance, providing the DIP Lender with the ability to exercise its rights upon the Debtor's Event of Default without having to seek further relief from the Court, while simultaneously providing the Debtor with notice and the opportunity to seek reinstatement of the automatic stay.

### E. Approval of the DIP Financing on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm.

53. Rule 4001(c)(2) of the Bankruptcy Rules governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2). "Immediate and irreparable harm" exists where loss of the business threatens the ability of the debtor to reorganize." *See In re Ames*, 115 B.R. at 36 n.2. Approval of a DIP facility on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as

informed by the facts of each case. *See In re Pan Am Corp.*, 1992 WL 154200 *1, *6 (S.D.N.Y. June 18, 1992).

54. Absent authorization from this Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed. The Debtor does not have cash sufficient to meet its immediate cash needs. The Debtor needs to obtain immediate access to liquidity under the DIP Financing to, among other things, continue its operations and to satisfy other working capital needs. Thus, the credit provided under the DIP Financing will enable the Debtor to continue to operate its business in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all parties in interest.

55. The availability of interim funding under the DIP Term Sheet will also provide necessary assurance of the Debtor's ability to meet its short-term obligations and work toward a streamlined Sale Process that will maximize value for the Debtor's estate. Failure to meet these obligations and to demonstrate progress toward a sale or reorganization will cause creditors, potential acquirers, and contract counterparties to lose confidence in the Debtor, thereby causing irreparable harm to the value of the Debtor's business and assets.

56. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor's assets for a sale or reorganization of those assets for the benefit of all parties. As such, the Debtor believes that, under the circumstances, entry of the Interim DIP Order is necessary to prevent immediate and irreparable harm to the estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

**F. <u>Request for a Final Hearing</u>**

57. Pursuant to Rule 4001(c)(2) of the Bankruptcy Rules, the Debtor requests that the Court set a date which is no sooner than fourteen (14) days after the date of this Motion and no

later than thirty (30) days after the Petition Date to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.

**REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(b)**

58. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Given the nature of the relief requested herein, the Debtor respectfully requests a waiver of the 14-day stay under Bankruptcy Rule 6004(h) so that the Interim DIP Order may be effective immediately. As set forth above, the Debtor needs immediate access to funding under the DIP Financing to prevent irreparable damage to the Debtor's business and to preserve the value of its assets. Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

**NOTICE**

59. Notice of this Motion will be provided to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtor; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) the state attorneys general for all states in which the Debtor conducts business; (f) the DIP Lender; (g) iHeartMedia; (h) the MCA Parties, (i) the Debtor's banks; (j) the Taxing Authorities; (k) any other party that has asserted a security interest in any of the Debtor's assets, and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. Given that this Motion seeks "first day" relief, within 48 hours of the entry of an order granting this Motion, the Debtor will serve copies of this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m). In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

WHEREFORE, the Debtor respectfully requests that this Court enter the Interim DIP Order, substantially in the form attached hereto as **Exhibit A**, and grant such other and further relief as this Court deems appropriate.

Dated: November 1, 2026
Wilmington, Delaware

Respectfully submitted,

*/s/ R. Stephen McNeill*

Christopher M. Samis (No. 4909)
R. Stephen McNeill (No. 5210)
Aaron H. Stulman (No. 5807)
Maria Kotsiras (No. 6840)
Andrew C. Ehrmann (No. 7395)
**ICE MILLER LLP**
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
Telephone: (302) 313-0600
Email: christopher.samis@icemiller.com
stephen.mcneill@icemiller.com
aaron.stulman@icemiller.com
maria.kotsiras@icemiller.com
andrew.ehrmann@icemiller.com

*Proposed Counsel for the Debtor and Debtor in Possession*

# **EXHIBIT A**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FuturHealth, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-_____ (___)<br><br>**Re: Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) AUTHORIZING USE OF CASH COLLATERAL, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER, (V) MODIFYING THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

Upon the motion (the "DIP Motion") of FuturHealth, Inc., as debtor and debtor in possession (the "Debtor"), in the above-captioned chapter 11 case (the "Chapter 11 Case"), for entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 4001-2 of the Local Rules of of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

(A) authorization to obtain a new-money, senior secured, superpriority priming delayed-draw term loan facility in an aggregate cash principal amount of up to $5,000,000 (the "DIP Commitment" and such facility, the "DIP Facility") from Twelve Bridge Capital, LLC (together with its successors and permitted assigns, the "DIP Lender"), including an initial $1,500,000 draw on an interim basis (the "Interim Draw");

[1] The Debtor's mailing address is 325 W Washington Street Suite 2944 San Diego, CA 92103-1946, and the last four digits of the Debtor's federal tax identification number are 1229.

(B) authorization to enter into and perform under the executed Comprehensive DIP Term Sheet dated October 14, 2026, between the Debtor and the DIP Lender, attached as **Exhibit 1** (the "DIP Term Sheet"), and any implementing documents permitted hereunder (collectively with the DIP Term Sheet and the DIP Orders, the "DIP Documents");

(C) authorization to use proceeds of loans under the DIP Facility (the "DIP Term Loans") and Cash Collateral, in accordance with the Approved Budget, and to grant the DIP Liens and DIP Claims securing and supporting the DIP Obligations, each as defined below;

(D) approval of adequate protection for iHeartMedia + Entertainment, Inc. ("iHeartMedia"), modification of the automatic stay to implement the relief granted herein, and approval of the other protections expressly set forth herein; and

(E) scheduling of a final hearing (the "Final Hearing") to consider a final order (the "Final DIP Order," and together with this interim order (this "Interim DIP Order"), the "DIP Orders").

The Court having considered the DIP Motion, the declaration of Richard Klein in support thereof [Docket No. •] (the "DIP Declaration"), the evidence and arguments presented at the interim hearing held on [•], 2026 (the "Interim Hearing"), and the record of the Chapter 11 Case; and after due deliberation and sufficient cause appearing, the Court makes the following findings of fact and conclusions of law:

1. Petition and case status. On [•], 2026 (the "Petition Date"), the Debtor commenced the Chapter 11 Case. The Debtor continues to operate its business and manage its property under sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed. Any official committee subsequently appointed under section 1102 of the Bankruptcy Code is referred

to herein as the "Committee." The Debtor is the sole borrower; no nondebtor is a borrower or guarantor under this Interim DIP Order.

2. Jurisdiction and venue. The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference of the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2), and venue is proper under 28 U.S.C. §§ 1408 and 1409. The Court may enter this Interim DIP Order consistent with Article III of the United States Constitution.

3. Notice. Notice of the DIP Motion and Interim Hearing was provided to the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); the DIP Lender; iHeartMedia; Cedar Advance LLC and Velocity Capital Group LLC; all other known parties asserting liens, security interests or ownership interests in the property affected by the requested relief; the Debtor's twenty largest unsecured creditors; the Internal Revenue Service; the United States Attorney for the District of Delaware; applicable governmental authorities; and all parties entitled to notice under the Bankruptcy Rules and Local Rules. Under the exigent circumstances, the notice described in the certificate of service [Docket No. •] was sufficient for the interim relief expressly granted herein. Further relief remains subject to the notice and hearing requirements stated below.

4. Findings Regarding the DIP Term Loans

(a) Need for financing and Cash Collateral. The Debtor requires immediate liquidity to preserve its business, maintain its technology platform and material provider relationships, pay employees and necessary operating expenses, and pursue a value-maximizing sale or other monetization process. Without the Interim Draw and authorized use of Cash Collateral, the Debtor and its estate would suffer immediate and irreparable harm pending the Final

Hearing. The interim authorization is limited to the funding and expenditures necessary to avoid that harm.

(b) Unavailable alternative credit. Based on the evidence presented, the Debtor cannot obtain adequate credit allowable solely as an administrative expense under section 503(b)(1), solely with a superpriority under section 364(c)(1), solely secured by unencumbered property under section 364(c)(2), or solely secured by junior liens under section 364(c)(3). The DIP Facility is the best financing presently available to the Debtor. The protections and economics expressly approved herein are necessary to induce the DIP Lender to fund and are reasonable in light of the Debtor's liquidity, collateral and sale-process risks.

(c) Good faith and business judgment. The DIP Documents were negotiated in good faith and at arm's length. Entry into the DIP Facility reflects the Debtor's sound business judgment. Credit extended in reliance on this Interim DIP Order is extended in good faith within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lender is entitled to that section's protections.

(d) Prepetition iHeartMedia facility and consent. Subject to the challenge rights preserved below, the Debtor acknowledges obligations to iHeartMedia arising from the conversion of amounts due under an advertising arrangement into secured indebtedness (the "**iHeart Loan**"). iHeartMedia has affirmatively consented to the priming of its liens and use of its Cash Collateral on the terms of this Interim DIP Order. The adequate protection granted below is sufficient for purposes of the consensual interim relief.

(e) Other asserted interests. The Debtor has represented that Cedar Advance LLC and Velocity Capital Group LLC (collectively, the "MCA Parties") did not perfect their asserted security interests, or that any perfection was untimely and subject to avoidance. This

recital is not an adjudication of those assertions, avoidance of a lien, or determination that any receivables transfer was or was not a true sale. The treatment of nonconsenting parties' valid liens and asserted ownership rights is expressly limited below.

(f) Interim protections and deferred relief. The DIP Lender is unwilling to extend the Interim Draw without the discrete fee approvals, liens, claims and protections expressly granted below. Those provisions were specifically disclosed in the DIP Motion and are justified by the need for immediate funding, the new-money nature of the Facility and the risks described in the DIP Declaration. No Qualified Stalking Horse APA was executed before the Petition Date; the reduced prepetition-stalking-horse pricing outlined in the DIP Term Sheet does not apply.

5. Disposition and controlling terms. The DIP Motion is granted on an interim basis to the extent set forth herein. Objections to that relief are overruled or resolved as provided on the record. This Interim DIP Order controls over any inconsistent DIP Document, budget, cash-management order or other general authorization to pay expenses, unless a subsequent order expressly modifies this Interim DIP Order after notice to the DIP Lender and an opportunity to be heard. Capitalized terms not defined herein have the meanings specified in the applicable captioned section of the DIP Term Sheet.

6. Authority to enter DIP Documents. The Debtor is authorized to enter into, be bound by and perform the DIP Term Sheet and to execute documents reasonably required to implement the DIP Facility, subject to this Interim DIP Order. The DIP Term Sheet and this Interim DIP Order constitute operative financing documents. No separate credit agreement is required as a condition to their enforceability. Any additional material DIP Document shall be filed and served on the U.S. Trustee, Committee and iHeartMedia before the Final Hearing and shall not enlarge the relief granted herein without further Court approval.

7. Interim borrowing authority. The Debtor is authorized to borrow, and the DIP Lender is authorized to fund, the Interim Draw of $1,500,000 upon satisfaction or written waiver of the applicable conditions precedent. This is the maximum aggregate cash principal authorized before entry of the Final DIP Order. Capitalized fees, PIK interest and other DIP Obligations are in addition to, and do not reduce, that cash borrowing authorization or the $5,000,000 cash DIP Commitment. No additional cash borrowing is authorized by capitalizing such amounts. The Interim Draw shall be funded in accordance with the Approved Budget; payment of authorized expenses from its proceeds reduces available operating cash but not the amount advanced.

8. Post-interim availability and funding obligation. The remaining $3,500,000 of the DIP Commitment shall not be available unless the Final DIP Order has been entered and a Qualified Stalking Horse APA has been executed and remains effective, in addition to satisfaction or written waiver of all other applicable conditions. No post-interim advance is authorized by this Interim DIP Order. Subject to the applicable borrowing authority and satisfaction or written waiver of conditions, each properly submitted draw request shall be funded within two (2) Business Days after receipt. Each draw after the Interim Draw shall be limited to the approved budgeted amount requested and reasonably required. Amounts repaid cannot be reborrowed; each advance permanently reduces undrawn availability. Nothing herein compels the DIP Lender to advance funds after termination of its commitment or while a condition to funding remains unsatisfied and unwaived.

