**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FuturHealth, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-_____ (___) |

**DECLARATION OF JON HAMBIDGE IN SUPPORT OF**
**FUTURHEALTH, INC.'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Jon Hambidge, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of FuturHealth, Inc., the debtor and debtor in possession in the above-captioned chapter 11 case ("FuturHealth" or the "Debtor"). I have served in this capacity since September 2026. Before assuming my current position, I served as the Debtor's Chief Financial Officer beginning in 2023. In addition to my role with the Debtor, I have experience providing M&A advisory services to private companies, and serving in marketing, corporate development, and strategy executive roles at private companies. I have an MBA from the Haas School of Business and am a graduate of the University of California, Berkeley.

2. In my capacity as CEO and experience as CFO, I have personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtor, and I am authorized to submit this Declaration (the "Declaration") on behalf of the Debtor. Except as otherwise noted herein, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees, agents, consultants, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration.

---

[1] The Debtor's mailing address is 325 W Washington Street Suite 2944 San Diego, CA 92103, and the last four digits of the Debtor's federal tax identification number are 1229.

3. On the date hereof (the "Petition Date"), FuturHealth filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). FuturHealth continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. To minimize any disruption or other adverse effect resulting from the filing of the Chapter 11 Case, FuturHealth is filing contemporaneously herewith various motions and pleadings seeking certain "first day" relief (collectively, the "First Day Motions").[2] I submit this Declaration to assist the Court and parties- in-interest in understanding FuturHealth, its business, and the circumstances leading to this Chapter 11 Case.

4. I am not being compensated specifically for this testimony other than through payments received by FuturHealth as an employee. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am over the age of 18 years and authorized to submit this Declaration on behalf of FuturHealth.

5. To better familiarize the Court with FuturHealth and its business, this Declaration is organized into five parts as follows:

> **Part I** provides background information regarding the Debtor's business, including its corporate history and operations;
>
> **Part II** provides an overview of the Debtor's prepetition capital structure;
>
> **Part III** describes the circumstances leading to the Chapter 11 Case;
>
> **Part IV** discusses the Debtor's chapter 11 objectives; and
>
> **Part V** discusses the First Day Motions.

[2] In connection with the filing of its chapter 11 petition, FuturHealth filed certain First Day Motions requesting relief that the Debtor believes is necessary to enable it to administer its estate with minimal disruption and loss of value during this Chapter 11 Case.

## CORPORATE BACKGROUND

### A. Corporate Structure

6. The Debtor's current business operations commenced in 2023 through FuturHealth, LLC. In November 2023, FuturHealth, LLC converted into a Delaware corporation under the name FuturCo Health Technologies, Inc. In December 2023, the Company completed a $5 million seed financing round led by Corazon Capital. In January 2024, the Company changed its name to FuturHealth, Inc. The Debtor is a privately held company with no subsidiaries and is the sole entity commencing this Chapter 11 Case. As of September 12, 2026, (i) the Debtor estimates that it has approximately 58 equity security holders, including option and warrant holders, (ii) the Debtor has issued and outstanding 3,121,246 shares of preferred stock held by four holders, (iii) the Debtor has issued and outstanding 10,087,540 shares of common stock held by six holders, (iv) the Debtor has issued and outstanding warrants to purchase 484,913 shares of common stock held by six holders, and (v) the Debtor also has issued and outstanding options to purchase 597,440 shares of common stock granted under its equity-based compensation plan, all as reflected on its capitalization table.

