**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FuturHealth, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 26-11748 (JKS)<br><br>**Hearing Date: TBD**<br>**Objection Deadline: TBD** |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (II) AUTHORIZING THE DEBTOR TO DESIGNATE ONE OR MORE STALKING HORSE BIDDERS AND TO PROVIDE BID PROTECTIONS, (III) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (IV) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES, (V) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor in possession (the "Debtor") hereby files this motion (the "Motion")[2] for the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (i)(a) approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures"), to be used in connection with the sale (the "Sale") of all or substantially all of the Debtor's assets (the "Assets"), (b) authorizing the Debtor to designate one or more Stalking Horse Bidders (as defined herein) and provide Bid Protections (as defined herein) in accordance with the Stalking Horse Designation Procedures (as defined herein), (c) scheduling an auction of the Assets (the "Auction"), (d) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "Contracts") in connection with any Sale

[1] The Debtor's mailing address is 325 W Washington Street Suite 2944 San Diego, CA 92103-1946, and the last four digits of the Debtor's federal tax identification number are 1229.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration or the Bidding Procedures (as defined herein).

(the "Assumption and Assignment Procedures"), and approving the form and manner of notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Assumption and Assignment Notice"), to be distributed to each relevant non-debtor counterparty to a Contract (each, a "Counterparty") of the Debtor's calculation of the amount necessary to cure any defaults under an applicable Contract (the "Cure Costs") and certain other information regarding the potential assumption and assignment of Contracts in connection with the Sale, (e) scheduling the hearing to approve a sale of the Assets (the "Sale Hearing") and approving the form and manner of notice of the entry of the Bidding Procedures Order, approval of the Bidding Procedures, the Sale Hearing, and certain objection deadlines related thereto, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice"), and (f) granting related relief, and (ii)(a) approving the Sale of the Debtor's Assets free and clear of all liens claims, interest, and encumbrances, (b) approving the assumption and assigned of certain Contracts to a Successful Bidder, and (c) granting related relief.

The Debtor will seek entry of a sale order (the "Sale Order")[3] at the Sale Hearing, which the Debtor will file in advance of the Sale Hearing. The proposed Sale Order will, among other things: (a) authorize and approve the Sale to the Successful Bidder, on the terms substantially set forth in the Successful Bid; (b) authorize and approve the Sale of the Assets free and clear of any liens, claims, interests, and encumbrances to the extent set forth in the asset purchase agreement with the Successful Bidder, attached to the Sale Order; (c) authorize and approve the assumption and assignment of certain Contracts to the Successful Bidder; and (d) grant related relief.

In support of this Motion, the Debtor relies upon and incorporate by reference the *Declaration of Richard Klein in Support of Debtor's Motion for Entry of an Order (I) Approving*

---

[3] The proposed Sale Order will be filed prior to the Sale Hearing.

*Bidding Procedures for the Sale of Substantially All of the Debtor's Assets, (II) Authorizing the Debtor to Designate One or More Stalking Horse Bidders and to Provide Bid Protections, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (VI) Granting Related Relief*, filed contemporaneously herewith (the "Klein Declaration") and the *Declaration of Jon Hambidge in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 11] (the "First Day Declaration"). In further support of this Motion, the Debtor represent as follows:

## PRELIMINARY STATEMENT

1. As described in the First Day Declaration, after carefully considering alternatives, the Debtor, in an exercise of their reasonable business judgment, commenced this chapter 11 case to preserve going-concern value, maximize the value of their estates for the benefit of all stakeholders, and pursue a value-maximizing transaction through the chapter 11 process. Together with its advisors, the Debtor determined that preservation of value for all stakeholders would be best accomplished by pursuing a sale of the Debtor's business and/or assets as a going concern or otherwise. To support the Debtor in its marketing and sale process and to ensure that value is maximized, the Debtor retained Hilco Corporate Finance, LLC ("Hilco") on September 21, 2026 to serve as the investment banker to the Debtor and to run a comprehensive sale and marketing process designed to maximize the value of the Assets on a going concern basis.

2. Through this Motion, the Debtor seeks the Court's approval of Bidding Procedures pursuant to which the Debtor will seek bids for all or a subset of its assets, and the ability to designate one or more Stalking Horse Bidders to set a floor at an Auction. The Debtor acknowledges that the proposed timelines laid out herein is expedient, but such is required in light of the fact that the Debtor has limited liquidity remaining, and does not have the luxury of being

able to conduct an elongated sale/marketing process (and such process, and the uncertainty caused thereby, would likely damage key vendor and customer relationships and substantially decrease value). That said, the Debtor is confident that the DIP financing is sufficient to allow the Debtor to run the sale process described herein without any financial interruption. In sum, the Debtor believes that the proposed timeline below maximizes value to the estate both by providing for a robust sale process and minimizing value destructive business disruption from a prolonged stay in chapter 11.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b), and pursuant to Rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor confirms its consent to the entry of a final order or judgment by the Court with respect to this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief sought herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rules 2002-1, 6004-1 and 9006-1.

**GENERAL BACKGROUND**

5. On November 1, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code. The Debtor is operating its business as

a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made, and no official committees have been appointed in this chapter 11 case.

6. The Debtor is a direct-to-consumer wellness platform focused on weight management and related wellness services. Through its platform, the Debtor facilitates consumer access to third-party medical providers, prescription medications, nutrition guidance, and other wellness-related services. The Debtor works with a network of third-party medical providers, pharmacies, and other service partners and provides consumers access to these services through its Whole Health OS technology platform and related digital channels.

7. Additional factual background regarding the Debtor, including its business operations, its corporate and capital structure, and the events leading to the filing of this chapter 11 case is set forth in detail in the First Day Declaration.

## MARKETING AND SALE PROCESS

8. On September 21, 2026, the Debtor retained Hilco as investment banker to, among other things: (i) identify and evaluate potential counterparties for a potential sale process, (ii) prepare a marketing plan and information materials to distribute to potential buyers on a confidential basis, (iii) solicit third-party interest in an acquisition of the Debtor's assets, (iv) evaluate, negotiate, and advise the Debtor with respect to potential sale, financing, and other transaction proposals, and (v) assist the Debtor in contacting potential buyers, arranging meetings with potential buyers, and coordinating due diligence.[4] During its engagement, Hilco has worked

[4] In March 2025, the Debtor engaged Centerview Partners LLC as its financial advisor to assist in evaluating strategic alternatives and potential value-maximizing transactions. In September 2026, as the Debtor's financial condition deteriorated, the Debtor retained a restructuring financial advisor and investment banker to continue the outreach initiated by Centerview and assist with a marketing and sale process. Shortly thereafter, the Debtor replaced that advisor with Hilco, which assumed responsibility for and continued the marketing and sale process. See First Day Declaration ¶¶ 36-37.

closely with the Debtor's management and other restructuring professionals and has become knowledgeable and familiar with the Debtor's capital structure, liquidity needs, and business operations.

9. The professionals at Hilco have also worked with the Debtor and its other advisors to prepare for the sale process. This includes, among other things, drafting a teaser and other marketing materials, establishing a virtual data room, and preparing a form non-disclosure agreement to be ready to immediately commence the postpetition marketing of the Assets, while the Debtor seeks approval of the Bidding Procedures in parallel. Hilco is poised to immediately continue its prepetition marketing process on a postpetition basis. In addition, prior to the Petition Date, Hilco has begun an initial outreach to potential strategic and financial buyers and has contacted 135 parties, including strategic buyers, private equity funds, and other financial institutions, that are reasonably likely to be interested in consummating a proposed Sale. To date 17 parties entered into confidentiality agreements (an "NDA") and received access to the Debtor's confidential information memorandum and data room.

10. During this process, the Debtor, under the oversight of the Independent Manager, will engage with and facilitate diligence for any potential bidders who may be interested in purchasing the Assets in chapter 11. Accordingly, the Debtor believes the Bidding Procedures set forth herein will allow the Debtor to maximize the value of its estate for the benefit of creditors.

**NEED FOR A TIMELY PROCESS**

11. The facts and circumstances of this chapter 11 case require that the Debtor run an expedited, but robust, sale process. The Debtor faces significant liquidity constraints and lacks sufficient liquidity to support a protracted sale process. Although the DIP Facility will provide

liquidity to fund the Debtor's continued operations and this chapter 11 case, access to additional funding under the DIP Facility is conditioned upon the Debtor entering into a qualified stalking horse asset purchase agreement. The DIP Facility also requires compliance with certain sale milestones. Accordingly, speed and certainty are critical to preserving the Debtor's operations and maximizing the value of its assets.