9. Conditions to funding. Each advance is subject to the conditions in the "Conditions Precedent to Draws" section of the DIP Term Sheet: continued effectiveness of the applicable DIP Order; enforceable and perfected DIP Liens and DIP Claims with the required priority; an Approved Budget and acceptable liquidity forecast; required corporate approvals, borrowing

notices and closing deliverables; materially accurate representations and warranties; no continuing or resulting Event of Default or Termination Event; payment or provision for then-due DIP Lender Professional Fees and other amounts; material compliance with the DIP Documents, budget, variance covenant and Milestones; and unrestricted cash of at least $100,000 immediately after funding and disbursements then due. The Qualified Stalking Horse APA condition applies to all post-interim funding. No qualification of lien priority or other relief by this Interim DIP Order is deemed a waiver of the DIP Lender's funding conditions; any such waiver must be in writing.

10. DIP Obligations. "DIP Obligations" means all cash advances under the DIP Facility, interest and capitalized PIK interest, Commitment Fees, Funding Fees, the Exit Fee to the extent approved, DIP Lender Professional Fees, and all other reimbursement, indemnification and payment obligations under the DIP Documents authorized herein, without duplication. The Debtor's obligations are valid and binding obligations enforceable under this Interim DIP Order. The DIP Lender shall maintain records distinguishing cash advances, capitalized fees, interest, expenses and payments so that no fee, interest amount, credit or repayment is counted twice. No prepetition funded debt is rolled up into the DIP Facility.

11. Interest. DIP Term Loans shall bear interest at 14.0% per annum on an actual-days-elapsed, 360-day-year basis, payable in kind monthly in arrears by capitalizing accrued interest and adding it to outstanding principal. Such capitalized PIK interest thereafter bears interest. Accrued interest not yet capitalized is due upon repayment or maturity. During a continuing Event of Default, all DIP Obligations automatically bear interest at an additional 3.0% per annum, payable in kind or in cash at the DIP Lender's election and due on demand or the DIP Termination Date, subject to the remedies procedures below. Capitalization does not permit interest to be charged twice on the same amount.

12. Commitment Fee. A $250,000 interim commitment fee (the "Interim Commitment Fee") is approved, fully earned, nonrefundable and irrevocable upon entry of this Interim DIP Order, and shall then be capitalized and added to the DIP Obligations. An additional $250,000 (the "Final Commitment Fee," and together, the "Commitment Fee") shall become fully earned, nonrefundable and irrevocable and be capitalized upon entry of the Final DIP Order, whether or not all committed funds are advanced. If the Debtor obtains replacement financing from another lender after entry of this Interim DIP Order and before entry of the Final DIP Order, the full $500,000 Commitment Fee shall be earned, with the unpaid $250,000 balance added to the DIP Obligations and paid in the replacement-financing payoff. This replacement-financing treatment is expressly approved herein. Absent that trigger or entry of the Final DIP Order, this Interim DIP Order does not accelerate the Final Commitment Fee. If the Debtor obtains a Qualified Stalking Horse APA in the first twenty-one (21) days of the Chapter 11 Case, the Final Commitment Fee will be reduced to $150,000.

13. Funding Fees. A fee equal to 5.0% of the cash principal amount of each DIP Term Loan actually funded (each, a "Funding Fee") shall be fully earned and nonrefundable when that advance is funded and shall be capitalized and added to the DIP Obligations at that time. The Interim Draw therefore carries a $75,000 Funding Fee. No Funding Fee is charged on undrawn commitments, capitalized fees or capitalized interest. The 5.0% Funding Fee for each authorized advance is expressly approved on a final basis by this Interim DIP Order, without authorizing any cash advance otherwise requiring the Final DIP Order. If the Debtor obtains a Qualified Stalking Horse APA in the first twenty-one (21) days of the Chapter 11 Case, the Funding Fee for each draw after the Interim Draw will be reduced to 4% of the principal amount funded in each draw.

14. Exit Fee and Work Fee credit. An exit fee equal to 7.0% of outstanding DIP Term Loan principal plus capitalized PIK interest immediately before the applicable repayment, refinancing, satisfaction, sale closing, plan effective date, acceleration or other exit (the "Exit Fee") is approved on an interim basis, subject to final approval in the Final DIP Order. The Exit Fee is payable in cash when triggered. For a partial prepayment, the Exit Fee applies only to the principal and capitalized PIK interest then repaid; amounts on which it has been paid shall not be charged again. The fee is based on amounts actually outstanding, not the DIP Commitment, and excludes Commitment Fees, Funding Fees, professional fees and expenses, and the Exit Fee itself. The $50,000 work fee specified in the DIP Term Sheet (the "Work Fee") is hereby approved and was deemed fully earned and nonrefundable upon receipt, subject only to the $25,000 credit against the Exit Fee expressly provided herein. The Work Fee is separate from, and shall not reduce, the Debtor's obligation to pay DIP Lender Professional Fees otherwise payable under the DIP Documents, subject to the review procedures set forth in this Interim DIP Order. Any request for final Exit Fee approval before entry of the Final DIP Order, including in a replacement financing, shall be presented on notice and an opportunity to be heard. The specific staged fee provisions herein and in the **"Fees"** section of the DIP Term Sheet govern over inconsistent general descriptions of interim or final approval elsewhere in the DIP Term Sheet.

15. Treatment of fees. Commitment Fees, Funding Fees, the Exit Fee and other fees approved herein (collectively, the "Fees") are DIP Obligations secured by the DIP Liens and entitled to the DIP Claims, in addition to cash principal. Except for the express Work Fee credit and matters reserved for final determination, approved and earned fees are not subject to reduction, setoff, recoupment, recharacterization, avoidance or disgorgement.

16. DIP Collateral. Effective upon entry, the DIP Lender is granted liens and security interests in all property of the Debtor and its estate, now owned or later acquired, wherever located, and all proceeds, products, rents and profits thereof (the "DIP Collateral"), including cash; deposit and securities accounts; accounts and receivables; merchant-processor settlements; inventory; equipment; real and personal property; leasehold and contractual rights; intellectual property, software, technology and the Debtor's interests in the Whole Health OS platform; equity interests owned by the Debtor; insurance rights and proceeds; commercial tort claims and litigation claims; tax refunds; duty drawbacks; and the Debtor's rights in sale deposits, escrow releases, termination payments and other Sale Proceeds. The grant reaches only the Debtor's property interests. It does not transfer or authorize disclosure or use of patient information in violation of applicable law.

17. Avoidance Actions and excluded property. "Avoidance Actions" means claims and causes of action under sections 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code and analogous avoidance claims under applicable nonbankruptcy law. Avoidance Actions themselves are excluded from DIP Collateral. Before express approval in the Final DIP Order, their proceeds and recoveries are also excluded from DIP Collateral and are not available to satisfy DIP Claims or iHeartMedia adequate-protection claims. Attachment to proceeds of Avoidance Actions is reserved for the Final Hearing.

18. DIP Liens and priorities. Subject to the Carve-Out and the express limitations herein, the DIP Lender is granted: (a) under section 364(c)(2), first-priority liens on unencumbered DIP Collateral; (b) under section 364(d)(1), first-priority priming liens on DIP Collateral subject to iHeartMedia's liens and the liens of any other secured party; and (c) under section 364(c)(3), liens on DIP Collateral subject to other valid, perfected and unavoidable prepetition liens, or valid liens perfected after the Petition Date as permitted by section 546(b), junior only to those interests

to the extent they have not been consensually primed or primed by further order (the "Permitted Prior Liens"). Collectively these are the "DIP Liens." Except for the Carve-Out, Permitted Prior Liens and express iHeartMedia sharing provisions outlined below, the DIP Liens are senior to all other liens and claims, including adequate-protection liens and judgment liens. Identification of possible Permitted Prior Liens does not validate or allow them; the Debtor shall identify known asserted interests.

19. Nonconsensual priming and MCA interests. The DIP Liens shall prime and be senior to all liens and security interests asserted by the MCA Parties in the DIP Collateral, including receivables and proceeds, without acknowledging their validity, perfection or enforceability or waiving any challenge thereto. Any asserted true-sale or ownership rights are reserved for determination by the Court; any interest determined to constitute a lien shall be subordinate to the DIP Liens. Priming of other nonconsenting holders' valid liens is reserved for further hearing. No adequate protection or postpetition payment to an MCA Party is authorized herein.

20. DIP Claims. Under section 364(c)(1), all authorized DIP Obligations constitute allowed superpriority administrative expense claims against the Debtor (the "DIP Claims"), with priority over administrative expenses and unsecured claims of every kind, including claims under sections 503(b), 507(a), 507(b) and 726(b), subject to the Carve-Out and express sharing provisions herein. DIP Claims have recourse to all estate property subject to the exclusions in this Interim DIP Order and the rights of holders of Permitted Prior Liens in their collateral. No other professional or administrative claim becomes senior or pari passu merely by allowance, inclusion in a budget, or entry of a general payment order. Approval of the DIP Claims does not finally approve the Exit Fee or any other matter expressly reserved for the Final Hearing.

21. Automatic perfection. The DIP Liens attach and are valid, binding, enforceable and automatically perfected upon entry without execution, filing, recording, possession, control or other act. The DIP Lender may nevertheless file financing statements, mortgages, notices or a certified copy of this Interim DIP Order, and the Debtor shall execute reasonable implementing instruments. Such acts are authorized and the automatic stay is modified to permit them. No failure to take an optional perfection step impairs the priority conferred by this Interim DIP Order. Any custodian or account bank served with this Interim DIP Order shall recognize the DIP Liens, subject to the rights and reservations expressly stated herein.

22. Cash Collateral and authorized uses. "Cash Collateral" has the meaning in section 363(a) and includes estate cash and proceeds subject to iHeartMedia's liens or the DIP Liens. The Debtor is authorized to use such Cash Collateral and DIP proceeds solely under the Approved Budget and this Interim DIP Order for necessary working capital and ordinary-course employee, vendor, technology, marketing and other operating expenses; DIP transaction expenses; allowed and budgeted estate professional expenses subject to the Carve-Out; authorized adequate-protection payments; and other uses expressly agreed in writing by the DIP Lender and approved by the Court. iHeartMedia's and the DIP Lender's consent is limited to those uses. Use of Cash Collateral of a different nonconsenting interest holder requires that holder's consent or an express order under section 363 after appropriate notice and consideration of adequate protection. The Debtor shall segregate and account for Cash Collateral under section 363(c)(4). No finding that any disputed property is estate property is made herein.

23. Receipts and cash controls. The Debtor shall cause postpetition merchant-processor settlements and other estate receivables to be remitted to disclosed Debtor accounts subject to the DIP Liens, consistent with applicable cash-management orders. The Debtor shall not voluntarily

authorize an MCA Party to debit, divert or receive estate postpetition receipts on account of prepetition obligations except by express Court order. The Debtor shall promptly notify the DIP Lender of any diversion, withholding, setoff, account-control demand or asserted ownership claim affecting receipts and seek appropriate relief. This provision does not adjudicate a processor's or other third party's contractual or ownership rights without the required process. Entry of an order permitting an MCA Party to divert or receive postpetition receipts without the DIP Lender's agreement constitutes an Event of Default, subject to the remedies procedures herein.