7. Prior to the Petition Date, the Debtor implemented changes to its executive leadership and board of directors. Effective September 9, 2026, Luke Mahoney resigned as the Debtor's Chief Executive Officer and, separately, resigned from the Board of Directors (the "Board"). Effective the same date, John Levan resigned as the Debtor's President, from all other officer positions, and from the Board of Directors.[3] Concurrently therewith, the Board appointed me as the Chief Executive Officer. In addition, Sabrina Burgi and I became members of the Board

[3] Prior to the Petition Date, the Debtor also entered into advisory agreements with John Levan, its former President, and Luke Mahoney, its former Chief Executive Officer, as independent contractors to provide transition and advisory services and preserve their institutional knowledge during the Debtor's restructuring. The Debtor terminated those advisory agreements on October 31, 2026.

of Directors. Mary Schroeder also became a member of the Board as an independent director (the "Independent Director") to provide additional independent oversight as the Debtor evaluated its strategic alternatives and prepared for the commencement of this Chapter 11 Case.

8. On September 18, 2026, the Board established a special restructuring committee and appointed the Independent Director as its sole member (the "Committee"). The Committee was authorized to take any actions that the Committee determined necessary or advisable in connection with the Debtor's restructuring. The Committee, with the assistance of the Debtor's advisors, evaluated the Debtor's available strategic alternatives and ultimately authorized the commencement of this Chapter 11 Case.

### B. Business Overview and Operations

9. FuturHealth is a direct-to-consumer wellness platform focused primarily on weight-management and wellness solutions. Through its digital platform, the Debtor facilitates access to prescription medications, including glucagon-like peptide-1 medications commonly referred to as "GLP-1 Medications," as part of broader wellness programs that incorporate medical support, nutrition planning, exercise resources, and other tools designed to support customers throughout their weight-loss journeys.

10. The Debtor's business is designed to simplify what can otherwise be a fragmented patient experience. Through relationships with medical service organizations, pharmacies, and other third-party service providers, the Debtor provides customers with access to a coordinated digital experience that may include medical consultations, prescription fulfillment and delivery, nutrition guidance, fitness content, progress tracking, and ongoing customer support. Customer payments are processed principally through third-party merchant processors that remit the resulting proceeds to the Debtor.

11. The Debtor's services are delivered principally through a proprietary technology and operating platform known as "Whole Health OS." Whole Health OS integrates with medical, pharmacy, and wellness-service providers and supports the Debtor's services through mobile and web-based applications, text messaging, email, and other digital channels. The platform uses dynamic content, data, and artificial-intelligence-enabled tools to guide users through individualized wellness journeys, including by directing patient information to an appropriate medical-service organization or treatment pathway and delivering personalized nutrition, fitness, and educational content throughout a user's program.

12. Since its inception, the Debtor made substantial investment in Whole Health OS and the operating infrastructure that supports it. Among other things, this infrastructure connects the Debtor's customer-acquisition capabilities, digital-user experience, medical-service relationships, pharmacy supply chain, customer support, payment processing, data, and wellness content into an integrated platform. The Whole Health OS platform is one of the Debtor's most valuable assets. Among other assets, the Debtor owns a federally registered FUTURHEALTH trademark covering downloadable software and meal-planning services and has additional trademark applications relating to its stylized "F" logo and related health, diet, and weight-management services.

13. The Debtor's business model is substantially dependent upon recurring customer relationships. Marketing expenditures are used to acquire new customers, while customer renewals and additional product offerings are intended to generate revenue over the duration of the customer relationship. Accordingly, the Debtor's ability to invest in customer acquisition, retain existing customers, and maintain uninterrupted access to its technology and supply-chain partners has a

direct effect on its revenue. As of the Petition Date, the Debtor has approximately 26,000 current customers and 195,000 historical customers.

14. The Debtor markets its programs primarily through digital and social-media channels. Its programs vary based on the duration selected by a customer, the services included, and, where prescribed by an independent medical professional, the medication selected. The Debtor's revenues include both initial customer purchases and recurring subscription or renewal revenue.

15. The Debtor has achieved significant scale in a relatively short period. In 2024, its first full year of operations, FuturHealth grew rapidly and generated $86.6 million in GAAP revenue. Although the Company recorded an operating loss of $10.7 million for the year, it was cash-flow positive and generated $1.2 million in cash during 2024. Since 2023, the Debtor has facilitated more than one million prescriptions and served more than 500,000 subscribers.