12. Thus, pursuing the Sale in the manner and within the time periods prescribed in the Bidding Procedures is in the best interest of the Debtor's estate and will provide interested parties with sufficient opportunity to participate.

## STALKING HORSE DESIGNATION PROCEDURES

13. As part of the Bidding Procedures, the Debtor seeks authority, subject to the terms of the Bidding Procedures Order, to designate a stalking horse bid (the "Stalking Horse Bid"), pursuant to the procedures set forth in section IV of the Bidding Procedures (the "Stalking Horse Designation Procedures") for any or all of the Assets and, upon consultation with the Consultation Parties (defined herein) to enter into a purchase agreement (the "Stalking Horse Agreement") with a potential bidder (the "Stalking Horse Bidder"). If the Debtor proposes to designate any Stalking Horse Bidder, they shall enter into any Stalking Horse Agreement **no later than December 1, 2026**, which deadline may be extended by the Debtor (after consultation with the Consultation Parties).

14. The Debtor believes that the ability to enter into a Stalking Horse Agreement with a potential buyer will assist in driving value for the Debtor's estate, as a Stalking Horse Bid will set the baseline bid in what the Debtor anticipates will be a robust auction process. In addition, entry into a qualified Stalking Horse Agreement will permit the Debtor to access additional funding under the DIP Facility, which is necessary to support the Debtor's continued operations

and sale process. Consistent with the market for this kind of process, the Debtor anticipates that it may be necessary to afford a Stalking Horse Bidder certain protections to induce the Stalking Horse Bidder to provide a substantial bid and firm commitment to the Sale.

15. Pursuant to the Bidding Procedures, the Debtor is hereby requesting authority to, upon the designation of a Stalking Horse Bidder and in consultation with the Consultation Parties, seek approval of an award to a Stalking Horse Bidder with incentives in the form of a break-up fee and necessary expenses incurred by the Stalking Horse Bidder in connection with submitting its Stalking Horse Bid (collectively, the "Bid Protections"). Those Bid Protections will be described with specificity in a Stalking Horse Notice (as defined below) that will be served on the Stalking Horse Notice Parties (as defined below). All parties in interest shall have the right to object to the Debtor's entry into a Stalking Horse Agreement on any grounds, including objections to the Bid Protections and the proposed Stalking Horse Order (as defined below).

## BIDDING PROCEDURES, NOTICE PROCEDURES, AND ASSIGNMENT PROCEDURES

### A. Bidding Procedures

16. The Bidding Procedures are intended to facilitate a competitive marketing and sale process, including identifying the highest or otherwise best offer or offers for the Assets. The Sale may be for all of the Assets or for a portion thereof to one or more purchasers as potential purchasers may direct, and based on the highest or otherwise best return for the Debtor's estate.

17. As the Bidding Procedures are attached to the Bidding Procedures Order, they are not restated in their entirety herein. Pursuant to Local Rule 6004-1, certain of the key terms of the Bidding Procedures are highlighted in the chart below.[5]

[5] In the event of any conflict between the summary of Bidding Procedures set forth in this Motion and the Bidding Procedures, the Bidding Procedures as approved by the Court shall govern in all respects. Capitalized terms used but not defined in this section shall have the meanings ascribed to such terms in the Bidding Procedures.

<table>
<tr><th colspan="2">MATERIAL TERMS OF THE BIDDING PROCEDURES AND<br>BIDDING PROCEDURES ORDER</th></tr>
<tr><td>Provisions Governing Qualification of Bidders and Qualified Bids<br><br>L.R. 6004-1(c)(i)(A)-(B)</td><td>Due Diligence, Qualified Bid and Qualified Bidder Requirements are set forth in Sections III, V, and VI of the Bidding Procedures.<br><br>A. Due Diligence.<br><br>Each person or entity that desires to participate as a bidder in the Auction process (each, a "<u>Prospective Bidder</u>") must first deliver to Hilco the following:<br><br>• documentation identifying the Prospective Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale;<br><br>• an executed confidentiality agreement, in form and substance satisfactory to the Debtor;<br><br>• a statement and other factual support demonstrating to the Debtor and its advisors, in its sole judgment, that the Prospective Bidder has a bona fide interest in purchasing some or all of the Assets; and<br><br>• preliminary proof by the Prospective Bidder of its financial capacity to close a proposed sale transaction, which may include current unaudited or verified financial statements of, or verified financial commitments obtained by, the Prospective Bidder (or, if the Prospective Bidder is an entity formed for the purpose of acquiring the Assets to be sold, the party that will bear liability for a breach by the Prospective Bidder of an asset purchase agreement or other agreement entered into in respect of the sale transaction), the adequacy of which the Debtor will determine in its sole judgment.<br><br>Without the need for any further action, any Stalking Horse Bidder is a Qualified Bidder.<br><br>Upon execution of a valid confidentiality agreement and subject to the other limitations and guidelines set forth herein, the Debtor may grant a Prospective Bidder that the Debtor identifies as reasonably likely to become a Qualified Bidder with access to information allowing such Prospective Bidder to conduct due diligence with respect to the potential acquisition of some or all of the Assets. If any Prospective Bidder is (or is affiliated with) a competitor of the Debtor, the Debtor will not be required to disclose to such Prospective Bidder any trade secrets or proprietary information (as determined by the Debtor in its sole discretion), unless the confidentiality agreement executed by such Prospective Bidder is satisfactory to the Debtor and contains provisions sufficient to ensure that such Prospective Bidder will not use such trade secrets or proprietary information for an improper purpose or to gain an unfair competitive advantage.<br><br>If the Debtor determines, after consulting with the Consultation Parties, that a Prospective Bidder is unlikely to qualify as a Qualified Bidder or fails to become a Qualified Bidder, then such Prospective Bidder shall have no further right to access due diligence or any other non-public information. The Prospective Bidder shall return or destroy any non-public information the Debtor or its advisors provided to the Prospective Bidder in accordance with the terms of the confidentiality agreement executed by the Debtor and the Prospective Bidder. For purposes hereof, the term "Consultation Parties" shall include the Committee, if any, and, solely to the extent it is not participating in the Auction as a bidder and is not otherwise a participant in any active or prospective Bid with respect to any Assets, the DIP Lender. If a</td></tr>
</table>

| | |
|---|---|
| | member of the Committee submits a Qualifying Bid, the Committee will continue to have consultation rights as set forth in these Bid Procedures; provided that the Committee shall exclude such member from any discussions or deliberations regarding the sale of the Assets and shall not provide any information regarding the sale of the Assets to such member.<br><br>All diligence requests shall be directed to the Debtor's investment banker, Hilco.<br><br>**B. Bid Deadline**. **December 15, 2026 at 5:00 p.m. (ET).**<br><br>**C. Qualified Bid Requirements**. To qualify as a "Qualified Bid," a bid must be in writing and satisfy the following requirements:<br><br>1. Identification of Bidder. A Qualified Bid must fully disclose the following: (a) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such bid) the Auction in connection with such bid and the complete terms of any such participation; and (b) any past or present connections or agreements with the Debtor, any other known Prospective Bidder, any Stalking Horse Bidder, or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtor).<br><br>2. Purchased Assets. A Qualified Bid must identify the following:<br><br>a. the Assets to be purchased, including any executory contracts and unexpired leases (collectively, the "Contracts") that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtor in connection with the proposed sale; and<br><br>b. the liabilities, if any, to be assumed, including any debt to be assumed.<br><br>3. Form of Consideration.<br><br>a. Credit Bidding. In connection with the Sale of all or any portion of the Assets, a person or entity holding a perfected security interest in such Assets may seek to credit bid some or all of its claims for its respective collateral (each such bid, a "Credit Bid") pursuant to section 363(k) of the Bankruptcy Code; provided that the Credit Bid complies with the orders of the Bankruptcy Court.<br><br>b. Consideration. Each other bid must include a statement confirming that the bid is based on an all-cash offer, or if a bid includes forms of consideration other than cash, the bidder shall include an analysis or description of the value of such non-cash components, including any supporting documentation, to assist the Debtor and the Consultation Parties in evaluating the bid.<br><br>4. Minimum Bid for Assets. If a Stalking Horse Bidder has been designated, each bid that is not a Stalking Horse Bid must have a value to the Debtor, as determined by the Debtor, in consultation with the Consultation Parties, that is greater than or equal to the sum of (a) the value offered under the Stalking Horse Agreement, plus (b) the amount of the Bid Protections, if any, plus (c) $250,000 (collectively, the "Minimum Bid Amount"). Any subsequent bid made by the Stalking Horse Bidder shall be deemed to have been made in an amount equal |