24. Approved Budget. The initial lender-approved rolling thirteen-week cash-flow budget attached as **Exhibit 2** is the "Approved Budget." It shall set forth weekly sources and uses, cash borrowing and Cash Collateral usage, operating expenditures, professional allocations, authorized adequate-protection payments and reserves. Each week, by Wednesday at 4PM, prevailing Eastern Time, the Debtor shall deliver an updated rolling thirteen-week budget and a variance report for the preceding completed week to the DIP Lender and concurrently to iHeartMedia, the U.S. Trustee and Committee, if any, subject to appropriate confidentiality arrangements. An updated budget becomes the Approved Budget only upon written approval of the DIP Lender; silence is not approval. Until then, the existing Approved Budget remains effective for its covered periods. A budget cannot amend this Interim DIP Order or authorize relief requiring a separate order.

25. Variance and minimum liquidity. Aggregate cash disbursements shall not exceed aggregate budgeted disbursements by more than 15%, measured on a rolling four-week basis (the "Permitted Variance"), unless the DIP Lender agrees otherwise in writing. Testing shall commence upon completion of the first four-week period; compliance with authorized uses and other funding conditions applies throughout. Favorable variances may be carried forward only within the

applicable testing period. A budget update does not retroactively cure a breach absent written waiver. Transfers to the Professional Fee Reserve count as cash disbursements when deposited; payments from that reserve are not counted a second time. The Permitted Variance does not increase any professional Carve-Out allocation, post-trigger cap, or other express dollar limit. After the Interim Draw, the Debtor shall maintain unrestricted cash of at least $100,000 at all times unless otherwise agreed in writing by the DIP Lender.

26. Reporting and access. The Debtor shall provide weekly cash, liquidity and variance reports; cash-management balances; accounts payable and vendor aging; merchant receipts and settlements; reasonably relevant revenue, active-customer, subscriber, renewal and churn metrics; material provider status; and Sale Process updates, and shall promptly report defaults, material litigation or regulatory matters, contract terminations and material business disruptions. The DIP Lender, Fishel Law Group, Morris James as Delaware counsel, and any designated financial advisor shall receive prompt and continuing reasonable access to management, books, records, bank information, data rooms, models, material contracts and other reasonably requested diligence information, and the Debtor's professionals shall participate in reasonably requested calls. Access is subject to applicable law, privilege and appropriate confidentiality measures, including for protected health information; privileged material need not be waived, and the parties shall cooperate on lawful alternatives.

27. Sale information and covenants. The Debtor shall provide the DIP Lender's counsel drafts of material pleadings, proposed orders, bid procedures, sale agreements and restructuring documents sufficiently before filing for meaningful review, at least two (2) Business Days before filing or execution, as applicable, unless the DIP Lender agrees in writing to a shorter period. The Debtor shall promptly provide bids, indications of interest and material sale or financing

communications unless and until the DIP Lender elects to participate as a bidder or submits a Qualified Bid, after which access to competitively sensitive bidder information is governed by Court-approved sale procedures. The Debtor shall preserve collateral, maintain insurance, books, permits and licenses, maintain the Whole Health OS platform and material medical, pharmacy, technology and service relationships in the ordinary course, and pay postpetition taxes and administrative obligations as required by applicable law and orders. Restrictions on additional debt, liens, material prepetition payments, extraordinary asset dispositions and materially adverse restructuring transactions in the **"Affirmative and Negative Covenants"** section of the DIP Term Sheet apply, subject to the fiduciary provisions below and this Court's authority.

28. Sale Process and Qualified Stalking Horse APA. "Sale Process" means the marketing, bidding, auction and sale process for substantially all of the Debtor's assets or business, or another restructuring or monetization transaction acceptable to the DIP Lender. A "Qualified Stalking Horse APA" is a binding executed asset purchase agreement acceptable to the DIP Lender that provides sufficient closing cash to indefeasibly pay all DIP Obligations and DIP Lender Professional Fees in full; has no financing or material remaining diligence contingency; is supported by reasonable evidence of the purchaser's financial capacity; and provides a credible path to closing within the Milestones. Entry of the Final DIP Order alone does not satisfy this condition. No particular purchaser, sale, bidding procedure, break-up fee or expense reimbursement is approved herein.

29. Milestones. The Debtor shall comply with the following milestones, subject to the DIP Lender's written extension or waiver (the "Milestones"): entry of this Interim DIP Order within three (3) Business Days after the Petition Date; filing of a motion for bidding procedures and a sale process, including any requested stalking-horse protections, within seven (7) days after

the Petition Date; and entry of the Final DIP Order and bidding-procedures order within thirty (30) days after the Petition Date. A Qualified Stalking Horse APA must be executed and remain effective before any post-interim funding. Bid, auction, sale-hearing and closing dates remain to be agreed and approved through the appropriate procedures. The intended closing is within approximately 120 days after the Petition Date, without extending the Maturity Date. Extensions or waivers shall be furnished promptly to the U.S. Trustee, Committee, if any, and iHeartMedia; they do not alter Court-set dates without required approval. No milestone overrides required notice or directs the Court to enter an order.

30. iHeartMedia adequate-protection liens and claim. In consideration of iHeartMedia's affirmative consent and solely to protect against diminution in the value of its valid prepetition interests resulting from the stay, authorized collateral use and consensual priming ("Diminution"), iHeartMedia is granted replacement liens on DIP Collateral (the "iHeart AP Liens"), junior to the Carve-Out, DIP Liens and any Permitted Prior Liens that are not primed herein. Subject to those priorities, the iHeart AP Liens are second-priority liens. If that protection proves insufficient, iHeartMedia is entitled to a section 507(b) claim solely to the extent of the resulting uncompensated Diminution (the "iHeart AP Claim"), subordinate to the DIP Claims and Carve-Out. No replacement lien or claim secures an enhancement of iHeartMedia's prepetition position unrelated to Diminution. Avoidance Actions and, pending express final approval, their proceeds are excluded. The iHeart AP liens are automatically perfected without further act. Any amount recovered for Diminution shall be credited to avoid duplicative recovery.

31. iHeartMedia payments and information. Subject to the Approved Budget, the Debtor is authorized to pay current interest under the iHeart Loan at the applicable nondefault contract rate, when due, and reasonable documented fees and expenses of iHeartMedia's legal

counsel and financial advisor under the invoice procedure below. No default interest, principal payment, make-whole or other premium on the iHeart Loan is authorized. iHeartMedia shall concurrently receive the financial reporting and Sale Process information provided to the DIP Lender, subject to privilege, confidentiality and applicable bidder-information restrictions. Payments are subject to the challenge provisions below and shall be accounted for without duplication. Except for the express Sale Proceeds sharing provisions below, these rights do not alter DIP priority.

32. iHeartMedia stipulations and challenge rights. Subject to this paragraph, the Debtor acknowledges the iHeart Loan and liens and, together with the DIP Lender, agrees not to challenge their extent, validity or priority. These stipulations bind the Debtor and the DIP Lender upon entry but do not bind the Committee or another party with requisite standing before expiration of seventy-five days after entry of this first Interim DIP Order (the "Challenge Deadline"). Until then, such parties may commence an appropriate proceeding challenging the amount, validity, enforceability, perfection or priority of the iHeart Loan or liens or asserting estate claims against iHeartMedia (a "Challenge"). No derivative standing is conferred automatically. A motion seeking standing filed before the Challenge Deadline preserves the proposed claims identified with specificity in that motion until the Court rules and, if standing is granted, for the filing period fixed by the Court. The deadline may be extended by written agreement with iHeartMedia or Court order on a motion filed before it expires. A timely Challenge remains preserved through its final disposition. If no timely Challenge or standing motion is filed, the stipulations become binding on the estate and its representatives to the extent not otherwise ordered; matters not covered by the stipulations are not released. The Court's authority to grant appropriate relief upon a successful Challenge, including recovery or reallocation of adequate-protection payments, is preserved. This

challenge period concerns iHeartMedia's prepetition claims and liens, not the DIP Lender's new-money DIP Liens, DIP Claims or authorized advances. It does not limit objections to the Final DIP Order or fee review rights expressly preserved herein.

33. Carve-Out. The DIP Liens, DIP Claims, iHeart AP Liens and iHeart AP Claim are subject and subordinate to the following "Carve-Out": (a) all fees payable to the Clerk of Court and U.S. Trustee under 28 U.S.C. § 1930(a), together with statutory interest; (b) chapter 7 trustee fees and expenses payable under section 726(b), capped at $25,000 in the aggregate; and (c) fees and expenses of professionals retained by the Debtor or Committee with Court approval under sections 327, 328 or 1103 (the "Estate Professionals"), to the extent allowed by the Court, that (i) are incurred on or before delivery of a Carve-Out Trigger Notice, but only within the amounts allocated to the applicable professional in the Approved Budget through the applicable period, plus (ii) are incurred after delivery, capped at $100,000 in the aggregate for all Estate Professionals (the "Post-Trigger Cap"). Later allowance of a pre-trigger fee does not make it a post-trigger fee. The Carve-Out is not an uncapped administrative reserve, and budgeted amounts for one professional are not automatically available to another.

34. Trigger notice and Professional Fee Reserve. A "Carve-Out Trigger Notice" is written notice delivered by the DIP Lender after occurrence and during continuation of an Event of Default to the Debtor, Debtor's counsel, U.S. Trustee, Committee counsel and iHeartMedia's counsel stating that the Post-Trigger Cap is invoked. It may accompany a Termination Notice. The Debtor may maintain a segregated professional fee reserve (the "Professional Fee Reserve"), funded only in the amounts and at the times provided in the Approved Budget, without accelerating future allocations or including unbudgeted amounts. Deposits are treated as uses when made. Reserved funds are subject to the DIP Liens and iHeart AP Liens, subordinated to the Carve-Out.

Upon a trigger, the Debtor shall continue to preserve and, from available estate cash subject to this Interim DIP Order, fund amounts necessary to satisfy the Carve-Out before remitting residual collateral to the DIP Lender. No reserve may duplicate amounts already paid, deposited or otherwise funded for the same fees. Unused amounts remain DIP Collateral and shall be released to the Debtor's collateral accounts or applied to DIP Obligations when no longer required for the Carve-Out.

35. Carve-Out limitations and survival. Nothing herein approves Estate Professional retention or compensation, waives objections on any ground, or excuses compliance with applicable fee orders. Payments for pre-trigger fees do not reduce the Post-Trigger Cap. The Carve-Out survives termination of cash use, acceleration, enforcement, conversion and dismissal. Neither the DIP Lender nor iHeartMedia guarantees payment of the Carve-Out or is required to lend additional money to fund it beyond its contractual obligations. Professional fees outside the Carve-Out remain subordinate to DIP Liens and DIP Claims; their allowance does not expand the Carve-Out. No other reserve, wind-down account or transaction expense shall prime DIP recoveries without the DIP Lender's written agreement and express Court approval, subject to rights expressly reserved herein.

36. Limitations on use of funds. No DIP proceeds, Cash Collateral or Carve-Out may be used to investigate, challenge, contest, prosecute or finance claims against the DIP Lender or the validity, perfection, priority or enforceability of the DIP Liens, DIP Claims, DIP Obligations or transactions contemplated by the DIP Documents, except an investigation budget expressly agreed by the DIP Lender and approved by the Court. This restriction does not prohibit review of proposed final financing relief, participation in the Final Hearing, objections to invoices under the procedures herein, or requests to enforce this Interim DIP Order. It does not bar budgeted

investigation of iHeartMedia's prepetition claims and liens or override preserved challenge rights. No DIP proceeds or Cash Collateral may fund distributions to equity, unauthorized prepetition debt payments or expenditures outside the permitted uses. The Debtor's and nondebtor parties' rights at a remedies hearing are not restricted by this paragraph.