16. The Debtor's remaining workforce is lean following prepetition cost-reduction measures. As of the Petition Date, the Debtor employs approximately 28 full-time employees and also relies on approximately 20 independent contractors and personnel supplied by third-party staffing agencies to support its operations. The Debtor's employees, independent contractors, and staffing-agency personnel perform essential functions across the business, including engineering, quality assurance, customer experience, medical operations, marketing, finance, and administration, with limited redundancy in several areas. The Debtor operates through a remote workforce located across multiple states and does not depend upon any centralized office location for its day-to-day operations. Although the Debtor maintains a lease for office space in San Diego, California, that location is not currently utilized for ongoing business operations, and the Debtor presently anticipates rejecting the lease during this Chapter 11 Case. The loss of additional

employees or other key workforce personnel could therefore disrupt customer-facing operations, impair the Debtor's ability to maintain Whole Health OS and its integrations, and jeopardize the continuity of services provided to customers.

### C. Prepetition Capital Structure

17. As of the Petition Date, the Debtor estimates approximately $28 million in liabilities which includes secured indebtedness arising from the iHeartMedia transaction, unsecured merchant cash advance financing obligations, unsecured prepetition notes, aged accounts payable, and other liabilities incurred in the ordinary course of business. As of the Petition Date, the Debtor's estimated liabilities include:

- Secured debt owed to iHeartMedia + Entertainment, Inc.: approximately $7.5 million.
- Unsecured merchant cash advance obligations: approximately $1 million.
- Unsecured prepetition notes and related financing obligations: approximately $1.7 million.
- Unsecured trade debt: approximately $10 million.

18. During the first quarter of 2025, the Debtor entered into an approximately $13.5 million advertising agreement with iHeartMedia + Entertainment, Inc. ("iHeartMedia"). At the end of 2025, iHeartMedia agreed to convert the remaining payable balance under that arrangement into an approximately $9.1 million secured debt facility (the "Prepetition Facility"). The obligations under the Prepetition Facility are secured by the Debtor's now-owned and after-acquired accounts receivable and all proceeds thereof (collectively, the "iHeart Collateral"). iHeartMedia's security interest in the iHeart Collateral is perfected by UCC financing statements. As of the Petition Date, approximately $7.5 million in principal, interest, fees, and other obligations remained outstanding under the Prepetition Facility.

19. During 2026, after the Debtor was unable to obtain conventional equity or debt financing, the Debtor entered into three merchant cash agreements (collectively, the "Merchant

Cash Agreements"), one with Cedar Advance LLC and two with Velocity Capital Group LLC (collectively, the "MCA Lenders").

20. The Merchant Cash Agreements provided aggregate purchase prices of approximately $1.8 million, from which the Debtor received approximately $1.73 million in aggregate net proceeds, in exchange for the purported sale of approximately $2.51 million of future receipts. Specifically:

a. On May 12, 2026, the Debtor entered into a Merchant Cash Agreement with Cedar, pursuant to which Cedar provided a purchase price of $725,000, less $25,375 in fees, resulting in approximately $699,625 in net cash proceeds to the Debtor, in exchange for a purchased amount of up to $986,000.

b. On June 12, 2026, the Debtor entered into a Merchant Cash Agreement with Velocity, pursuant to which Velocity provided a purchase price of $725,000, less a $21,950 origination fee, resulting in approximately $703,050 in net cash proceeds to the Debtor, in exchange for a purchased amount of $1,015,000.

c. On July 24, 2026, the Debtor entered into a second Merchant Cash Agreement with Velocity, pursuant to which Velocity provided a purchase price of $350,000, less a $21,200 origination fee, resulting in approximately $328,800 in net cash proceeds to the Debtor, in exchange for a purchased amount of $504,000.