| | |
|---|---|
| | to such subsequent bid plus the Bid Protections, if any, to the extent provided for in the Stalking Horse Agreement.<br><br>If the value of a bid relative to the Stalking Horse Bid includes non-cash components (such as fewer contingencies than are in such Stalking Horse Agreement), the bidder should include an analysis or description of the value of any such additional non-cash components, including any supporting documentation, to assist the Debtor and the Consultation Parties in better evaluating the competing bid. The Debtor, in consultation with its advisors and the Consultation Parties, reserve the right in its sole discretion to ascribe a value to any non-cash components of competing bids and the Stalking Horse Bid.<br><br>If a Stalking Horse Bidder is not designated pursuant to the Stalking Horse Designation Procedures, the Debtor may set a minimum bid requirement, which shall be considered the Minimum Bid Amount for all purposes hereunder. In such case, the Debtor shall inform (email being sufficient) any known potential bidder of such Minimum Bid Amount.<br><br>5. <u>Assumption of Certain Obligations</u>. A Qualified Bid must provide for the payment or assumption of all Cure Costs associated with any Contracts proposed to be assumed and assigned to the Prospective Bidder. Such amounts shall be in addition to the cash and other consideration otherwise offered by the Prospective Bidder for the Assets.<br><br>6. <u>Proposed Asset Purchase Agreement</u>. A Qualified Bid must constitute an irrevocable offer and be in the form of an asset purchase agreement reflecting the terms and conditions of the bid (each, a "<u>Proposed Asset Purchase Agreement</u>"). A Proposed Asset Purchase Agreement shall be (a) duly authorized and executed; (b) based on, and marked against the form asset purchase agreement (the "<u>Form APA</u>") or, if a Stalking Horse Bidder has been designated, the Stalking Horse Agreement, to reflect the proposed sale transaction and to show any other proposed modifications to the Form APA or Stalking Horse Agreement, as applicable; (c) specify the proposed purchase price for the Assets in U.S. dollars; (d) include all exhibits and schedules contemplated thereby (other than exhibits and schedules that, by its nature, must be prepared by the Debtor); and (e) identify any Contracts that, as of the submission of such bid, the Prospective Bidder proposes to be assumed and assigned by the Debtor in connection with the proposed sale transaction.<br><br>7. <u>Financial Information</u>. A Qualified Bid must include the following:<br><br>a. a statement that the Prospective Bidder is financially capable of consummating the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement;<br><br>b. sufficient evidence, as determined by the Debtor in its sole discretion, to determine that the Prospective Bidder has, or will obtain, the financial wherewithal to consummate the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement; and<br><br>c. Adequate Assurance Information with respect to any Contracts included or that may be included in the Prospective Bidder's bid, including the identity of any known proposed assignee of the applicable |

| | |
|---|---|
| | Contracts (if different from the Prospective Bidder), including contact information for such proposed assignee.<br><br>8. Good Faith Deposit. Each Qualified Bid must be accompanied by a good faith deposit (each, a "Good Faith Deposit") in the form of cash in an amount equal to ten percent (10%) of the proposed purchase price for the Assets. The Good Faith Deposit shall be deposited no later than the Bid Deadline with an escrow agent selected by the Debtor (the "Escrow Agent") and held in escrow until ten (10) business days after the conclusion of the Auction, except for the Good Faith Deposit of any bidder who is selected at the Auction as a Successful Bidder or as a Backup Bidder, and thereafter returned to the respective Qualified Bidders in accordance with these Bidding Procedures.<br><br>9. Adequate Assurance. A Qualified Bid must include evidence of the Prospective Bidder's (or any other relevant assignee's) ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Prospective Bidder's (or any other relevant assignee's) ability to perform future obligations arising under any Contracts included in its bid. The Debtor may require the following information in connection with demonstrating adequate assurance of future performance: (a) information evidencing the Prospective Bidder's (or any other relevant assignee's) financial wherewithal and willingness to perform under any Contracts included in the bid, which information may include (i) a corporate organizational chart or similar disclosure identifying corporate ownership and control, (ii) financial statements, (iii) tax returns, and (iv) annual reports; and (b) the Prospective Bidder's (or any other relevant assignee's) proposed use of any leased premises or other property included in the bid (the information described in clauses (a) and (b), the "Adequate Assurance Information").<br><br>All Adequate Assurance Information must be in a form that will permit its immediate dissemination to Contract counterparties ("Counterparties").<br><br>10. Representations and Warranties (As-Is, Where-Is). Each Qualified Bid must include a written acknowledgement and representation that (a) the Prospective Bidder has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Qualified Bid, (b) the Prospective Bidder has relied solely upon its own or its advisors' independent review, investigation, and/or inspection of any documents and/or the Assets in making its Qualified Bid, (c) the Prospective Bidder did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Prospective Bidder's Proposed Asset Purchase Agreement; and (d) the Assets will be conveyed "as is, where is, with all faults," with limited representations and warranties, and no indemnification or guarantees by the Debtor.<br><br>11. Authorization. A Qualified Bid must (a) include evidence of authorization and approval from the Prospective Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of any bid for the Assets, participation in the Auction, and closing of the sale transaction contemplated by the Prospective Bidder's Proposed Asset Purchase Agreement; or, (b) if the Prospective Bidder is an entity formed for the purpose of effecting the proposed sale transaction, a Qualified Bid must provide written evidence |

| | |
|---|---|
| | acceptable to the Debtor of authorization and the approval by the equity holder(s) of such Prospective Bidder.<br><br>12. Other Requirements. A Qualified Bid must:<br><br>a. state that the Prospective Bidder agrees to serve as a backup bidder (a "Backup Bidder") if such bidder's Qualified Bid is selected at the Auction as the next highest or next best bid after the Successful Bid for the Assets (each such bid, a "Backup Bid");<br><br>b. state that the bid represents a binding, good-faith, and bona fide offer to purchase the Assets and is not subject to or conditioned on any further due diligence, and is irrevocable (i) until the selection of the Successful Bid in accordance with these Bidding Procedures; or (ii) if the bid is selected as a Successful Bid or as a Backup Bid, until the Backup Bid Expiration Date;<br><br>c. state and acknowledge that the Prospective Bidder shall not be entitled to any bidding protection or payment in connection with the submission of a bid for the Assets or otherwise participating in the Sale Process;<br><br>d. for any bidder other than the Stalking Horse Bidder, state that the Prospective Bidder is committed to closing the sale transaction contemplated in its bid as soon as practicable (and in no event later than January 12, 2027);<br><br>e. expressly waive any claim or right to assert any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code in connection with bidding for any of the Assets and/or otherwise participating in the Auction or the Sale Process;<br><br>f. not contain any financing contingencies of any kind;<br><br>g. state whether the Prospective Bidder intends to offer future employment to any of the Debtor's employees and, if so, to whom;<br><br>h. certify that the Prospective Bidder did not collude with any other bidders and is not otherwise a partnership, joint venture, or other entity in which more than one bidder (or any affiliates of a bidder) has a direct or indirect interest, unless consented to in writing by the Debtor;<br><br>i. include a covenant to comply with the terms of these Bidding Procedures and the Bidding Procedures Order; and<br><br>j. contain such other information as may be reasonably requested by the Debtor.<br><br>By submission of its bid, each Qualified Bidder shall be deemed to acknowledge and represent that it (a) has reviewed, understands, and accepts these Bidding Procedures, (b) has consented to the jurisdiction of the Court, (c) intends to consummate its Qualified Bid if it is selected as the Successful Bidder, and (d) waives any and all rights (whether actual or potential) to contest any of the Debtor's determinations made during, or in connection with, any aspect of the Bidding Process. |