37. Voluntary and mandatory prepayments. Voluntary prepayments require at least three Business Days' prior written notice, minimum principal payments of $50,000, and payment of related accrued interest, the approved Exit Fee and other then-due amounts. Unless waived in writing by the DIP Lender, 100% of net cash proceeds of extraordinary asset dispositions; insurance and condemnation recoveries, litigation recoveries, tax refunds and other extraordinary receipts; and financing, refinancing, recapitalization or equity issuances shall be applied immediately to DIP Obligations, except amounts specifically budgeted for reinvestment with prior written DIP Lender consent. These requirements are subject to the Carve-Out, Permitted Prior Liens, excluded property and express iHeartMedia sharing provisions. No use of **"net"** permits deduction of transaction costs ahead of the DIP Lender except as expressly authorized herein or by further order on notice.

38. Sale Proceeds and direct payoff. "Sale Proceeds" includes all cash and noncash consideration, deposits to the extent belonging to the estate, escrow releases, assignment proceeds, price adjustments, settlements, break-up fees, termination payments and other proceeds of the Sale Process or asset dispositions. Subject to the express exceptions herein, the first dollars of Sale Proceeds shall be paid to the Debtor by the purchaser or closing agent at closing and promptly remitted by the Debtor to the DIP Lender until all DIP Obligations are indefeasibly paid in full in cash. The Debtor shall furnish a proposed payoff and funds flow to the DIP Lender reasonably before closing. No reserve, escrow, netting, purchase-price allocation or distribution to another

creditor shall delay or reduce that payoff without the DIP Lender's written consent and required Court approval. Noncash consideration does not discharge cash payment obligations

39. iHeartMedia sharing and application waterfall. As expressly agreed in the DIP Term Sheet, the first $50,000 of Sale Proceeds shall be shared equally between iHeartMedia and the DIP Lender. This is a single aggregate sharing amount, not $50,000 for each sale, draw or recipient; each distribution shall reduce the recipient's corresponding debt without duplication. In addition, solely to the extent the Sale Process produces a transaction that will pay all DIP Obligations in full, the interest portion of the DIP Obligations shall rank pari passu with obligations owed to iHeartMedia under the iHeart Loan. That conditional treatment does not subordinate DIP principal or Fees or excuse full cash repayment of DIP Obligations. Subject to these express exceptions, proceeds payable to the DIP Lender shall be applied first to professional fees and reimbursable expenses; second to Fees; third to accrued interest, including default interest; fourth to principal, including capitalized PIK interest and capitalized Fees; and fifth to other DIP Obligations. An item paid in one category shall not be paid again in another.

40. Credit bidding and sale rights. Subject to section 363(k), the DIP Lender may credit bid all or part of its authorized DIP Obligations against DIP Collateral in a sale under section 363, a plan or a successor chapter 7 case, and may assign those rights to an affiliate, designee, acquisition vehicle or permitted assignee. No categorical waiver of the Court's authority to limit credit bidding for cause is granted. iHeartMedia may credit bid its allowed secured prepetition claim subject to section 363(k), provided the transaction pays all DIP Obligations and DIP Lender Professional Fees indefeasibly in full in cash at closing. The **"Qualified Bid"** requirements in the DIP Term Sheet govern the Debtor's financing covenants, subject to Court-approved sale procedures; this Interim DIP Order does not itself establish bidding procedures or finally determine

a bid's qualification. The DIP Lender retains the right to object to any sale or plan that fails to provide the treatment required herein.

41. Maturity and termination of availability. All DIP Obligations shall be due in full in cash on the earliest of: 120 days after the Petition Date; closing of a sale or disposition of all or substantially all assets or business; the effective date of a chapter 11 plan; conversion to chapter 7; dismissal; appointment of a chapter 11 trustee or examiner with enlarged powers; consummation of financing, recapitalization or another transaction refinancing or replacing the DIP Facility; or acceleration following an Event of Default (each, a "Termination Event," and the earliest, the "Maturity Date"). Undrawn availability terminates on the first Termination Event or unwaived Event of Default (the "DIP Termination Date"). Termination or maturity does not eliminate the Carve-Out or permit collateral enforcement without the notice and hearing protections below. No commitment survives solely because a remedies hearing is pending.

42. Events of Default. Each of the following constitutes an "Event of Default," subject to any applicable cure period expressly agreed in an approved DIP Document or written waiver: failure to pay a DIP Obligation when due or make a required prepayment; material noncompliance with a DIP Document, DIP Order, Milestone, Approved Budget or Permitted Variance; a Termination Event; reversal, vacatur, stay or materially adverse modification of a DIP Order or sale order without DIP Lender consent; allowance of a lien or superpriority claim senior or pari passu to the DIP Liens or DIP Claims except as expressly permitted herein; incurrence or approval of financing that does not indefeasibly repay DIP Obligations in full; loss of the validity, perfection, enforceability or required priority of DIP Liens or DIP Claims; payment of a material prepetition claim not authorized by the Court and included in the Approved Budget; termination or abandonment of a Qualified Stalking Horse APA after post-interim funding without an

acceptable replacement transaction; a material misrepresentation or breach of representation or warranty; or an unauthorized MCA-receipts order as described above. This Interim DIP Order creates no additional blanket cure period. Exercise of rights expressly permitted by the fiduciary out and Alternate Proposal provisions below is not itself an Event of Default.

43. Termination Notice and remedies notice period. Upon a continuing Event of Default, the DIP Lender may give written notice identifying the default and intended remedies (a "Termination Notice"), terminate undrawn commitments, declare authorized DIP Obligations due and deliver a Carve-Out Trigger Notice. The Termination Notice shall be delivered by email to the Debtor and its counsel, U.S. Trustee, Committee counsel and iHeartMedia's counsel, and filed on the docket. Termination of Cash Collateral use, cash sweeps, foreclosure and other collateral enforcement shall not become effective before expiration of five (5) Business Days after delivery (the "Default Notice Period"). During that period the Debtor and U.S. Trustee may request an emergency hearing; if timely requested but heard later, the Default Notice Period extends until the Court hears and rules on that request. The Committee and other parties with standing may also seek relief, and the Court may extend the period. No provision limits the issues that nondebtor parties may raise at such a hearing. The term-sheet reference to notice by the "Prepetition Secured Lender" shall, for DIP remedies, mean notice by the DIP Lender.

44. Interim cash use and enforcement. During the Default Notice Period and any extension, the Debtor may use Cash Collateral under the Approved Budget solely for necessary expenditures to prevent immediate and irreparable harm, payroll and the Carve-Out, subject to further Court order. No additional advance is required if funding conditions are unsatisfied. Upon expiration of that period, unless the Court orders otherwise, the stay is modified to permit the DIP Lender to terminate authorized cash use and enforce its liens and other remedies under the DIP

Documents and applicable law, including collection, application of cash and foreclosure, without a further stay-relief order. Enforcement remains subject to the Carve-Out, express lien priorities, applicable nonbankruptcy requirements and any required sale approval. The Debtor shall cooperate with lawful enforcement. The contractual waiver of section 105 relief applies only to the extent consistent with these notice and hearing rights and does not deprive the Court of jurisdiction or restrict a nondebtor party's available arguments.

45. DIP Lender Professional Fees. The Debtor shall pay reasonable, documented out-of-pocket costs and expenses of diligence, underwriting, negotiation, documentation, approval, administration, monitoring, amendment, enforcement and protection of the DIP Facility, including fees and expenses of Fishel Law Group, Morris James and a financial advisor designated by the DIP Lender (the "DIP Lender Professional Fees"), whether incurred before or after the Petition Date. Such professionals are not estate professionals and need not obtain retention or submit compensation applications under sections 327, 330 or 331 solely to receive payment under this Interim DIP Order. Payment is nevertheless subject to the invoice review procedure below. The Carve-Out and its professional caps do not limit DIP Lender Professional Fees, and such fees are not included in the Carve-Out. Invoices or summaries thereof for DIP Lender Professional Fees shall be emailed to the Debtor, its counsel, the U.S. Trustee and Committee counsel, if any. Such invoices or summaries may redact privileged or protected information but shall contain sufficient summary detail to permit meaningful review, without requiring detailed time entries. Their disclosure shall not constitute a waiver of any privilege or protection. Recipients have ten (10) Business Days after receipt to deliver written objections identifying the disputed items and grounds. After that period, the Debtor shall promptly pay undisputed amounts without further application or order. Timely disputed amounts shall be held pending consensual resolution or

Court determination on notice; payment of undisputed amounts shall not be delayed. Accrued unpaid fees through closing shall be paid from the Interim Draw only after this review procedure is satisfied. The same procedure applies to budgeted iHeartMedia professional fees, with invoices also furnished to DIP Lender counsel. No provision automatically approves previously paid fees or deprives the Court of review of a timely dispute.

46. Limited release of DIP Lender. Effective upon entry of this Interim DIP Order, the Debtor, on behalf of itself and its estate, releases the DIP Lender and its affiliates, members, managers, officers, employees, participants, professionals, representatives, successors and assigns from claims and causes of action arising from acts, omissions and matters occurring on or before entry of this Interim DIP Order and relating to negotiation, documentation and consummation of the DIP Facility. Upon actual funding of the Interim Draw, the release additionally covers acts and matters relating to that draw through its funding date. It does not release future performance or conduct after that funding date, obligations to perform the DIP Documents, or fraud, gross negligence or willful misconduct established by final nonappealable judgment. It does not release any third party's direct claims. No iHeartMedia release or waiver beyond the specifically stated prepetition stipulations is created by this paragraph. Nothing herein precludes enforcement of this Interim DIP Order or fee objections expressly authorized herein.

47. Indemnification. The Debtor shall indemnify the DIP Lender and its affiliates, members, managers, officers, employees, professionals and representatives against claims, liabilities, losses, damages and reasonable documented costs and expenses arising from the DIP Facility, DIP Documents, Chapter 11 Case or contemplated transactions, except to the extent finally determined by a nonappealable judgment to result from the indemnified party's gross negligence, fraud or willful misconduct. Reimbursement and indemnification obligations survive

repayment and termination, subject to their terms, the exclusions herein and applicable review procedures. Survival of a contingent indemnity does not create an additional undisclosed fee or require a reserve not authorized herein.

48. Protections reserved for final approval. The DIP Lender's requested protections concerning surcharge under section 506(c), the equities-of-the-case exception under section 552(b), and marshaling are reserved for express consideration in the Final DIP Order. No such waiver is granted on an interim basis, whether by incorporation, priority language, a release, or otherwise. The DIP Lender reserves its request for those protections and for liens on Avoidance Action proceeds at the Final Hearing. Consent to interim cash use or funding does not constitute consent to a surcharge or marshaling, and all parties' rights concerning the reserved relief remain available.

49. Amendments and waivers. The Debtor and DIP Lender may agree in writing to nonmaterial implementing changes, budget updates, extensions and waivers that do not materially adversely affect the estate or other parties. Copies shall be provided to the U.S. Trustee, Committee and iHeartMedia before effectiveness, except a beneficial deadline extension or waiver may be delivered promptly thereafter. An increase in cash commitments, interest or fees; acceleration of maturity; material expansion of collateral or releases; a materially more restrictive covenant or default; or reduction of the Carve-Out requires further Court approval on notice. No amendment may bypass a matter reserved for final approval. No DIP Lender consent or waiver is implied by inaction, delay, partial enforcement or continued negotiations.

50. Good-faith reliance and section 364(e). The DIP Lender is entitled to section 364(e) protection for credit extended in good-faith reliance on this Interim DIP Order. Unless the authorization and incurrence of debt or grant of priority or lien were stayed pending appeal,

reversal or modification on appeal shall not affect the validity of debt incurred or the priority or lien granted to the extent protected by section 364(e). Any later modification remains subject to those statutory protections. This paragraph does not convert deferred relief into presently granted relief or impair the challenge and invoice-review rights expressly preserved herein.