21. Accordingly, as of October 31, 2026, approximately $1 million in aggregate obligations remained outstanding under the Merchant Cash Agreements. Although the Merchant Cash Agreements provided needed liquidity, the resulting payment obligations further strained the Debtor's cash resources. The Merchant Cash Agreements provide the MCA Lenders with a number of harsh remedies against the Debtor, including (i) purported security interests in the Debtor's receivables and certain other assets, (ii) accelerated maturity of all amounts owed upon default, (iii) the provision of a personal guaranty by John Levan, and (iv) confessed judgment in favor of the MCA Lenders, among others. While the MCA Lenders may purport to have security interests in some or all of the Debtor's assets, none have perfected any security interest in any of the Debtor's assets, or such interest was not timely perfected and is subject to avoidance.

22. In March and April 2026, the Debtor entered into two note and warrant purchase agreements (the "Prepetition Note Purchase Agreements") to obtain additional liquidity to fund operations while pursuing a resolution of the Goglia Litigation (defined below). Under the first Prepetition Note Purchase Agreement, the Debtor was authorized to issue up to $1.5 million in promissory notes bearing interest at 18% per annum and maturing 180 days after the first closing, together with warrants to purchase up to an aggregate of 427,866 shares of the Debtor's common stock at an exercise price of $6.35 per share. The Debtor issued only approximately $1.3 million in aggregate principal amount of promissory notes under the first Prepetition Note Purchase Agreement. Certain purchasers included then-current officers and directors of the Debtor, or their affiliates, and the financing was approved by the Debtor's disinterested director and disinterested stockholders after disclosure of those relationships. The second Prepetition Note Purchase Agreement was with InterAlpen Partners, LLC, an affiliate of a holder of the Debtor's preferred stock. Under this financing, the Debtor issued a $300,000 promissory note requiring fourteen weekly payments totaling approximately $360,000, together with a seven-year warrant to purchase 142,622 shares of common stock at an exercise price of $6.35 per share. As of the Petition Date, approximately $1.6 million in principal, accrued interest, and other obligations remain outstanding under the Prepetition Note Purchase Agreements (collectively, the "Prepetition Note Obligations").

23. The Debtor also incurred debt owed to Attivo Partners LLC in connection with consulting, finance, accounting, and administrative services provided to the Debtor (the "Attivo Note"). As of October 31, 2026, approximately $174,000, consisting of principal and accrued interest, remained outstanding under the Attivo Note.

24. The Debtor's unsecured liabilities consist primarily of aged accounts payable and other trade and operating obligations. Declining revenue and the Debtor's substantial scheduled debt payments caused the Debtor to fall behind on amounts owed to vendors and other service providers. As of the Petition Date, the Debtor estimates that its general unsecured claims total approximately $10 million.

## EVENTS LEADING UP TO THE CHAPTER 11 CASE

25. The combined effects of business, litigation, and liquidity challenges progressively constrained the Debtor's ability to invest in customer acquisition, satisfy its obligations as they came due, and obtain the financing necessary to capitalize on the improved unit economics of its reconfigured business model.

### i. Unsuccessful Advertising Investment

26. The Debtor's liquidity challenges began to intensify following its entry into the approximately $13.5 million advertising agreement with iHeartMedia in the first quarter of 2025. The advertising arrangement failed to produce the anticipated return and required more than $4 million in cash payments during the first half of 2025. At the end of 2025, the Debtor converted the remaining payable into an approximately $9.1 million secured debt facility. This alleviated the immediate payment burden but left the Debtor with funded indebtedness.

27. The timing of this cash drain was particularly consequential because the Debtor's business model requires investment in advertising to replenish and grow its recurring customer base. Cash used to satisfy the iHeartMedia obligations was therefore unavailable to fund other operating needs and customer acquisition. The Debtor generated approximately $120 million of GAAP revenue during 2025 but ended the year with approximately $3 million less cash than it began the year with.