| | |
|---|---|
| **Provisions Providing Bid Protections to Stalking Horse Bidder**<br><br>Local Rule 6004-1(c)(i)(C) | The procedures set forth in Section IV of the Bidding Procedures (the "Stalking Horse Designation Procedures") shall apply to the designation of any Stalking Horse Bidder, Stalking Horse Agreement and Bid Protections.<br><br>Subject to the provisions set forth herein, the Bidding Procedures Order, and in consultation with the Consultation Parties, the Debtor may designate a Stalking Horse Bidder that submits a Qualified Bid acceptable to the Debtor and enter into a Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, **no later than December 1, 2026**, which deadline may be extended by the Debtor (after consultation with the Consultation Parties).<br><br>The Debtor, in consultation with the Consultation Parties, may seek approval of one or more bid protections, including, break-up fees and/or reimbursement of expenses, if any, for documented, actual, and necessary expenses incurred by any Stalking Horse Bidder (collectively, the "Bid Protections").<br><br>If the Debtor selects a Stalking Horse Bidder, then the Debtor shall file with the Court and serve a notice (the "Stalking Horse Notice") regarding such selection and provide no less than three (3) business days' notice of the deadline to object to the Debtor's acceptance of the Stalking Horse Bid to (a) the U.S. Trustee, (ii) the Consultation Parties, and (iii) any party that has filed the appropriate notice pursuant to Bankruptcy Rule 2002 requesting notice of all pleadings filed in the chapter 11 case (the "Stalking Horse Notice Parties") with no further or other notice regarding the Stalking Horse Bidder, the Stalking Horse Bid, or the Bid Protections being required. Any Stalking Horse Notice shall (a) set forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (b) set forth the amount of the Stalking Horse Bid and any Bid Protections; (c) state whether the Stalking Horse Bidder has any connection to the Debtor other than those that arise from the Stalking Horse Bid; (d) confirm the proposed Bid Protections are consistent with the Bidding Procedures Order; (e) attach the purchase agreement finalized with the Stalking Horse Bidder or otherwise summarize the material terms thereof; and (f) set forth the deadline to object to the Stalking Horse Bidder designation. All parties in interest shall have the right to object to the Debtor's entry into a Stalking Horse Agreement on any grounds, including objections to the Bid Protections and the form of proposed order (a "Stalking Horse Order").<br><br>Objections to the designation of a Stalking Horse Bidder or any of the terms of a Stalking Horse Bid (a "Stalking Horse Objection") shall (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof and (d) be filed with the Court and served on the Objection Notice Parties within three (3) business days after the service of the Stalking Horse Notice.<br><br>If a timely Stalking Horse Objection is filed, the Debtor will schedule a hearing regarding such Stalking Horse Objection as soon as reasonably practicable seeking approval of such Stalking Horse Bid and in accordance with this Order and the Bidding Procedures. If no timely Stalking Horse Objection is filed and served with respect to the Stalking Horse Bid, upon the expiration of the objection deadline, the Debtor will submit a proposed Stalking Horse Order to the Court approving the Debtor's entry into the Stalking Horse Bid (including the Stalking Horse Agreement and the Bid Protections), which the Court may enter without a hearing and any further or other notice except as required herein or under the Bidding Procedures, including with respect to any Bid Protections set forth in the Stalking Horse Notice.<br><br>Upon entry of a Stalking Horse Order, any Stalking Horse Agreement executed by the Debtor and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtor will be deemed to be a Qualified Bidder. |

| | |
|---|---|
| | Other than as provided by order of the Court, no party submitting a Bid shall be entitled to a break-up fee or expense reimbursement except for the Bid Protections for any Stalking Horse Bidder. Any substantial contribution claims by any bidder are deemed waived. |
| **Modification of Bidding Procedures**<br><br>Local Rule 6004-1(c)(i)(D) | Section IX of the Bidding Procedures provides that Debtor reserves the right to, in its reasonable business judgment, after consultation with the Consultation Parties and in a manner consistent with its fiduciary duties and applicable law, (i) modify these Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth herein, adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Prospective Bidders and Qualified Bidders, as applicable; or (ii) otherwise modify these Bidding Procedures to further promote competitive bidding for, and maximizing the of value of, the Assets, in each case, to the extent not materially inconsistent with these Bidding Procedures or the Bidding Procedures Order. |
| **Closing with Alternative Back-up Bidders**<br><br>Local Rule 6004-1(c)(i)(E) | Section VII.C.2 of the Bidding Procedures sets forth the primary requirements with respect to Backup Bids:<br><br>Backup Bids. Immediately prior to the conclusion of the Auction, the Debtor will (a) determine, in a manner consistent with these Bidding Procedures and in consultation with the Consultation Parties, which Qualified Bid, other than any Credit Bid, is the Backup Bid; and (b) notify all Qualified Bidders at the Auction of the identity of the Backup Bidder and the amount of the purchase price and other material terms of the Backup Bid.<br><br>Except as may otherwise be provided in any Stalking Horse Agreement, a Backup Bid will remain binding on the applicable Backup Bidder until the earlier of (a) the first business day after the closing of the sale transaction with the Successful Bidder for the Assets and (b) thirty (30) days after the Sale Hearing (such date, the "Backup Bid Expiration Date"). If the sale transaction with the Successful Bidder is terminated prior to the Backup Bid Expiration Date, the Backup Bidder shall be deemed the new Successful Bidder for the Assets and shall be obligated to consummate the Backup Bid as if it were the Successful Bid at the Auction. |
| **Provisions Governing the Auction**<br><br>Local Rule 6004-1(c)(ii) | Section VII of the Bidding Procedures sets forth the procedures governing the Auction.<br><br>If the Debtor received more than one Qualified Bid (including a combination of bids that, when considered together, constitute a Qualified Bid) for the Assets, the Debtor will conduct an Auction for the Assets. If the Stalking Horse Bid is the only Qualified Bid received in respect of the Assets, the Debtor will not conduct an Auction for the Assets and will seek approval of such Stalking Horse Bid at the Sale Hearing. If the Debtor determines not to hold an Auction, the Debtor will file with the Court, and cause to be served and published on the Case Website, a notice containing the following information, as applicable: (i) a statement that the Auction for the Assets has been canceled; (ii) the identity of the Successful Bidder; (iii) a copy of the Successful Bid or a summary of the material terms of such bid, including any assumption and assignment of Contracts contemplated thereby, or provide instructions for accessing the Successful Bid free of charge from the Case Website; and (iv) the date, time, and location of the Sale Hearing.<br><br>The Auction, if required, will be conducted either at the offices of Ice Miller LLP, 500 Delaware Avenue, Suite 220, Wilmington, Delaware 19801 or virtually, **on December 18, 2026, at 10:00 a.m. (ET)** or at such other date, time or location as designated by the Debtor, after consulting with the Consultation Parties. If the Debtor conducts the Auction virtually, the Debtor will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail. The Debtor will provide notice (via electronic mail or otherwise) of any change in the date, time or location of the Auction to Qualified Bidders |

| | |
|---|---|
| | and the Consultation Parties, and will cause publication of such change to occur on the Case Website.<br><br>If held, the Auction proceedings will be transcribed and/or video recorded.<br><br>A. <u>Participation and Attendees</u>.<br><br>Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtor in accordance with these Bidding Procedures. Qualified Bidders participating in the Auction must attend the Auction personally or through a duly authorized representative. Subject to the Auction procedures set forth herein, all Qualified Bidders and the Consultation Parties are permitted to attend the Auction; *provided* that the Debtor may, in its sole discretion, establish a reasonable limit on the number of representatives and/or professional advisors that may appear on behalf of a Qualified Bidder or otherwise attend the Auction.<br><br>Each Qualified Bidder participating in the Auction will be required to confirm in writing and on the record at the Auction that (i) it has not engaged in any collusion with respect to the Auction or the submission of any bid for any of the Assets and (ii) its Qualified Bid that gained the Qualified Bidder admission to participate in the Auction and each Qualified Bid submitted by the Qualified Bidder at the Auction is a binding, good-faith, and bona fide offer to purchase the Assets identified in such bids.<br><br>All Prospective Bidders and Qualified Bidders (including any Stalking Horse Bidder, Successful Bidder, and Backup Bidder) shall be deemed to have (i) agreed that all proceedings in the Court related to these Bidding Procedures, the Auction, any other relief requested in the Motion or granted pursuant to the Bidding Procedures Order, or the construction or enforcement of any agreement or any other document directly relating to the sale transaction are core proceedings as described in 28 U.S.C. § 157; (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document directly relating to the sale transaction; and (iii) consented to the entry of a final order or judgment by the Court in connection with any disputes relating to these Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document relating directly to the sale transaction, if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the relevant parties.<br><br>Any party in interest may attend the Auction; provided that any such party request attendance at least two (2) days prior to the start of the Auction by emailing counsel to the Debtor, Ice Miller LLP, 500 Delaware Avenue, Suite 220, Wilmington, Delaware 19801 (Attn: Aaron H. Stulman (aaron.stulman@icemiller.com), Maria Kotsiras (maria.kotsiras@icemiller.com) and Andrew Ehrmann (andrew.ehrmann@icemiller.com).<br><br><u>Auction Proceedings</u>.<br><br>The Auction shall be governed by the following procedures, subject to the Debtor's right to modify such procedures in its reasonable business judgment (in a manner consistent with its fiduciary duties and in consultation with the Consultation Parties):<br><br>1. <u>Baseline Bids</u>. Prior to the commencement of the Auction, the Debtor will determine, in its reasonable business judgment (and in consultation with the Consultation Parties) the highest or otherwise best Qualified Bid submitted for the Assets (such Qualified Bid, a "Baseline Bid"). Bidding at the Auction shall commence at the amount of the Baseline Bid. **No later than December 17, 2026**, the Debtor will provide all Qualified Bidders with (a) a notice identifying |