51. Survival and binding effect. This Interim DIP Order binds the Debtor, its estate and successors, any chapter 7 or chapter 11 trustee, examiner with enlarged powers, plan administrator, liquidating trustee and other estate representative in this or a successor case. The authorized DIP Obligations, DIP Liens, DIP Claims and Carve-Out survive conversion, dismissal, plan confirmation and closing to the extent necessary to enforce their terms, subject to applicable law, express reservations herein and further Court orders. Pursuant to section 349(b), dismissal shall not vacate the liens and priorities granted herein; they shall remain effective until the secured obligations have been indefeasibly satisfied. No general provision of a subsequent order shall be construed to impair these rights without express treatment and notice to the affected parties.

52. Proofs of claim and payoff accounting. The DIP Lender need not file a proof of claim or administrative claim request for authorized DIP Obligations, and general bar dates do not apply to them. It may file or amend a claim at its election. This Interim DIP Order is sufficient evidence of the authorization and priority of DIP Claims; the actual amount remains determined by advances, authorized charges, credits and payments under the DIP Documents. Upon reasonable request in connection with a proposed payoff, the DIP Lender shall provide a statement itemizing those amounts. Neither the absence of a proof of claim nor repayment of interim advances extinguishes properly preserved, unpaid obligations.

53. Assignments and confidentiality. The DIP Lender may assign or participate its rights to the extent permitted by the DIP Documents and applicable law; any transfer remains

subject to this Interim DIP Order and does not enlarge the Debtor's obligations or release an unperformed funding obligation without an effective assumption or consent as required by applicable law. The Debtor may not assign its obligations without written DIP Lender consent and required Court approval. Nonpublic information obtained under the DIP Documents shall be maintained subject to customary confidentiality protections, permitting disclosure to advisors, representatives and permitted transferees bound by confidentiality and as required by law or Court order. Credit-bid assignments are expressly permitted as stated above.

54. Notices. Notices required herein shall be delivered by email to the Debtor and counsel, the DIP Lender through Fishel Law Group and Morris James, iHeartMedia through its designated counsel, the U.S. Trustee, and Committee counsel as applicable.

55. Final Hearing and objections. The Final Hearing is scheduled for [________], 2026 at [____] [a.m./p.m.] prevailing Eastern Time, in accordance with the Court's hearing procedures. Objections to final relief shall be filed and served by [________], 2026 at [____] prevailing Eastern Time on Debtor's counsel, DIP Lender counsel, iHeartMedia's counsel, the U.S. Trustee and Committee counsel, if any. The hearing shall comply with Bankruptcy Rule 4001 and Local Rule 2002-1(b). Proposed final relief includes additional borrowing authority, final Exit Fee approval and the expressly deferred lender protections. No Final DIP Order is deemed entered solely because a contractual milestone expires.

56. Service of Interim DIP Order and final notice. Within two Business Days after entry, the Debtor shall serve this Interim DIP Order, the DIP Motion and its exhibits to the extent not previously served, and notice of the Final Hearing and objection deadline on the parties identified in paragraph 3, all parties requesting notice, any subsequently appointed Committee, if

any, and all other persons entitled to notice of final financing relief. The Debtor shall file proof of service.

57. Immediate effectiveness and implementation. To the extent applicable, stays under Bankruptcy Rules 4001(a)(3) and 6004(h) are waived, and this Interim DIP Order is effective and enforceable upon entry. That waiver does not shorten the Default Notice Period or authorize immediate collateral remedies. The Debtor and DIP Lender are authorized to take actions necessary to implement the relief expressly granted herein, subject to its terms.

58. Governing law and jurisdiction. The DIP Term Sheet is governed by Delaware law, subject to the Bankruptcy Code and this Interim DIP Order. This Court retains jurisdiction over implementation, interpretation and enforcement of this Interim DIP Order and the DIP Documents, including disputes concerning priorities, fees, the Carve-Out, permitted cash use and remedies.

# EXHIBIT 1

**Executed DIP Term Sheet**

TWELVE BRIDGE CAPITAL

**October 14, 2026**

**FuturHealth, Inc.**

**Twelve Bridge Capital, LLC Comprehensive DIP Term Sheet**

**$5,000,000 Superpriority Priming Secured**
**Debtor-in-Possession ("DIP") Term Loan Credit Facility**

| | |
|---|---|
| **Debtor / Borrower:** | FuturHealth, Inc. (the "**Borrower**" or "**Debtor**"), as the sole debtor and debtor-in-possession in its chapter 11 case (the "**Chapter 11 Case**") to be commenced in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). |
| **Guarantors:** | None. |
| **DIP Lender:** | Twelve Bridge Capital, LLC ("**12BC**" or the "**DIP Lender**"). |
| **Documentation:** | Definitive financing documentation shall include (i) this term sheet, (ii) an interim order approving the DIP Facility (the "Interim DIP Order"), (iii) a final order approving the DIP Facility (the "**Final DIP Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), and (iv) such other documents, instruments, certificates and agreements as the DIP Lender may reasonably require (collectively, the "**DIP Documents**"), in each case in form and substance satisfactory to the DIP Lender. |
| **DIP Facility:** | A new-money, senior secured, superpriority priming, delayed-draw term loan facility (the "**DIP Facility**," the loans thereunder, the "**DIP Term Loans**," and all obligations thereunder, the "**DIP Obligations**") in an aggregate committed principal amount of up to $5,000,000 (the "**DIP Commitment**").<br><br>• Interim Availability. Upon entry of the Interim DIP Order and satisfaction or waiver of the applicable Conditions Precedent, an initial draw of $1,500,000 shall be funded to the Debtor in accordance with the Approved Budget.<br><br>• Final Availability. Upon entry of the Final DIP Order, up to an additional $3,500,000 shall be available in one or more draws in the budgeted amounts requested by the Debtor and in accordance with the Approved Budget; provided that no portion of such additional $3,500,000 shall be available or funded unless and until a Qualified Stalking Horse APA has been executed and remains in full force and effect.<br><br>• Each draw after the initial $1,500,000 draw shall be limited to the budgeted amount requested by the Debtor and reasonably required under the Approved Budget and shall remain subject to the applicable Conditions Precedent. Subject to satisfaction or written waiver of the applicable Conditions Precedent, the DIP Lender shall fund each properly submitted draw request within two (2) Business Days after receipt thereof. |

| | |
|---|---|
| | • Amounts repaid or prepaid may not be reborrowed, and each funding permanently reduces the remaining DIP Commitment by the amount funded. |
| **Closing Date:** | The date on which all conditions to the initial interim draw have been satisfied or waived in writing by the DIP Lender (the "**Closing Date**"). |
| **Use of Proceeds:** | Proceeds of the DIP Term Loans may be used solely in accordance with a rolling cash-flow budget approved by the DIP Lender (the "**Approved Budget**") and the DIP Orders, including:<br><br>i. payment of transaction costs, fees and expenses of the DIP Facility, including all reasonable and documented fees and expenses of Fishel Law Group, as counsel to the DIP Lender, local Delaware counsel, and a financial advisor as the DIP Lender may designate (collectively, the "**DIP Lender Professional Fees**");<br>ii. payment of allowed and budgeted professional fees and expenses of the Debtor and any statutory committee, subject to the Carve-Out;<br>iii. working capital and ordinary-course operating expenses, including employee, vendor, technology, marketing and other operating costs expressly set forth in the Approved Budget; and<br>iv. such other uses as are expressly approved in writing by the DIP Lender and authorized by the Bankruptcy Court.<br><br>No DIP proceeds may be used to investigate, challenge, object to, contest, prosecute or finance any action against the DIP Lender, the DIP Liens, the DIP Claims, the DIP Obligations, or any transaction contemplated by the DIP Documents, except solely to the extent of any investigation budget expressly agreed in the DIP Orders. |
| **Availability Period:** | The DIP Term Loans may be drawn from the Closing Date through, but excluding, the earliest occurrence of a Termination Event or Event of Default that has not been waived in writing by the DIP Lender (the "**DIP Termination Date**"). The DIP Lender's obligation to fund any undrawn commitment terminates automatically on the DIP Termination Date. |
| **Maturity:** | All DIP Obligations shall be due and payable in full in cash on the earliest of (each, a "**Termination Event**," and the earliest thereof, the "**Maturity Date**"):<br><br>i. 120 days after the Petition Date;<br>ii. the closing of any sale or other disposition of all or substantially all of the Debtor's assets or business;<br>iii. the effective date of any chapter 11 plan;<br>iv. conversion of the Chapter 11 Case to chapter 7;<br>v. dismissal of the Chapter 11 Case;<br>vi. appointment of a chapter 11 trustee or examiner with enlarged powers;<br>vii. consummation of any financing, recapitalization or other transaction that refinances or replaces the DIP Facility; or<br>viii. acceleration following an Event of Default. |
| **Interest Rate:** | The DIP Term Loans shall bear interest at 14.0% per annum, calculated on the basis of a 360-day year and payable in kind ("**PIK**") monthly in arrears by capitalizing accrued interest and adding it to outstanding principal. Capitalized PIK interest shall thereafter |

| | |
|---|---|
| | constitute principal for all purposes and itself bear interest. During the continuance of an Event of Default, all DIP Obligations shall automatically bear interest at an additional 3.0% per annum (the "**Default Rate**"), payable in kind or in cash at the DIP Lender's election and due on demand or the DIP Termination Date. |
| **Fees:** | A fee equal to $250,000 (the "**Interim Commitment Fee**"), fully earned, non-refundable and irrevocable upon entry of the Interim DIP Order, and an additional $250,000 fully earned, non-refundable and irrevocable upon entry of the Final DIP Order (the "**Final Commitment Fee,**" and together with the Interim Commitment Fee, the "**Commitment Fee**"), whether or not the entire DIP Commitment is ultimately funded, provided however that if the Debtor obtains replacement financing from a different lender between the entry of the Interim DIP Order and the entry of the Final DIP Order, the full Commitment Fee shall be fully earned, non-refundable and irrevocable. The Interim Commitment Fee shall be capitalized and added to the DIP Obligations upon entry of the Interim DIP Order, and the Final Commitment Fee shall be capitalized and added to the DIP Obligations upon entry of the Final DIP Order. In the event the Debtor obtains a Qualified Stalking Horse APA prior to the commencement of the Chapter 11 Case, the Commitment Fee shall be reduced to $350,000, with $175,000 due upon entry of the Interim DIP Order and the remaining $175,000 due upon entry of the Final DIP Order.<br><br>A fee equal to 5.0% of the principal amount of each DIP Term Loan funded (each, a "**Funding Fee**"), fully earned and non-refundable when the applicable draw is funded. Each Funding Fee shall be capitalized and added to the DIP Obligations at the time of the applicable draw. The Funding Fee applicable to each draw, whenever funded, shall be approved on a final basis upon entry of the Interim DIP Order. In the event the Debtor obtains a Qualified Stalking Horse APA prior to the commencement of the Chapter 11 Case, the Funding Fee shall be reduced to 2.5%.<br><br>A fee equal to 7.0% of the aggregate principal amount of DIP Term Loans outstanding plus capitalized PIK interest immediately before the applicable repayment, refinancing, satisfaction, sale closing, plan effective date, acceleration or other exit from the DIP Facility (the "**Exit Fee**"), fully earned and payable in cash at such time. The Exit Fee shall be determined by reference to principal amounts actually outstanding, including interest, not the DIP Commitment. Any partial voluntary or mandatory prepayment shall trigger payment of the Exit Fee on the amount of principal then repaid (including capitalized PIK interest), without duplication on subsequent payments. The Exit Fee shall be approved upon entry of the Interim DIP Order subject to final approval upon entry of a Final DIP Order, notwithstanding that it is payable only upon the applicable repayment or other exit from the DIP Facility. In the event the Debtor obtains a Qualified Stalking Horse APA prior to the commencement of the Chapter 11 Case, the Exit Fee shall be reduced to 2.5%.<br><br>A work fee equal to $50,000 (the "**Work Fee**") payable upon execution of this Term Sheet. One half of the Work Fee $25,000 shall be credited against the Exit Fee when due.<br><br>All Commitment Fees, Funding Fees, Exit Fees and any other fees approved by the Bankruptcy Court (collectively, the "**Fees**") shall constitute DIP Obligations, shall be |