**ii. Transition from Compounded to FDA-Approved Medications**

28. In addition to the operational challenges associated with the rapidly evolving regulatory environment for GLP-1 medications, the Debtor became involved in litigation with Novo Nordisk A/S and Novo Nordisk Inc. concerning the marketing of compounded semaglutide products. The litigation required the Debtor to devote significant management attention and incur substantial professional-fee expenses at a time when the Debtor was already evaluating changes to its business model. Although the Debtor ultimately resolved the litigation through a consensual settlement that avoided the uncertainty, expense, and distraction of continued litigation, the dispute further contributed to the Debtor's decision to transition away from compounded GLP-1 medications and focus on FDA-approved alternatives.

29. In August 2025, the Debtor opted to stop marketing compounded GLP-1 medications and focus on FDA-approved medications. The Debtor believed that this strategic transition would position the business for more sustainable long-term growth, but the transition required the Debtor to reduce marketing expenditures. The marketing reduction lowered the rate at which the Debtor acquired new customers. The Debtor therefore faced the challenge of funding the transition to its new operating model while also maintaining the investment needed to replenish its recurring customer base.

**iii. Goglia Litigation Effects**

30. On September 17, 2025, Goglia Nutrition, LLC ("Goglia Nutrition"), an entity owned in part by the Debtor's founders, filed a complaint against the Debtor and certain current and former officers and other parties in the United States District Court for the Central District of California captioned *Goglia Nutrition, LLC v. John Levan et al.*, Docket No. 2:25-cv-08840-CAS-MAA (C.D. Cal. Sep 17, 2025). As amended, the complaint asserts claims relating to, among other things, the formation and operation of the Debtor, certain technology, data-license, and

services agreements entered into between Goglia Nutrition and the Debtor in December 2023, and the alleged use by the Debtor of certain intellectual property, confidential information, customer data, and business opportunities claimed by Goglia Nutrition.

31. The Goglia Litigation imposed substantial direct and indirect costs on the Debtor. The Debtor incurred significant legal expenses, and approximately $920,000 in disputed revenue was placed in escrow in connection with the dispute. More consequentially, the pendency of the litigation materially impaired the Debtor's ability to obtain new equity or conventional debt financing during 2026.

32. Faced with reduced revenue and limited access to capital, the Debtor implemented substantial cost-reduction initiatives. From January through July 2026, the Debtor reduced non-marketing operating expenses by approximately 42%. These initiatives included two reductions in force and other measures designed to preserve liquidity while maintaining the personnel and infrastructure necessary to serve existing customers. Although these measures materially lowered the Debtor's expense base, they could not offset the effects of declining revenue.

33. The Debtor initially anticipated that the Goglia Litigation would be referred to arbitration and resolved on a timetable that would permit the Debtor to obtain additional capital. On August 20, 2026, the district court denied the Debtor's motion to compel arbitration and also denied the motions of certain other defendants to compel arbitration or judicial reference (the "Arbitration Order"). The Arbitration Order did not adjudicate the merits of Goglia Nutrition's underlying claims, but instead permitted the Goglia Litigation to proceed in the district court, subject to further proceedings. On September 8, 2026, the Debtor filed a notice of appeal from the Arbitration Order with the United States Court of Appeals for the Ninth Circuit. The Arbitration Order substantially diminished the likelihood that the Debtor could obtain a prompt resolution of

the Goglia Litigation and thereafter raise sufficient new capital to fund operations and satisfy its outstanding obligations outside of chapter 11.

**iv. Merchant Cash Advance Agreements**

34. At the same time, and as discussed above, the Debtor's access to conventional financing became increasingly constrained. The Merchant Cash Agreements, which provided approximately $1.8 million in aggregate net cash proceeds in exchange for the purported sale of approximately $2.5 million of the Debtor's future receipts.

35. Although these transactions provided needed short-term liquidity, the Merchant Cash Agreements required estimated weekly remittances totaling approximately $77,000. Together with the Debtor's approximately $200,000 monthly payment obligation to iHeartMedia, these obligations required aggregate payments of approximately $500,000 per month and further strained the Debtor's cash resources. The Debtor therefore fell increasingly behind on obligations owed to vendors and other service providers.