| | |
|---|---|
| | all the Qualified Bidders and which Qualified Bid is the Baseline Bid; and (b) a copy of the Baseline Bid.<br><br>2. Minimum Overbid. Bidding shall commence at the Baseline Bid. The first overbid at the Auction shall be in an amount not less than the amount of the Baseline Bid (plus the Bid Protections, if any, if a Stalking Horse Bid is the Baseline Bid) plus $250,000 (the "Minimum Overbid"). At each round of bidding, Qualified Bidders may submit successive bids higher than the Leading Bid (as defined below) from the prior round. During the Auction, the Debtor may, in its reasonable discretion, announce increases or reductions to Minimum Overbids at any time.<br><br>Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any bid subsequent to the Baseline Bid, the Debtor will, at each round of bidding, consider and/or give effect to (a) any additional liabilities to be assumed by a Qualified Bidder under the bid, including whether such liabilities are secured or unsecured; and (b) any additional costs that may be imposed on the Debtor. Any subsequent bid made by any Stalking Horse Bidder shall be deemed to have been made in an amount equal to such subsequent bid plus the Bid Protections, if any, to the extent provided for in the Stalking Horse Agreement.<br><br>3. Leading Bid. After the first round of bidding and between each subsequent round of bidding, the Debtor will announce, after consultation with the Consultation Parties, the bid that they believe to be the highest or otherwise best offer for the Assets (such bid, a "Leading Bid") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the material terms of the Leading Bid.<br><br>The Auction will include open bidding in the presence of all other Qualified Bidders. Each Qualified Bidder shall have the right to be present for all rounds of bidding and to submit additional bids and make modifications to its Proposed Asset Purchase Agreement at the Auction to improve its bid. The Debtor may, in its reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.<br><br>The Debtor shall have the right to determine, in its reasonable business judgment after consultation with the Consultation Parties, which bid is the highest or otherwise best bid with respect to the Assets and, after consultation with the Consultation Parties, reject, at any time, without liability (but only in the absence of gross negligence or willful misconduct), any bid that the Debtor deem to be inadequate or insufficient, not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, these Bidding Procedures, any order of the Court, or the best interests of the Debtor.<br><br>4. Modification of Auction Procedures. The Debtor, in consultation with the Consultation Parties, reserves the right, in its reasonable business judgment, to adopt, modify, or waive any of the rules, procedures, or requirements governing the Auction at any time |

**B. Key Dates and Deadlines.**

18. The Debtor proposes the following key dates and deadlines for the sale process, certain of which dates and deadlines may be subject to extension in accordance with the Bidding Procedures:

| Deadline | Event |
|---|---|
| **Three business days after the entry of the Bidding Procedures Order** | Deadline for the Debtor to file and serve Sale Notice and Assumption and Assignment Notice |
| **Five business days after entry of the Bidding Procedures Order** | Deadline for the Debtor to publish Publication Notice |
| **December 1, 2026** | Deadline for Debtor to designate a Stalking Horse Bidder and enter into a Stalking Horse Agreement |
| **December 14, 2026 at 4:00 p.m. (ET)** | Deadline to object to Cure Costs |
| **December 14, 2026 at 4:00 p.m. (ET)** | Sale Objection Deadline |
| **December 15, 2026 at 5:00 p.m. (ET)** | Bid Deadline |
| **December 17, 2026** | Deadline to designate Qualified Bids or to cancel the Auction, as applicable |
| **December 18, 2026 at 10:00 a.m. (ET)** | Auction (if needed) |
| **One business day after the conclusion of the Auction** | Deadline for Debtor to file and serve Notice of Auction Results |
| **December 22, 2026 at 4:00 p.m. (ET)** | Supplemental Sale Objection Deadline and Adequate Assurance Objection Deadline |
| **December 28, 2026 at 12:00 p.m. (ET)** | Debtor's Deadline to Reply to any Sale Objections or Supplemental Sale Objections |
| **Proposed Date Subject to the Court's availability*: December 29, 2026 at a Time to Be Determined (ET)** | [Proposed] Sale Hearing |
| **January 12, 2027** | Deadline to Consummate Sale |

**B. Sale Noticing and Objection Procedures**

19. The Bidding Procedures provide the following "Noticing Procedures":

a. **Stalking Horse Order**. As soon as practicable after the Debtor files the Stalking Horse Notice with the Court, the Debtor will cause a copy thereof to be served on the Stalking Horse Notice Parties.

b. **Sale Notice.** Within three (3) business day after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtor shall file and serve on the Sale Notice Parties and cause to be published on the Case Website the Sale Notice.

c. **Publication**. As soon as practicable but no later than five (5) business days after the entry of the Bidding Procedures Order, the Debtor will cause the information contained in the Sale Notice to be published once in the national edition of the *USA Today* or *The New York Times* (the "Publication Notice").

d. **Sale Objection**. Except objections to the conduct of the Auction, all objections to a sale of the Assets, including any objection to a sale of the Assets free and clear of all liens, claims, interests and encumbrances pursuant to section 363(f) of the Bankruptcy Code, must be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; and (ii) filed with the Court by **no later than December 14, 2026 at 4:00 p.m. (ET)** and served on the Objection Notice Parties.

e. **Notice of Determination of Qualified Bids**. The Debtor, in consultation with the Consultation Parties, will make a determination regarding which bids qualify as Qualified Bids and will notify Potential Bidders whether they have been selected as Qualified Bidders by **no later than December 17, 2026**.

   i. **No later than December 17, 2026**, the Debtor will provide all Qualified Bidders copies of the Qualified Bid that the Debtor, after consultation with the Consultation Parties, determines is the highest or otherwise best offer for the Assets (the "Baseline Bid").

f. **Auction Results.** Within one business day after the conclusion of the Auction, the Debtor shall file with the Court and cause to be served and published on the Case Website, a notice setting forth the results of the Auction (the "Notice of Auction Results"). The Notice of Auction Results will (i) identify each Successful Bidder and each Backup Bidder; (ii) either include a copy of each Successful Bid and each Backup Bid or a summary of the material terms of such bid, or provide instructions for accessing each Successful Bid and each Backup Bid free of charge from the Case Website;

and (iii) set forth the date, time, and location of the Sale Hearing and any other relevant dates or other information necessary to reasonably apprise the Objection Notice Parties of the outcome of the Auction.

g. **Supplemental Sale Objections.** Following service of the Notice of Auction Results, parties in interest may file an objection solely with respect to the conduct of the Auction (each a "Supplemental Sale Objection"). Any Supplemental Sale Objection shall be (i) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (ii) filed with the Court by **no later than December 22, 2026 at 4:00 p.m. (ET)** (the "Supplemental Sale Objection Deadline"); and (iii) served on the Objection Notice Parties.

20. The Debtor believes that the Noticing Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, the dates and deadlines identified above. Accordingly, the Debtor requests that the Court find that the Noticing Procedures are adequate and appropriate under the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

**D. Assumption and Assignment Procedures**

21. In connection with the Sale, the Debtor likely will seek to assume and assign to the Successful Bidder one or more Contracts. The Assumption and Assignment Procedures are designed to, among other things, govern the Debtor's provision of Adequate Assurance Information and notice of Cure Costs to applicable Counterparties.