| | |
|---|---|
| | secured by the DIP Liens, shall be entitled to the DIP Claims, and shall not be subject to reduction, setoff, recoupment, recharacterization, avoidance or disgorgement. |
| **Voluntary Prepayments:** | Voluntary prepayments shall be permitted only upon at least three (3) Business Days' prior written notice to the DIP Lender, in minimum principal amounts of $50,000, together with all accrued PIK interest, the Exit Fee and all other amounts then due. Amounts prepaid may not be reborrowed. |
| **Mandatory Prepayments:** | Unless waived in writing by the DIP Lender, the Debtor shall immediately apply 100% of the following proceeds to the DIP Obligations until indefeasibly paid in full in cash:<br><br>i. net cash proceeds of any sale, lease, assignment, transfer or other disposition of assets outside the ordinary course, including all proceeds of the Sale Process;<br>ii. net proceeds of any insurance recovery, condemnation award, litigation recovery, tax refund or other extraordinary receipt, except to the extent specifically budgeted for reinvestment with the prior written consent of the DIP Lender;<br>iii. proceeds of any financing, refinancing, recapitalization, equity issuance or similar transaction; and<br>iv. such other proceeds as may be agreed in the definitive DIP Documents.<br><br>All Sale Proceeds and other mandatory-prepayment proceeds shall constitute first dollars payable directly to the DIP Lender at the applicable closing or upon receipt, ahead of any distributions, reserves, escrows or payments to any other secured or unsecured creditor or claimant, including, without limitation, iHeartMedia, the holders of any merchant cash advance or receivables-purchase claims, insiders, unsecured creditors or other parties, and without any prior deduction for transaction costs or other amounts except solely amounts constituting the expressly approved Carve-Out under the DIP Orders. For the avoidance of doubt, except as provided herein, the first dollars of all Sale Proceeds shall be paid to the DIP Lender in cash in full before any payment on account of any other secured claim, including the iHeart Loan. Such amounts shall be paid directly by the purchaser or closing agent to the DIP Lender, without passing through the Debtor's operating accounts, to the fullest extent permitted by the DIP Orders and shall be applied first to DIP Lender Professional Fees and reimbursable expenses, second to Fees, third to accrued interest (including default interest), fourth to principal (including capitalized PIK interest and Fees), and fifth to all other DIP Obligations, in each case subject only to the expressly approved Carve-Out and no other senior or pari passu priority unless separately agreed in writing by the DIP Lender and expressly approved in the DIP Orders. No sale or transaction proceeds may be escrowed, reserved, recharacterized, netted or otherwise diverted in a manner that delays or avoids repayment of the DIP Obligations.<br><br>To the extent the Sale Process results in a transaction that will pay all DIP Obligations in full, DIP Lender agrees that the Interest Rate portion of the DIP Obligations shall be treated *pari passu* with the obligations owed to iHeartMedia, whether under the iHeart Loan, as part of iHeartMedia's adequate protection claims, or otherwise. |
| **Credit Bidding:** | Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of the DIP Obligations in connection with any sale or disposition of any assets of the Debtor, whether under section 363, a chapter 11 plan, or a chapter 7 case. The DIP Lender may assign its credit-bid rights to an affiliate, designee, acquisition |

| | |
|---|---|
| | vehicle or other permitted assignee without further consent of the Debtor. Subject to section 363(k) of the Bankruptcy Code, iHeartMedia shall also be permitted to credit bid all or any portion of its allowed secured prepetition claim; provided, however, that no credit bid by iHeartMedia may be consummated unless the applicable sale transaction provides for the indefeasible payment in full in cash at closing of all DIP Obligations and DIP Lender Professional Fees. |
| **Priority and Liens:** | Pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Lender shall receive continuing, valid, binding, enforceable, non-avoidable and automatically perfected first-priority priming liens and security interests (the "**DIP Liens**") on all prepetition and postpetition property of the Debtor, whether now owned or hereafter acquired, and all proceeds thereof (collectively, the "**DIP Collateral**"), including cash, deposit accounts, accounts receivable, inventory, equipment, intellectual property, equity interests, insurance proceeds, commercial tort claims, litigation claims and proceeds, and, subject to entry of the Final DIP Order, proceeds of avoidance actions.<br><br>Subject only to the Carve-Out and any adequate-protection liens expressly subordinated to the DIP Liens in the DIP Orders, the DIP Liens shall prime and be senior to all prepetition and postpetition liens, claims and encumbrances, including, without limitation, any liens securing the obligations owing to iHeartMedia + Entertainment, Inc. ("**iHeartMedia**") under the secured debt facility arising from the conversion of amounts owing under the Debtor's advertising arrangement with iHeartMedia (the "**iHeart Loan**"), including iHeartMedia's liens on the Debtor's accounts receivable and proceeds thereof, which iHeartMedia has agreed shall be consensually primed by the DIP Liens, and any purported liens, security interests or other collateral rights asserted by Cedar Advance LLC or Velocity Capital Group LLC under their merchant cash advance arrangements, in each case to the extent such liens or interests are valid and enforceable.<br><br>Merchant Cash Advance, Receivables Purchase and Similar Arrangements. The DIP Liens shall prime, to the fullest extent authorized by the Bankruptcy Court and applicable law, any liens, security interests and other collateral rights asserted under or relating to merchant cash advance, receivables purchase, payment-processing or similar arrangements. The Debtor has represented that none of Cedar Advance LLC or Velocity Capital Group LLC perfected any security interest in the Debtor's assets, or that any such interest was not timely perfected and is subject to avoidance. Nothing herein constitutes an admission that any purported sale of receivables was a true sale or that receivables purportedly transferred are or are not property of the estate; any asserted ownership, remittance, control, setoff or recoupment rights shall be addressed in the DIP Orders, cash-management orders and/or separate consensual arrangements or contested proceedings satisfactory to the DIP Lender.<br><br>The Debtor shall cause all postpetition merchant-processor and other receivables proceeds to be remitted to accounts subject to the DIP Liens and shall not permit any prepetition MCA Lender to divert or receive postpetition receipts except as expressly authorized by the Bankruptcy Court. Unless agreed by the DIP Lender, the entry of an order authorizing any MCA Lender to divert or receive postpetition receipts shall be an event of default. |

| | |
|---|---|
| | The DIP Obligations shall constitute allowed superpriority administrative expense claims under section 364(c)(1) (the "**DIP Claims**") with priority over all other administrative expenses and unsecured claims, subject only to the Carve-Out.<br><br>The DIP Liens shall be effective and automatically perfected upon entry of the Interim DIP Order without further action, filing or recording, and the Debtor shall execute any additional perfection documents reasonably requested by the DIP Lender. |
| **iHeartMedia Adequate Protection:** | In consideration of iHeartMedia's consent to the priming of the iHeart Loan, iHeartMedia shall receive adequate protection consisting of: (i) a second priority lien on the DIP Collateral, in all cases junior and subordinate to the DIP Liens and the Carve-Out; (ii) a superpriority claim under section 507(b) of the Bankruptcy Code solely to the extent the foregoing adequate protection proves insufficient, junior and subordinate to the DIP Claims and the Carve-Out; (iii) current cash payments, when due, of interest accruing under the iHeart Loan at the applicable non-default contract rate; (iv) all reporting and information rights provided to the DIP Lender under the DIP Documents, including weekly cash, liquidity and variance reporting and Sale Process updates, subject to customary privilege and confidentiality limitations; (v) the first $50,000 in proceeds from the Sale Process shall be shared pari passu between iHeart and the DIP Lender, (vi) the Debtor and DIP Lender agree not to challenge the extent, validity, or priority of the iHeart Loan and (vii) payment by the Debtor of the reasonable and documented fees and expenses of iHeartMedia's legal counsel and financial advisor, subject to customary notice and review procedures and inclusion in the Approved Budget. All such adequate-protection payments, liens, claims and rights shall be subject and subordinate to the DIP Liens and DIP Claims as set forth above, and, except solely for the sharing of the first $50,000 of Sale Proceeds expressly provided in clause (v) above, nothing in this adequate-protection package shall alter the first-dollar Sale Proceeds waterfall in favor of the DIP Lender. |
| **Remedies:** | Upon the occurrence and during the continuance of an Event of Default, and subject only to the delivery of a notice of event of default to the Debtor by the DIP Lender (a "**Termination Notice**") and the passage of any notice period expressly required by the DIP Orders and the Carve-Out, the DIP Lender may, without further order of the Bankruptcy Court:<br><br>i. terminate all remaining DIP Commitments and any obligation to fund additional DIP Term Loans;<br>ii. declare all DIP Obligations immediately due and payable;<br>iii. terminate or restrict the Debtor's use of cash collateral;<br>iv. sweep or apply cash and other proceeds of DIP Collateral to the DIP Obligations;<br>v. exercise rights and remedies against DIP Collateral, including foreclosure and other rights of a secured creditor; and<br>vi. seek such other relief as is authorized by the DIP Orders or applicable law.<br><br>The Debtor shall waive any right to seek relief under section 105 or otherwise to restrict or impair the DIP Lender's exercise of the rights and remedies expressly provided in the DIP Documents and DIP Orders.<br><br>The Debtor and the U.S. Trustee shall be entitled to an emergency hearing before this Court within five (5) business days after the Termination Notice is sent by |

| | |
|---|---|
| | the Prepetition Secured Lender to the Debtors, the U.S. Trustee, (such 5-business-day period, the "**Default Notice Period**"); provided that, if a request for such hearing is made prior to the expiration of the Default Notice Period but the Court schedules such hearing for a date thereafter, the Default Notice Period shall be automatically extended until the Court hears and rules with respect thereto. |
| **Conditions Precedent to Draws (collectively, the "Conditions Precedent"):** | Each extension of credit is subject to satisfaction or written waiver by the DIP Lender of customary conditions, including:<br><br>i. entry and continued effectiveness of the applicable DIP Order authorizing the requested funding and the DIP Documents;<br>ii. valid, perfected and enforceable DIP Liens and DIP Claims with the priority contemplated herein;<br>iii. an Approved Budget and updated liquidity forecast acceptable to the DIP Lender;<br>iv. receipt of required corporate approvals, borrowing notices and customary closing deliverables;<br>v. accuracy in all material respects of representations and warranties;<br>vi. no Event of Default or Termination Event has occurred and is continuing or would result from the funding;<br>vii. payment or provision for all then-due DIP Lender Professional Fees and other amounts owing to the DIP Lender;<br>viii. continued compliance in all material respects with the Approved Budget, Permitted Variance, Milestones, DIP Documents and DIP Orders; and<br>ix. immediately after giving effect to each draw and the disbursements then due, unrestricted cash on hand shall be not less than $100,000;<br>x. with respect to any funding from the additional $3,500,000 available following entry of the Final DIP Order, execution and continued effectiveness of a Qualified Stalking Horse APA. |
| **Interim DIP Order:** | The Interim DIP Order shall, among other things, authorize and approve on an interim basis: (i) the full $5,000,000 DIP Commitment, with up to $1,500,000 available on an interim basis, (ii) priming DIP Liens and DIP Claims, (iii) use of cash collateral on terms acceptable to the DIP Lender; (iv) final approval of the Commitment Fee calculated on the entire DIP Commitment, final approval of the Funding Fee as applicable to each draw, and final approval of the Exit Fee; (v) payment of all DIP Lender Professional Fees and expenses incurred before and after the Petition Date, including fees and expenses of Fishel Law Group, local Delaware counsel and the DIP Lender's financial advisor; (vi) the mandatory-prepayment provisions and first-dollar DIP sale-proceeds waterfall; (vii) all reporting, budget and variance requirements; and (viii) customary waivers, releases, stipulations and lender protections, in each case in form and substance satisfactory to the DIP Lender.<br><br>Upon entry of the Interim DIP Order, the Alternative DIP / Break-Up Claim provision shall terminate automatically, and the Commitment Fee shall instead be earned and payable in accordance with the Fees section and the Interim DIP Order. |
| **Final DIP Order:** | The Final DIP Order shall be substantially consistent with the Interim DIP Order, with such additional customary protections as the DIP Lender may require, and shall finally approve the full DIP Commitment and confirm the final approval granted in the Interim DIP Order of the Commitment Fee, Funding Fees and Exit Fee, and shall finally approve all DIP Lender Professional Fees, the additional $3,500,000 of post-interim availability |