**v. Strategic Alternatives**

36. In March 2025, the Debtor engaged Centerview Partners LLC (the "Centerview") as its financial advisor to assist in evaluating strategic alternatives and potential value-maximizing transactions. Consistent with that engagement, the Debtor and its advisors evaluated a range of opportunities, including potential acquisition transactions, strategic investments, and other financing alternatives involving some or all of the Debtor's business and assets.

37. As the Debtor's financial condition continued to deteriorate and the prospects for an out-of-court solution diminished, the Debtor sought to engage an investment banker with distressed capabilities to simultaneously explore restructuring options and continue the financial and strategic investor outreach initiated by Centerview. In September 2026, the Debtor retained a

financial advisor and investment banker to assist with the marketing and sale process. Shortly thereafter on September 21, 2026, the Debtor replaced that advisor with Hilco Corporate Finance, LLC ("Hilco") as investment banker to the Debtor to assist in evaluating and executing strategic alternatives, including a potential sale of the Debtor's business or assets and the pursuit of debtor in possession financing and other capital-raising opportunities. As described more fully in the *Declaration of Richard Klein in Support of Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing Debtor to Obtain Post-Petition Financing and to Grant Security Interests and Super-Priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 364(c), and 364(d); (B) Authorizing the Use of Cash Collateral and the Payment of Certain Related Fees and Charges; (C) Granting Adequate Protection to the Prepetition Lender; (D) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (E) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "Klein DIP Declaration") filed in support of the DIP Motion, Hilco thereafter conducted parallel marketing processes for potential debtor-in-possession financing and a sale or other strategic transaction. Those efforts resulted in the Debtor's entry into a term sheet with Twelve Bridge Capital, LLC for a debtor-in-possession financing facility intended to provide liquidity to support the Debtor's operations and administration of this Chapter 11 Case. The Debtor intends to continue and expand its prepetition marketing efforts during this Chapter 11 Case, including by soliciting interest from potential strategic and financial purchasers, continuing discussions with interested parties, and seeking to maximize value through a robust sale process.

## OBJECTIVES OF THE CHAPTER 11 CASE

38. The Debtor commenced this Chapter 11 Case primarily to pursue a court-supervised sale of some or all of its business and assets. The Debtor will, however, conduct a dual-track process and simultaneously evaluate whether a stand-alone reorganization or other strategic transaction would provide greater value. This approach will preserve the Debtor's optionality to pursue the transaction that maximizes value for the estate and other stakeholders. In anticipation of a potential restructuring transaction, and as mentioned above, the Debtor retained investment banking advisors to assist in evaluating strategic alternatives and maximizing value. Prior to the Petition Date, Hilco conducted a marketing process for a sale or reorganization of the Debtor's business and assets, which process will continue during this Chapter 11 Case under the supervision of this Court. In parallel, Hilco marketed a potential debtor-in-possession financing transaction to prospective financing sources. As described more fully in the Klein DIP Declaration, these efforts resulted in the Debtor's entry into a term sheet with Twelve Bridge Capital, LLC for the DIP Facility described below.

39. The Debtor's chapter 11 strategy is intended to preserve these sources of value while providing a breathing spell from collection activity and an opportunity to address its prepetition liabilities. On October 14, 2026, the Debtor and the DIP Lender agreed to the terms of the proposed post-petition financing (the "DIP Facility") provided by the DIP Lender on the terms and conditions set forth in the term sheet dated as of October 14, 2026 (the "Term Sheet"). Following additional negotiations with the DIP Lender, the parties agreed to an amendment of the Term Sheet on October 30, 2026, which provided for a more favorable set of fees if the Debtor acquires an acceptable binding stalking horse bid within the first twenty-one (21) days following the Petition Date. The DIP Facility provides for aggregate commitments of up to $5.0 million,

consisting of an initial draw of $1.5 million upon entry of the Interim DIP Order and up to an additional $3.5 million following entry of the Final DIP Order and execution of a qualified stalking horse asset purchase agreement. In connection with the proposed DIP Facility, iHeartMedia has consented to the priming of its liens, subject to receipt of the adequate protection described in the DIP Motion and proposed DIP Orders. The proposed financing and use of cash collateral will provide the liquidity necessary to maintain operations, satisfy authorized postpetition obligations, preserve the Debtor's platform and customer relationships, continue the marketing process, and pursue the Debtor's chapter 11 strategy.