22. Accordingly, the Debtor hereby seeks approval of the proposed Assumption and Assignment Procedures set forth below, which are designed to, among other things, (i) outline the process by which the Debtor will serve notice to all Counterparties regarding the proposed assumption and assignment, related Cure Costs, if any, and information regarding the Successful Bidder's adequate assurance of future performance, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to assumption and assignment of

executory contacts and unexpired leases. Specifically, the Assumption and Assignment Procedures are as follows:

a. **Potential Assumption and Assignment Notice**. Within three (3) business days after the entry of the Bidding Procedures Order, the Debtor will file with the Court and serve on each Counterparty to a Contract that may be assumed in connection with any Sale an Assumption and Assignment Notice, which will (i) identify the applicable Contracts; (ii) list the Debtor's good-faith calculation of Cure Costs with respect to each such Contract; (iii) expressly state that assumption or assignment of a Contract is not guaranteed and is subject to Court approval; and (iv) prominently display the deadlines to file Cure Objections and Adequate Assurance Objections (each as defined below). The Assumption and Assignment Notice shall also be served on each Counterparty listed therein via first class mail.

b. **Assumption and Assignment Objections**.

i. Cure Objection Deadline. Any objection to the proposed Cure Costs (each a "Cure Objection") shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court by **no later than December 14, 2026, at 4:00 p.m. (ET)**; and (c) served on the Objection Notice Parties.

ii. Resolution of Cure Objections. The Debtor, any Stalking Horse Bidder, or the Successful Bidder, as applicable, and the objecting Counterparty shall first confer in good faith to attempt to resolve the Cure Objection without Court intervention. If a Cure Objection is resolved in a manner that is not in the best interests of the Debtor and its estate, whether or not such resolution occurs prior to or after the closing of the sale of the Assets, the Debtor, any Stalking Horse Bidder, or the Successful Bidder, as applicable, may determine that any Contract subject to such resolved Cure Objection no longer will be assumed and assigned in connection with the sale of the Assets (subject to the terms of the applicable purchase agreement).

iii. Adjournment. If a timely Cure Objection cannot otherwise be resolved by the parties, the Cure Objection may be heard at the Sale Hearing or, with the agreement of the Debtor, any Stalking Horse Bidder, or the Successful Bidder, as applicable, be adjourned to a subsequent hearing, with notice to the party having filed the Cure Objection (each an "Adjourned Cure Objection"). An Adjourned Cure Objection may be resolved after the closing of the Sale of the Assets. Upon resolution of an Adjourned Cure Objection and the payment of the applicable cure amount, if any, the Contract that was the subject of such Adjourned Cure Objection shall be deemed

assumed and assigned to the Successful Bidder as of the closing date of the Sale of the Assets.

iv. Failure to Timely Object. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Cure Objection, the Counterparty forever shall be barred from asserting any objection with regard to the cost to cure any defaults under the applicable Contract. The Cure Costs set forth in the applicable Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract and satisfy the requirements of section 365(b) of the Bankruptcy Code, and the Counterparty to the Contract shall be bound by and deemed to have consented to the Cure Costs.

v. Adequate Assurance Objection Deadline. Any objection to the proposed assumption and assignment of a Contract, the subject of which objection is the provision of adequate assurance of future performance with respect to the Contract (each such objection, an "Adequate Assurance Objection"), shall be (a) in writing and state, with specificity, the legal and factual bases thereof and include any appropriate documentation in support thereof; (b) filed with the Court by **no later than December 22, 2026 at 4:00 p.m. (ET)**; and (c) served on the Objection Notice Parties.

vi. Resolution of Adequate Assurance Objections. The Debtor, any Stalking Horse Bidder, or the Successful Bidder, as applicable, and a Counterparty that has filed an Adequate Assurance Objection shall first confer in good faith to attempt to resolve the Adequate Assurance Objection without Court intervention. If the parties are unable to consensually resolve the Adequate Assurance Objection prior to the commencement of the Sale Hearing, the Adequate Assurance Objection and all issues of adequate assurance of future performance of the Successful Bidder (or any other relevant assignee) shall be determined by the Court at the Sale Hearing or, at the option of the Debtor, any Stalking Horse Bidder, or the Successful Bidder, as applicable, be adjourned to a subsequent hearing, with notice to the party having filed the Adequate Assurance Objection.

vii. Failure to Timely Object. If a Counterparty fails to file with the Court and serve on the Objection Notice Parties a timely Adequate Assurance Objection, the Counterparty shall be forever barred from asserting any objection to the assumption and/or assignment of a Contract with regard to adequate assurance of future performance. The Successful Bidder shall be deemed to have provided adequate assurance of future performance with respect to a Contract in accordance with Bankruptcy Code sections 365(b)(1)(C),

365(f)(2)(B), and, if applicable, Bankruptcy Code section 365(b)(3), notwithstanding anything to the contrary in the Contract or any other document.

c. **Supplemental Assumption and Assignment Notice**. If (i) the Debtor identifies (a) additional Contracts to be assumed and assigned to a Successful Bidder or a Stalking Horse Bidder (any "Additional Contracts"), or (b) modifications that need to be made to a proposed Cure Cost previously stated in the Assumption and Assignment Notice, or (ii) a Successful Bidder designates any Additional Contracts not previously included on the Assumption and Assignment Notice for assumption in accordance with the time period set forth in the applicable purchase agreement between the Debtor and such Successful Bidder or Stalking Horse Bidder, the Debtor shall promptly file with the Court and serve by first class mail a supplemental Assumption and Assignment Notice, the form of which shall be substantially similar to the form of Assumption and Assignment Notice (each, a "Supplemental Assumption and Assignment Notice"), only on the Counterparties to each added, removed, or otherwise affected Contract. As soon as reasonably practicable after filing a Supplemental Assumption and Assignment Notice, the Debtor shall post a copy of the Supplemental Assumption and Assignment Notice on the Case Website. Any Cure Objection with respect to Cure Costs set forth in a Supplemental Assumption and Assignment Notice or any Adequate Assurance Objection with respect to the provision of adequate assurance of future performance must be filed no less than seven (7) calendar days after service of a Supplemental Assumption and Assignment Notice and must otherwise comply with the requirements herein for Cure Objections.

d. **Notice of Assumed Contracts**. As soon as reasonably practicable after the closing of the Sale, the Debtor will file with the Court, serve on the applicable Counterparties and cause to be published on the Case Website, a notice containing the list of Contracts that the Debtor assumed and assigned pursuant to the asset purchase agreement with the Successful Bidder.

e. **Reservation of Rights**. The inclusion of a Contract or Cure Costs with respect to any Contract on any Assumption and Assignment Notice, shall not constitute or be deemed a determination or admission by the Debtor, any Successful Bidder, or any other party that such Contract is an executory contract or an unexpired lease within the meaning of the Bankruptcy Code, and shall not be a guarantee that such Contract ultimately will be assumed or assigned. The Debtor reserves all rights, claims, and causes of action with respect to each Contract listed on any Assumption and Assignment Notice.

## **RELIEF REQUESTED**

23. By this Motion, pursuant to sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rule 6004-1, the Debtor requests entry of the following:

a. the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting the following relief:

   (i) approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, to be used in connection with one or more Sale of all, substantially all, or portion of the Debtor's Assets;

   (ii) authorizing the Debtor to designate a Stalking Horse Bidder and provide Bid Protections in accordance with the Stalking Horse Designation Procedures;

   (iii) scheduling (A) the Auction of the Assets and (B) the Sale Hearing to consider approval of the proposed Sale;

   (iv) approving the Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**;

   (v) approving the Assumption and Assignment Procedures;

   (vi) approving the Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3**; and

   (vii) granting related relief; and

b. a Sale Order, granting the following relief:

   (i) authorizing the sale of the Assets free and clear of all liens, claims, interests and encumbrances, except certain permitted encumbrances and assumed liabilities as determined by the Debtor and the Successful Bidder, with liens to attach to the proceeds of the Sale;

   (ii) authorizing the assumption and assignment of certain Contracts in connection with an Sale; and

   (iii) granting related relief.

## BASIS FOR RELIEF

### A. The Proposed Bidding Procedures Are Fair, Appropriate and Should Be Approved

24. The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (recognizing that a main goal of any proposed sale of property of a debtor's estate is to maximize value). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing the benefit of sale procedures that "encourage bidding and . . . maximize the value of the debtor's assets").