| | |
|---|---|
| | subject to the Conditions Precedent (including the requirement for a Qualified Stalking Horse APA), the DIP Liens and DIP Claims on a final basis, waivers under sections 506(c) and 552(b), the agreed challenge period and standing provisions, and all other protections contemplated by the DIP Documents. |
| **Sale Process / Milestones:** | The DIP Facility is being underwritten on the basis of a prompt sale or other monetization process acceptable to the DIP Lender (the "**Sale Process**"). The Debtor shall comply with customary milestones (the "**Milestones**") to be agreed in connection with the definitive DIP Documents. The initial Milestones are expected to include:<br><br>i. Petition Date: [TBD];<br>ii. entry of Interim DIP Order: within three (3) business days of the Petition Date;<br>iii. filing of motion seeking approval of bidding procedures and sale process, including the approval of stalking horse protections: within seven (7) days of the Petition Date;<br>iv. entry of Final DIP Order and bidding-procedures order: within thirty (30) days of the Petition Date;<br>v. execution and continued effectiveness of a Qualified Stalking Horse APA before any funding from the additional $3,500,000 of final availability;<br>vi. bid deadline, auction (if required), Sale Hearing and closing on dates to be agreed in the definitive DIP Documents, with the objective of consummating a Sale Transaction within approximately one hundred and twenty (120) days of the Petition Date; and<br>vii. such other reasonable process milestones as the parties may agree following completion of diligence.<br>viii. Each Milestone may be extended or waived by prior written consent of the DIP Lender. Failure to timely achieve a Milestone shall constitute an Event of Default only after expiration of any applicable cure period set forth in the definitive DIP Documents or as otherwise waived by the DIP Lender. |
| **Events of Default:** | The Events of Default shall include customary events for a financing of this type, including:<br><br>i. failure to pay any DIP Obligation when due or comply with any mandatory-prepayment obligation;<br>ii. material failure to comply with any DIP Document, DIP Order, Milestone, Approved Budget or Permitted Variance, subject to any applicable cure period;<br>iii. occurrence of any Termination Event;<br>iv. reversal, vacatur, stay or material modification of a DIP Order or Sale Order in a manner adverse to the DIP Lender without its prior written consent;<br>v. entry or allowance of any lien or superpriority claim senior to or pari passu with the DIP Liens or DIP Claims other than the Carve-Out or other expressly agreed priority;<br>vi. incurrence or approval of additional financing that does not indefeasibly repay the DIP Obligations in full;<br>vii. cessation of the DIP Liens or DIP Claims to be valid, perfected, enforceable and senior as required;<br>viii. payment of any material prepetition claim except as expressly authorized by the Bankruptcy Court and included in the Approved Budget; |

| | |
|---|---|
| | ix. after execution of a Qualified Stalking Horse APA and funding from the additional $3,500,000 final availability, termination or abandonment of such APA without a replacement transaction acceptable to the DIP Lender; or<br>x. any material misrepresentation or breach of representation or warranty. |
| **Representations and Warranties:** | Customary for a financing of this type and acceptable to the DIP Lender, including due organization and authority; enforceability of DIP Documents; accuracy and completeness of information provided to the DIP Lender and its professionals; ownership of assets; validity and priority of liens; no undisclosed material liabilities; compliance with laws; taxes; litigation; insurance; intellectual property; permits and licenses; labor and employee matters; privacy, data-security and healthcare-regulatory matters; absence of defaults under material contracts; solvency-related matters as applicable; and the completeness and accuracy of information concerning the Debtor's capital structure, cash, collateral, customer and subscriber base, merchant-processing arrangements, medical and pharmacy provider relationships, technology platform, material vendors, liquidity and Sale Process. |
| **Affirmative and Negative Covenants:** | Customary lender-protective covenants, including that the Debtor shall:<br><br>i. provide the DIP Lender and its professionals with drafts of material pleadings, motions, orders, sale documents, bid procedures, asset purchase agreements and other restructuring materials sufficiently in advance of filing to permit meaningful review and comment;<br>ii. promptly provide all bids, indications of interest, proposals and other material communications concerning any sale, restructuring or financing transaction unless and until DIP Lender elects to participate in the Sale Process as bidder or otherwise submits a Qualified Bid by any deadline set forth in the bid procedures order entered in the chapter 11 case;<br>iii. comply with the DIP Documents, DIP Orders, Milestones and Approved Budget; maintain cash-management and merchant-processing controls, insurance, permits, licenses and books and records; maintain the Whole Health OS platform and material medical, pharmacy, technology and service-provider relationships in the ordinary course; and pay postpetition taxes and other administrative obligations when due;<br>iv. following funding of the initial draw, maintain unrestricted cash on hand of not less than $100,000 at all times, unless otherwise agreed in writing by the DIP Lender;<br>v. not incur additional indebtedness or liens, or make material payments on prepetition debt, except as expressly permitted in the Approved Budget, authorized by the Bankruptcy Court and not opposed by the DIP Lender;<br>vi. not sell or dispose of material assets outside the ordinary course except pursuant to the Sale Process or with the prior written consent of the DIP Lender;<br>vii. not enter into or materially amend any sale, financing, settlement or other restructuring transaction in a manner materially adverse to the DIP Lender without its prior written consent; and<br>viii. take commercially reasonable actions to preserve collateral value and facilitate the Sale Process. |
| **DIP Budget / Variance Reporting:** | The initial Approved Budget shall be acceptable to the DIP Lender and shall cover at least thirteen (13) weeks. The Debtor shall deliver an updated rolling thirteen-week budget and variance report weekly. The Debtor shall not permit aggregate cash |

| | |
|---|---|
| | disbursements for any testing period to exceed the aggregate disbursements set forth in the Approved Budget by more than 15% (the "**Permitted Variance**"), measured on a rolling four-week basis, unless otherwise agreed by the DIP Lender. Favorable variances may be carried forward within the testing period unless otherwise provided in the definitive DIP Documents. Any updated budget shall become an Approved Budget upon written approval of the DIP Lender. |
| **Other Reporting Requirements:** | The Debtor shall provide reporting reasonably requested by the DIP Lender and its financial advisor, including weekly cash, liquidity and variance reporting; revenue, active-customer, subscriber, renewal and churn metrics reasonably relevant to the business; merchant-processor receipts and settlement reporting; accounts payable and vendor-aging reports; cash-management balances; material medical, pharmacy and technology provider status; rolling sale-process updates; copies of material notices and communications; and prompt notice of any default, material litigation or regulatory matter, material contract termination, vendor or service-provider disruption, or other event reasonably expected to affect the Debtor, the DIP Collateral, the Sale Process or repayment of the DIP Obligations. |
| **Due Diligence Access:** | The Debtor shall provide the DIP Lender, Fishel Law Group, the DIP Lender's local Delaware counsel, and such financial advisor as the DIP Lender may designate, and their respective representatives prompt and continuing access to management, books and records, data rooms, financial models, bank records, merchant-processing records, material contracts, customer and subscriber metrics, medical and pharmacy provider arrangements, technology and intellectual-property information, vendors, advisors and other information reasonably requested in connection with the DIP Facility and Sale Process. The Debtor shall cause its professionals to participate in diligence calls and meetings with the DIP Lender and its professionals as reasonably requested. |
| **Carve-Out:** | The "**Carve-Out**" shall mean, collectively, and subject to the definitive DIP Orders: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and the Office of the United States Trustee under 28 U.S.C. § 1930(a), plus statutory interest, if any; (b) fees and expenses of a chapter 7 trustee payable under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; and (c) to the extent allowed by the Bankruptcy Court, accrued and unpaid fees and expenses of professionals retained by the Debtor and any statutory committee that are (i) incurred on or before delivery of a Carve-Out Trigger Notice, but only to the extent such fees and expenses are within the amounts allocated to the applicable professionals in the Approved Budget through the applicable period, and (ii) incurred after delivery of a Carve-Out Trigger Notice, subject to an aggregate post-trigger cap of $100,000.<br><br>Debtor shall be permitted to establish a professional fee reserve (the "**Professional Fee Reserve**") to ensure payment of professional fees. Amounts funded into the Professional Fee Reserve shall be considered used by the Debtor at such time as they are deposited into the Professional Fee Reserve for distribution to professionals in accordance with orders of the Bankruptcy Court. Any Professional Fee Reserve shall be limited to amounts provided for in the Approved Budget, shall not include unbudgeted or accelerated amounts, and any unused balance shall remain or become DIP Collateral. |

| | |
|---|---|
| | "**Carve-Out Trigger Notice**" means written notice delivered by the DIP Lender following the occurrence and during the continuation of an Event of Default to the Debtor, the U.S. Trustee, and such other parties as may be required by the DIP Orders. |
| **Indemnification and Reimbursement of Expenses:** | The Debtor shall pay all reasonable and documented out-of-pocket costs, fees and expenses of the DIP Lender, whether incurred before or after the Petition Date, in connection with diligence, underwriting, negotiation, documentation, court approval, administration, monitoring, amendment, enforcement, preservation or protection of the DIP Facility and the DIP Lender's rights, including all reasonable fees and expenses of Fishel Law Group, the DIP Lender's local Delaware counsel, and a financial advisor as the DIP Lender may designate. All accrued and unpaid DIP Lender Professional Fees through the Closing Date shall be paid from the Interim Draw, and thereafter shall be paid promptly as they come due in accordance with the DIP Orders. DIP Lender shall only be entitled to reimbursement of the reasonable fees and expenses of their professionals (the "**DIP Lender's Expenses**") after copies of all invoices (which may be redacted for privilege) reflecting the DIP Lender's Expenses are served by email on the Debtor, the U.S. Trustee, and any statutory committee appointed in the chapter 11 case, who shall have ten (10) business days to review and to assert any objections thereto.<br><br>The Debtor shall provide customary indemnification to the DIP Lender and its affiliates, members, managers, officers, employees, professionals and representatives for claims, liabilities, losses, damages, costs and expenses arising from or relating to the DIP Facility, the DIP Documents, the Chapter 11 Case or the transactions contemplated thereby, except to the extent finally determined by a non-appealable judgment to result from such indemnified party's gross negligence, fraud, or willful misconduct. These reimbursement and indemnification obligations shall survive repayment of the DIP Obligations and termination of the DIP Facility. |
| **Sale Process Definitions:** | "**Sale Process**" means the marketing, bidding, auction and sale process for all or substantially all of the Debtor's assets or business, or such other restructuring or monetization transaction acceptable to the DIP Lender, on terms and pursuant to milestones to be agreed following completion of diligence.<br><br>"**Qualified Stalking Horse APA**" means a binding executed asset purchase agreement acceptable to the DIP Lender that (i) provides sufficient cash consideration at closing to indefeasibly pay in full all DIP Obligations and DIP Lender Professional Fees, (ii) is not subject to a financing contingency or material remaining diligence contingency, (iii) is supported by reasonable evidence of the stalking-horse purchaser's financial ability to close, and (iv) otherwise provides a credible path to consummation within the Milestones.<br><br>"**Qualified Bid**" shall mean a binding bid that, among other requirements to be set forth in bidding procedures acceptable to the DIP Lender, provides first-dollar cash proceeds payable directly to the DIP Lender at closing, ahead of all other sale distributions (subject only to the expressly approved Carve-Out), sufficient to indefeasibly pay in full the DIP Obligations, including principal, PIK interest, Commitment Fee, Funding Fees, Exit Fee, DIP Lender Professional Fees and all other amounts owing to the DIP Lender, and is not subject to financing or material diligence contingencies. |