40. The Debtor has a substantial recurring customer base, a developed digital-health platform, established relationships with medical and pharmacy providers, a database of existing and prospective customers, and operating metrics that management believes demonstrate the potential viability of the underlying business. With DIP financing in hand, an agreement with its secured parties, and a robust marketing process led by Hilco, the Debtor enters chapter 11 positioned to pursue a value-maximizing transaction while continuing to operate as a going concern. In my judgment, commencing this Chapter 11 Case represents the best available path to preserve and maximize the value of the Debtor's estate while maintaining continuity of service for the Debtor's customers.

## FIRST DAY MOTIONS

41. In my capacity as Chief Executive Officer, I believe that the relief requested in the First Day Motions is necessary and essential to ensuring the Debtor's immediate needs are met, and that the Debtor (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of this Chapter 11 Case. My opinion as to the necessity of the First Day Motions is based upon my firsthand experience as Chief Executive Officer and my

review of various materials and information provided to me by the Debtor's other members of senior management and the Debtor's advisors, as well as discussions had in connection therewith. In considering the necessary first-day relief, the Debtor's other members of senior management, the Debtor's advisors, and I were cognizant of the level of cash on hand and, in light of these limitations, narrowed the relief requested at the outset of the Chapter 11 Case to only those matters that require urgent relief to preserve value during the pendency of this case.

42. I have reviewed each of the First Day Motions (including the exhibits and schedules thereto) and am familiar with the content and substance contained therein. The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other officers and advisors and I can attest to such facts.

43. For a more detailed description of the First Day Motions, I respectfully refer the Court to the respective First Day Motion. The facts set forth in each of the First Day Motions, listed below, are incorporated herein in their entirety. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control. A list of the First Day Motions is set forth below:

a. **DIP Motion**: Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims Pursuant to 11 U.S.C. §§ 105, 364(c), and 364(d); (III) Authorizing Use of Cash Collateral and the Payment of Certain Related Fees and Charges; (IV) Granting Adequate Protection to the Prepetition Lender; (V) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (VI) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001

b. **Cash Management Motion**: Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue to Operate Its Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms; (II) Authorizing the Debtor's Banks to Honor All Related Payment Requests; and (III) Granting Related Relief

c. **Claims Agent Application**: Debtor's Application for Entry of an Order Appointing Stretto, Inc. as Claims and Noticing Agent.

d. **Critical Vendor Motion**: Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Claims of Trade Claimants, And 503(B)(9) Claims; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief

e. **Redaction Motion:** Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Redaction Of Certain Personal Identifying Information Within the List of Creditors and Other Filings; (II) Approving the Form and Manner of Notice to Customers; and (III) Granting Related Relief

f. **Taxes Motion**: Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees, (II) Authorizing the Debtor's Banks to Honor All Related Payment Requests, and (III) Granting Related Relief

g. **Wages Motion**: Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtor to (A) Pay Prepetition Wages, Compensation, Employee Benefits, and Other Workforce Obligations and (B) Continue Certain Employee Benefit Programs in the Ordinary Course; (II) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Workforce Obligations; and (III) Granting Related Relief

44. The Debtor has tailored its requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate. I believe an orderly transition into chapter 11 is critical to the viability of the Debtor's operations and that any delay in granting the relief described below could hinder the Debtor's operations and cause irreparable harm. Other requests for relief will be deferred for consideration at a later hearing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: November 1, 2026 By: */s/ Jon Hambidge*
Name: Jon Hambidge
Title: Chief Executive Officer