25. Here, the Bidding Procedures meet this standard because the proposed timeframe is necessary to allow the Debtor to emerge as a going concern, and the Debtor believes that the auction process and time periods set forth in the Bidding Procedures are reasonable and will provide interested parties with sufficient time and information necessary to formulate a bid to purchase all or substantially all of the Assets. The proposed timeline will facilitate a fair and open sale process and will position the Debtor to maximize the value received for the Assets.

26. The facts and circumstances of this chapter 11 case require that the Debtor run an expedited, but robust, sale process. The Debtor faces significant liquidity constraints and lacks

sufficient liquidity to support a protracted sale process. The DIP Facility and the Debtor's consensual use of iHeartMedia's cash collateral will provide liquidity to fund the Debtor's continued operations and this chapter 11 case, subject to and in accordance with the terms and conditions of the DIP Term Sheet, the DIP Motion, and any interim and final orders entered by the Court with respect thereto. However, access to additional funding under the DIP Facility is conditioned upon the Debtor entering into a qualified stalking horse asset purchase agreement, and the DIP Facility also requires compliance with certain sale milestones. Accordingly, speed and certainty are critical to preserving the Debtor's operations and maximizing the value of its assets.

27. The proposed Bidding Procedures provide interested parties with forty-four (44) days] after the Petition Date to continue diligence and submit a qualified bid, and with fifty-eight (58) days from the Petition Date to the proposed Sale Hearing. The timeline set forth in the Bidding Procedures is sufficient to provide these potential purchasers with an adequate amount of time to diligence the assets and submit bids.

28. Additionally, the Bidding Procedures will allow the Debtor to conduct the Auction in a transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale. Specifically, the Bidding Procedures contemplate an open auction process with no barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid. Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtor, its estate and all parties in interest.

29. Courts in this District routinely approve procedures substantially similar to the proposed Bidding Procedures. *See, e.g.*, *In re Simply Interior Homes, LLC*, Case No. 26-10922

(CTG) (Bankr. D. Del. June 25, 2026) (sale hearing scheduled 63 days after the petition date); *In re Charter School Capital, Inc.*, Case No. 25-11016 (CTG) (Bankr. D. Del. July 2, 2025) (sale hearing held 47 days after the petition date); *In re Lucira Health, Inc.*, No. 23-10242 (MFW) (Bankr. D. Del. Mar. 27, 2023) (sale hearing held 57 days after the petition date)*; In re The Rockport Company, LLC*, et al. Case No. 23-10774 (BLS) (Bankr. D. Del. July 25, 2023) (sale hearing held 41 days after the petition date); *In re Performance Powersports Group Holdings, Inc.*, No. 23-10047 (LSS) (Bankr. D. Del. Feb. 27, 2023) (sale hearing held 57 days after the petition date); *In re Enjoy Tech., Inc.*, Case No. 22-10580 (JKS) (Bankr. D. Del. Jul. 26, 2022) (sale hearing held 43 days after the petition date); *In re Gold Standard Baking, LLC*, Case No. 22-10559 (JKS) (Bankr. D. Del. Jul. 8, 2022) (sale hearing held 42 days after the petition date).

**B. The Proposed Bid Protections Have Sound Business Purposes and Should Be Approved**

30. As described above, the Bid Protections, if they prove necessary for the entry into any Stalking Horse Agreement, include break-up fees and reimbursement of reasonable, documented expenses. The Debtor believes that the Bid Protections, if any, may be necessary to encourage prospective bidders to become the Stalking Horse Bidder and enter into a binding Stalking Horse Agreement. The Debtor believes that the presence of a Stalking Horse Bidder will set a floor for the value of the Assets and attract other potential buyers to bid for the Assets, thereby maximizing the realizable value of the Assets for the benefit of the Debtor's estate, its creditors, and all other parties-in-interest.

31. The Debtor submits that approval of the Bid Protections is justified by the facts and circumstances of this case, whether considered under the business judgment rule or as an administrative expense of the estate. Similar procedures for the selection of stalking horse bidders have been approved in this District in many other chapter 11 cases. *See, e.g.*, *In re BFG Supply*

*Co., LLC*, Case No. 26-11284 (CTG) (Bankr. D. Del. Sept. 14, 2026) [Docket No. 165] (approving bidding procedures providing that bid protections are approved pursuant to the stalking horse designation procedures); *In re SC Healthcare Holding, LLC*, Case No. 24-10443 (TMH) (Bankr. D. Del. May 21, 2024) [Docket No. 341] (authorizing debtors to offer bid protections subject to subsequent Court approval on not less than three business days' notice and an opportunity to object); *In re Armstrong Flooring, Inc.*, Case No. 22-10426 (MFW) (Bankr. D. Del. May 31, 2022) [Docket No. 233] (approving bidding procedures authorizing payment of a break-up fee and expense reimbursement to a subsequently designated stalking horse bidder).

32. Approval of the Bid Protections is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. *First*, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537. *Second*, if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

33. In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a. the presence of self-dealing or manipulation in negotiating the break-up fee;

b. whether the fee hampers, rather than encourages, bidding;

c. the reasonableness of the break-up fee relative to the purchase price;

d. whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e. the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f. the correlation of the fee to a maximum value of the debtor's estate;

g. the support of the principal secured creditors and creditors' committees of the break-up fee;

h. the benefits of the safeguards to the debtor's estate; and

i. the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

34. While none of the factors is dispositive, an application of the facts to several of such factors supports the approval of the Bid Protections. In particular, the Bid Protections are necessary to preserve the value of the Debtor's estate because they may enable the Debtor to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than any Stalking Horse Agreement—a clear benefit to the Debtor's estate. Further, a Stalking Horse Bidder may not agree to act as a "stalking horse" without the Bid Protections, given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction. Without the Bid Protections, the Debtor might lose the opportunity to obtain the highest or otherwise best

offer for the Assets and would certainly lose any downside protection that would be afforded by the existence of a Stalking Horse Bidder. The bid of a Stalking Horse Bidder would send a message to all potential bidders that the Assets are worth at least as much as any Stalking Horse Bid. Therefore, without the benefit of the bid of a Stalking Horse Bidder (*i.e.*, a bid providing the floor), the bids received at auction for the Assets could be substantially lower than any bid offered by a Stalking Horse Bidder.

35. "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable." *In re Integrated Res., Inc.*, 147 B.R. at 659. The Debtor does not believe that the Bid Protections will stifle bidding. To the contrary, the Debtor believes that such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Id.* at 662.

36. Here, the bid of a Stalking Horse Bidder would serve all three functions. *First*, a Stalking Horse Bidder might not enter into a Stalking Horse Agreement without the Bid Protections. *Second*, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of any Stalking Horse Bidder. *Third*, the bid of the Stalking Horse Bidder could attract additional bidders because, among other things, additional bidders would be able to save considerable time and expense because they could use many of the documents that a Stalking Horse Bidder may negotiate, including, among other things, any Stalking Horse Agreement and the schedules thereto, in making their bid. In sum, if all, substantially all, or portion of the Assets are sold to a Successful Bidder other than a Stalking Horse Bidder, the Sale likely will be the result of the Stalking Horse Bidder's

crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

37. In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser. 'When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible.'" *Id.* (citation omitted).

38. Here, the Bidding Procedures would authorize the Debtor to file a Stalking Horse Notice, provide an opportunity for parties to object, and, if any objections are not resolved, allow a hearing on an expedited basis to approve Bid Protections in an amount to be set forth in such Stalking Horse Notice.

### C. Approval of a Sale of the Assets Is Warranted Under Section 363 of the Bankruptcy Code.

39. Ample authority exists for approval of the Sale contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983).

40. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was provided to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656.

**1. The Debtor Has Demonstrated a Sound Business Justification for the Sale of the Assets.**

41. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g.*, *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 148 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070-71; *In re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

42. As set forth above, a strong business justification exists for the sale of all, substantially all, or portion of the Assets as described herein. An orderly and expeditious sale of the Assets is critical to maximizing the value of the Debtor's estate and recoveries for the Debtor's economic stakeholders. Absent a sale, the Debtor lacks liquidity to reorganize and will be forced to shut down and liquidate.