| | |
|---|---|
| | "**Sale Proceeds**" means all cash and non-cash consideration, deposits, escrow releases, contract assignment proceeds, purchase-price adjustments, settlement amounts, break-up fees, termination payments and other proceeds arising from or relating to any Sale Process or other disposition of assets. |
| **Release:** | Effective solely upon entry of the Interim DIP Order, the Debtor shall provide the DIP Lender and its affiliates, members, managers, officers, employees, participants, professionals, representatives, successors and assigns a customary release solely for claims and causes of action arising from acts, omissions, transactions and matters occurring on or before the entry of the Interim DIP Order and, as and when any interim draw is actually funded, matters occurring in connection with such draw through its funding date, in each case relating to the DIP Facility, the DIP Documents or related negotiations and transactions, subject only to any challenge rights expressly preserved in the Interim DIP Order. No release is granted for future performance or conduct arising after the last funded interim draw; any later release requires a separately negotiated express agreement and court approval. |
| **Waivers:** | The DIP Orders shall include customary lender protections and waivers, including waiver of the automatic stay to the extent necessary to exercise remedies after any applicable notice period, full credit-bid rights, no-marshaling provisions, waiver of surcharge under section 506(c), waiver of the "equities of the case" exception under section 552(b), and such other waivers and stipulations as are customary for a priming DIP financing of this risk profile. |
| **Governing Law** | State of Delaware. |
| **Counsel to the DIP Lender:** | Fishel Law Group and Morris James, as Delaware local counsel |
| **Fiduciary Out** | Notwithstanding anything to the contrary in this Term Sheet or any document filed with or entered by the Court, nothing in the Term Sheet or the DIP Documents shall require the Debtor or its board of directors to take any action or to refrain from taking any action with respect to any financing transaction to the extent the Debtor or board of directors determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; provided that (a) the Debtor shall notify counsel to the DIP Lender of any such determination within twenty-four hours following such determination, (b) such determination shall not impede the DIP Lender's right to terminate the DIP Facility, and (c) the DIP Lender reserves its right to challenge any action taken (or omitted to take) pursuant to this section.<br><br>Further, notwithstanding anything to the contrary in this Term Sheet or any document filed with or entered by the Court, until the entry of the Final DIP Order, the Debtor and its directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (i) consider, respond to, and facilitate alternate proposals for financing (each, an "**Alternate Proposal**"); (ii) provide access to non-public information concerning the Debtor to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (iii) maintain or continue discussions or negotiations with respect to Alternate Proposals; (iv) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (v) enter into or |

| | |
|---|---|
| | continue discussions or negotiations with any person or entity regarding any Alternate Proposal. |

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Term Sheet to be duly executed as of the date first set forth above.

**<u>BORROWER:</u>**
**FuturHealth, Inc.**

Signed by:
By: Jon Hambidge
5AB74A449760438...
Name: Jon Hambidge
Title: Chief Executive Officer

**<u>LENDER:</u>**
**Twelve Bridge Capital, LLC**

Signed by:
By: Ric T. Best
15C797E2112C45D...
Name: Ric T. Best
Title: Authorized Signatory

# FIRST AMENDMENT TO DIP TERM SHEET

This Amendment is entered into as of October 30, 2026, by and between FuturHealth, Inc. (the "Borrower" or "Debtor") and Twelve Bridge Capital, LLC ("12BC" or the "DIP Lender"), and amends the Comprehensive DIP Term Sheet dated October 14, 2026, between the Debtor and the DIP Lender (the "Term Sheet"). Capitalized terms used but not defined herein have the meanings given in the Term Sheet.

**1. Amendment to Fees.** The following paragraph is added after the first paragraph of the "Fees" section of the Term Sheet:

> "Notwithstanding the foregoing, if the Debtor obtains a Qualified Stalking Horse APA on or after commencement of the Chapter 11 Case and no later than twenty-one (21) days after the Petition Date, (i) the Final Commitment Fee shall be reduced to $150,000, and (ii) the Funding Fee for each draw after the initial draw shall equal 4.0% of the principal amount of the DIP Term Loan funded in such draw. The Interim Commitment Fee and the Funding Fee for the initial draw shall remain unchanged. For the avoidance of doubt, the existing pricing applicable if the Debtor obtains a Qualified Stalking Horse APA prior to commencement of the Chapter 11 Case remains unchanged. If neither stalking horse pricing condition is satisfied, the otherwise applicable Fees remain unchanged."

**2. No Other Amendments.** Except as expressly amended hereby, the Term Sheet remains unchanged and in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first written above.

**FUTURHEALTH, INC.**

DocuSigned by:
By: ______________________
CB96D1C2ED8C436...
Name: Mary Schroeder
Title: Independent Director

**TWELVE BRIDGE CAPITAL, LLC**

Signed by:
By: Ric T. Best ______________________
15C797E2112C45D...
Name: Ric T. Best
Title: Authorized Signatory

# EXHIBIT 2

## Approved Budget

11/1/2026

| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 |
| Week Beginning | 11/2 | 11/9 | 11/16 | 11/23 | 11/30 | 12/7 | 12/14 | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 11/2 |
| Week Ending | 11/8 | 11/15 | 11/22 | 11/29 | 12/6 | 12/13 | 12/20 | 12/27 | 1/3 | 1/10 | 1/17 | 1/24 | 1/31 | 1/31 |
| **Receipts** | | | | | | | | | | | | | | |
| Stripe | $ 621,081 | $ 639,714 | $ 658,905 | $ 678,672 | $ 692,246 | $ 706,091 | $ 720,212 | $ 734,617 | $ 749,309 | $ 764,295 | $ 779,581 | $ 795,173 | $ 811,076 | 9,350,971 |
| Refund | $ (20,000) | $ (20,000) | $ (20,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | (60,000) |
| Authorize | $ 23,008 | $ 23,698 | $ 24,409 | $ 25,142 | $ 25,644 | $ 26,157 | $ 26,680 | $ 27,214 | $ 27,758 | $ 28,314 | $ 28,880 | $ 29,457 | $ 30,047 | 346,410 |
| **Total Receipts, Net** | **$ 624,089** | **$ 643,412** | **$ 663,314** | **$ 703,814** | **$ 717,890** | **$ 732,248** | **$ 746,893** | **$ 761,831** | **$ 777,067** | **$ 792,609** | **$ 808,461** | **$ 824,630** | **$ 841,123** | **$ 9,637,381** |
| *Weekly Growth, Stripe and Authorize* | | *3.0%* | *3.0%* | *3.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | *2.0%* | |
| **Disbursements** | | | | | | | | | | | | | | |
| Marketing | $ (123,611) | $ (357,592) | $ (121,949) | $ (128,046) | $ (134,448) | $ (141,171) | $ (389,679) | $ (155,641) | $ (163,423) | $ (171,594) | $ (421,624) | $ (189,182) | $ (198,642) | (2,696,602) |
| Wages & Benefits | $ - | $ (310,024) | $ (50,840) | $ (225,411) | $ (50,840) | $ (310,024) | $ (50,840) | $ (225,411) | $ (50,840) | $ - | $ (360,864) | $ - | $ (276,251) | (1,911,345) |
| Other Trade/Operational Payments | $ (428,868) | $ (420,783) | $ (250,000) | $ (225,000) | $ (255,625) | $ (225,000) | $ (435,783) | $ (225,000) | $ (549,630) | $ (225,000) | $ (435,783) | $ (225,000) | $ (225,000) | (4,126,472) |
| **Total Operating Disbursements** | **$ (552,479)** | **$ (1,088,399)** | **$ (422,789)** | **$ (578,457)** | **$ (440,913)** | **$ (676,195)** | **$ (876,303)** | **$ (606,052)** | **$ (763,892)** | **$ (396,594)** | **$ (1,218,271)** | **$ (414,182)** | **$ (699,893)** | **$ (8,734,419)** |
| **Operating Cash Flow** | **$ 71,611** | **$ (444,987)** | **$ 240,526** | **$ 125,357** | **$ 276,977** | **$ 56,053** | **$ (129,410)** | **$ 155,779** | **$ 13,175** | **$ 396,015** | **$ (409,810)** | **$ 410,448** | **$ 141,230** | **$ 902,962** |
| **Non Operating Disbursements** | | | | | | | | | | | | | | |
| Chapter 11 expenses | $ (352,885) | $ (102,885) | $ (152,885) | $ (252,885) | $ (102,885) | $ (102,885) | $ (102,885) | $ (102,885) | $ (102,885) | $ (102,885) | $ (102,885) | $ (102,885) | $ (427,885) | (2,112,500) |
| Secured Debt expenses | $ (50,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (75,000) | (125,000) |
| KEIP / KERP | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (1,000,000) | (1,000,000) |
| Prepetition Secured Lender Interest | $ - | $ (50,000) | $ - | $ - | $ - | $ - | $ (50,000) | $ - | $ - | $ - | $ (50,000) | $ - | $ - | (150,000) |
| Advisory Fees | $ - | $ (60,000) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | (60,000) |
| Critical Vendors | $ - | $ - | $ (250,000) | $ - | $ (250,000) | $ - | $ - | $ - | $ - | $ (500,000) | $ - | $ - | $ - | (1,000,000) |
| **Net Cash Flow before DIP Financing** | **$ (331,274)** | **$ (657,871)** | **$ (162,359)** | **$ (127,528)** | **$ (75,908)** | **$ (46,832)** | **$ (282,294)** | **$ 52,894** | **$ (89,710)** | **$ (206,870)** | **$ (562,695)** | **$ 307,563** | **$ (1,361,655)** | **$ (3,544,538)** |
| **DIP Financing** | | | | | | | | | | | | | | |
| DIP Draws - Funded Proceeds | $ 1,500,000 | $ - | $ - | $ - | $ - | $ - | $ 200,000 | $ - | $ 100,000 | $ 200,000 | $ 500,000 | $ - | $ 1,100,000 | 3,600,000 |
| **Net DIP Financing Cash Flow** | **$ 1,500,000** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 200,000** | **$ -** | **$ 100,000** | **$ 200,000** | **$ 500,000** | **$ -** | **$ 1,100,000** | **$ 3,600,000** |
| Opening Bank Cash | $ 93,367 | $ 1,262,093 | $ 604,222 | $ 441,863 | $ 314,335 | $ 238,427 | $ 191,596 | $ 109,301 | $ 162,195 | $ 172,486 | $ 165,616 | $ 102,921 | $ 410,484 | 93,367 |
| Net Cash Flow after DIP Financing | $ 1,168,726 | $ (657,871) | $ (162,359) | $ (127,528) | $ (75,908) | $ (46,832) | $ (82,294) | $ 52,894 | $ 10,290 | $ (6,870) | $ (62,695) | $ 307,563 | $ (261,655) | 55,462 |
| **Ending Bank Cash** | **$ 1,262,093** | **$ 604,222** | **$ 441,863** | **$ 314,335** | **$ 238,427** | **$ 191,596** | **$ 109,301** | **$ 162,195** | **$ 172,486** | **$ 165,616** | **$ 102,921** | **$ 410,484** | **$ 148,829** | **$ 148,829** |