**2. Noticing Procedures Are Reasonable and Appropriate.**

43. Bankruptcy Rules 2002 and 6004 require the Debtor to notify creditors of the proposed sale, provide a description of the Assets and disclose the time and place of the Auction, the terms and conditions of any proposed Sale, and the Objection Deadlines. *See* Fed. R. Bankr. P. 2002(a), 2002(c), 6004(a). The Noticing Procedures described herein are reasonably calculated to provide all of the Debtor's known creditors and all other parties-in-interest with adequate and timely notice of, among other things, the proposed Sale, the Bidding Procedures, the Stalking Horse Designation Procedures, the Auction, and the Sale Hearing. Further, publishing notice is designed to capture any creditors and parties in interest not currently known to the Debtor. Accordingly, the Debtor requests that the Court approve the Noticing Procedures described herein and in the Bidding Procedures Order.

**3. The Proposed Sale Will Yield a Fair and Reasonable Purchase Price for the Assets.**

44. As set forth above, the Debtor believes that any Sale governed by the Bidding Procedures will yield a fair and reasonable price for the Assets in the circumstances. The Bidding Procedures were designed to facilitate a competitive bidding process.

45. The Debtor also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire sale process. The Bidding Procedures provide an appropriate framework for the Debtor to review, analyze and compare bids for the Assets and to engage with bidders on an arm's-length basis to work to improve the quality of their bids for the benefit of all parties in interest.

46. A Sale governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the

highest or otherwise best value for the Assets. This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties-in-interest in this chapter 11 case.

**4. The Bidding Procedures Ensure that the Sale Process Is Conducted in Good Faith and that the Ultimate Purchaser of the Applicable Assets Is Entitled to the Protections Afforded by Section 363(m) of the Bankruptcy Code.**

47. Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser. Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) of the Bankruptcy Code fosters the "policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely." *In re Abbotts Dairies*, 788 F.2d at 147; *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

48. While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

49. In other words, a party would have to show fraud or collusion between the buyer and the debtor in possession, the trustee or other bidders to demonstrate a lack of good faith. *See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders") (quoting *In re Rock Indus. Mach Corp.*, 572 F. 2d 1195, 1998 (7th Cir. 1978)). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

50. The Debtor submits that any Successful Bidder will be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code. As set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. In addition, Hilco is an independent investment bank retained by the Debtor for the purpose of exploring strategic alternatives, marketing the Debtor's business, soliciting bids, and negotiating the terms of a potential Sale. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of the Assets. Any purchase agreement with a Successful Bidder executed by the Debtor will be negotiated at arm's-length and in good faith by sophisticated parties represented by competent counsel under the oversight of the Independent Manager Accordingly, the Debtor seeks a finding that any Successful Bidder is a good faith purchaser and is entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

51. Based on the foregoing, the Debtor submits that it has demonstrated that the proposed Sale is a sound exercise of its business judgment and should be approved as a good faith transaction.

**D. A Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code.**

52. A free and clear sale is a pre-requisite to ensuring that the Debtor is able to attract the best or otherwise highest offers and achieve a value-maximizing transaction in this chapter 11 case for the benefit of the Debtor and its stakeholders.

53. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

a. applicable non-bankruptcy law permits sale of such property free and clear of such interest;

b. such entity consents;

c. such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d. such interest is in *bona fide* dispute; or

e. such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

54. The Debtor anticipates that any Sale they elect to pursue will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the applicable Assets.

55. Accordingly, the Debtor requests that the Court authorize the sale of the Assets free and clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

**E. The Debtor's Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code.**

56. Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease. *See, e.g., In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim or caprice). In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

57. Any proposed Sale will provide a Successful Bidder with the opportunity to designate certain Contracts for assumption and assignment. Assumption of any Contracts is an exercise of the Debtor's sound business judgment because the transfer of Contracts in connection with a Sale is an essential element in the Debtor's ability to maximize the value of the Assets—and particularly so when a Contract is integral to the ownership or operation of the Assets to be acquired. Further, the ability to assume and assign Contracts will increase the likelihood that the

Debtor will be able to sell the Assets as a going concern, thereby avoiding needless value-destruction through a liquidation.

58. The consummation of any Sale involving the assignment of a Contract will be contingent upon the Debtor's compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) requires that the Debtor either cure, or provide adequate assurance that they will promptly cure, any outstanding defaults under the Contracts to be assumed. *See* 11 U.S.C. § 365(b)(1). The Debtor's assumption and assignment of any Contracts will be dependent upon payment of Cure Costs and effective only upon the closing of a Sale. As described with specificity herein, subject to the Court's approval, the Debtor will file with the Court and serve on each Counterparty an Assumption and Assignment Notice setting forth the Debtor's good-faith calculation of the Cure Costs for each Contract that could be assumed in connection with a Sale. Counterparties will have an opportunity to raise any Cure Objections in advance of the Sale Hearing.

59. Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance . . . whether or not there has been a default in such contract." 11 U.S.C. § 365(f)(2). While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language . . . from Section 2-609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined

by commercial rather than legal standards . . . [and] factual considerations"). While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance." *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

60. Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that industrial expertise, past success in running a similar business and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

61. The Bidding Procedures expressly specify that for a bid to qualify as a "Qualified Bid," a Prospective Bidder must include with its bid Adequate Assurance Information regarding the Prospective Bidder's (or any other relevant assignee's) ability to perform the applicable obligations under any Contracts that may be included in the bid. The Debtor will furnish all available Adequate Assurance Information to the relevant Counterparties as soon as reasonably possible following its receipt of such information, upon such Counterparty's request. Finally, any Counterparty that is dissatisfied with the content or quality of any relevant Adequate Assurance Information will have an opportunity to request additional information from the Debtor and, if necessary, file an Adequate Assurance Objection in advance of the Sale Hearing. In light of the foregoing, the Debtor's assumption and assignment of any Contracts in accordance with the Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

62. Finally, to facilitate the assumption and assignment of Contracts in furtherance of maximizing the value of the Assets, the Debtor also requests that the Court find that any anti-assignment provision included in any Contract, whether such provision expressly prohibits, or has the effect of restricting or limiting assignment of a Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.

**F. Requests for Immediate Relief and Waiver of Stay.**

63. Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtor seeks a waiver of any stay of the effectiveness of the Bidding Procedures Order, any Sale Order, any order authorizing the assumption or assumption and assignment of a Contract in connection with a Sale, and any other order entered by this Court in connection with the Sale. Bankruptcy Rule 6004(h) provides that "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stay for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) provides that "[u]nless the court orders otherwise, an order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6006(d).

64. The relief requested herein is necessary and appropriate to maximize the value of the Assets for the benefit of the Debtor's economic stakeholders. Given the Debtor's precarious financial condition and limited cash runway, the relief requested herein should be granted and effective as soon as practicable. Any delay in the sale process could jeopardize the Debtor's chapter 11 strategy and the ability of the Debtor to consummate a value-maximizing transaction. Accordingly, the Debtor submits that ample cause exists to justify waiving the fourteen-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

## NOTICE

65. Notice of this Motion will be provided to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the twenty (20) largest unsecured claims against the Debtor; (c) the Internal Revenue Service; (d) the United States Attorney's Office for the District of Delaware; (e) the state attorneys general for all states in which the Debtor conducts business; (f) the DIP Lender; (g) iHeartMedia (h) the Debtor's banks; (i) the Taxing Authorities; (j) any other party that has asserted a lien on or security interest in the Debtor's Assets and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtor respectfully submits that, in light of the nature of the relief requested, no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtor respectfully request that the Court (i) enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**; (ii) and, after the Sale Hearing, the Sale Order, respectively, granting the relief requested in the Motion; and (iii) grant such other and further relief to the Debtor as the Court may deem proper.

Dated: November 3, 2026
Wilmington, Delaware

Respectfully submitted,

*/s/ Maria Kotsiras*

Christopher M. Samis (No. 4909)
Aaron H. Stulman (No. 5807)
Maria Kotsiras (No. 6840)
Andrew C. Ehrmann (No. 7395)
**ICE MILLER LLP**
500 Delaware Avenue, Suite 220
Wilmington, Delaware 19801
Telephone: (302) 313-0600
Email: christopher.samis@icemiller.com
aaron.stulman@icemiller.com
maria.kotsiras@icemiller.com
andrew.ehrmann@icemiller.com

*Proposed Counsel for the Debtor and Debtor in Possession*